## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **AMY CARMEN**, | Case No. 1:25-cv-1671 |
|    10645 N Tatum Blvd | |
|    Suite 200-644 | **COMPLAINT** |
|    Phoenix, AZ 85028 | |
| | |
|            Plaintiff, | **JURY DEMAND** |
| | **ENDORSED HEREON** |
|    v. | |
| | |
| **PENSKE MEDIA CORPORATION**, | |
|    475 Fifth Avenue | |
|    New York, NY 10017 | |
| | |
| **ANDY GREENE,** | |
|    60 Pineapple Street | |
|    Apt. 2D | |
|    Brooklyn, NY 11201 | |
| | |
| **FRED N. CARMEN**, | |
|    776 Village Trail | |
|    Gates Mills, OH 44040 | |
| | |
| **CLAYTON E. CARMEN**, | |
|    1347 N Stanley Avenue | |
|    Apt. 1 | |
|    Los Angeles, CA 90046 | |
| | |
| and **KATHRYN L. CARMEN**, | |
|    1220 Huron Road | |
|    Apt. 1103 | |
|    Cleveland, OH 44115, | |
| | |
|            Defendants. | |

Plaintiff, AMY CARMEN ("Amy"), by and through undersigned counsel, bring this action

against Defendants PENSKE MEDIA CORPORATION ("Penske"), ANDY GREENE

1

("Greene"), FRED N. CARMEN ("Fred"), CLAYTON E. CARMEN ("Clayton"), and KATHRYN L. CARMEN ("Kathryn") (collectively, "Defendants"), and alleges as follows:

## <u>NATURE OF THE ACTION</u>

1.      Beloved pop star Eric Carmen ("Eric") was widely loved for his musical genius, but behind the music lurked a family tragedy of Shakespearian proportions.

2.      This is an action for defamation and false light arising out of a wildly false article entitled "*Eric Carmen Was a Power-Pop Legend. Then He Vanished*," written by Greene following communications with Fred (Eric's brother), Clayton (Eric's son), and Kathryn (Eric's daughter), and published by Penske in *Rolling Stone* magazine on January 19, 2025 (the "Article") (attached hereto as **Exhibit A**).

3.      Defendants shamelessly used *Rolling Stone's* massive national and international platform (owned by Penske) to ravage the reputations of Eric and his beloved widow, Amy, through distortions, innuendo, and outright fabrications, knowing that Eric, having passed away months before, would be tragically unable to defend himself or Amy in either a court of law or the court of public opinion.

4.      Even worse, Defendants used the Article to create a fantasy world woven from whole cloth, a magical realm of good versus evil in which heroic, albeit fictional, versions of Fred, Clayton, and Kathryn were Eric and Amy's helpless victims. In reality, the reverse was true—at every turn, Fred greedily mismanaged Eric's money, while monstrous children Clayton and Kathryn, abetted by their maternal handler, Susan Wirtenberg (known as Susan Carmen while she and Eric were married between 1993 and their long-litigated divorce in 2011) ("Susan"), remorselessly and relentlessly terrorized Eric and Amy with a demonic fervor and purpose.

5.      Indeed, Eric was not the only target of Defendants' cowardly attacks; the hit-piece Article was also calculated to inflict maximum harm upon Amy, who is very much alive and

2

unwilling to be a sitting duck for Defendants' falsehoods. Exacerbating the outrageous conduct at issue, Fred, Clayton, and Kathryn, acting with an extraordinary level of malice fueled by an all-consuming animus toward Eric that has been erupting from their volcano of hatred for years, brazenly disregarded binding settlement agreements that contained non-disparagement provisions so that they could speak to *Rolling Stone* about Eric and Amy just to malign them even more.

6.      Penske and Greene were more than happy to oblige the pathological and compulsive urges of Eric's family members to malign him, because this played right into their far-left editorial agenda; Eric and Amy's early and open support of President Donald J. Trump provided ample reason for the unabashedly leftist *Rolling Stone* to run a hit piece attacking Eric and his widow. Like all artists (and their families) who refused to toe the far-left party line in the entertainment world, Eric and Amy became expendable *persona non grata* to *Rolling Stone*, perfect targets to be dragged through the mud, musical genius notwithstanding.

7.      Thus, the Article was a Frankenstein's monster born of a warped alliance between embittered family members with axes to grind and an unscrupulous publisher clinging to every poisonous word in a calculated effort to manufacture controversy. This effort was fueled by inflammatory political criticism paired with many years of unresolved conflict between Eric and his long-estranged family, who became *Rolling Stone's* eager collaborators.

8.      Accordingly, Amy brings this action to hold all the Defendants accountable for publishing a shocking deceit to an audience of over 100,000,000 people, which has irreparably harmed her both personally and professionally, and for dishonorably trampling on the memory of an honorable man who can no longer defend himself.

## THE PARTIES

9.      Plaintiff, Amy, is an individual person and a citizen of Arizona, and Eric's widow, having been married to him from 2016 until his death in March 2024.

10.     Defendant, Penske, is a Delaware corporation with its principal place of business in New York and additional offices in California, which owns and operates *Rolling Stone* magazine. Defendant Penske publishes both print and digital content throughout the United States, including in Ohio, where Penske purposefully targets consumers.

11.     Penske's prized *Rolling Stone* is a world-famous American magazine that focuses on music, politics, and popular culture, founded in 1967; in 2017, Penske acquired 51% of the magazine; in 2019, Penske acquired the remaining 49% to gain full ownership of the magazine.

12.     *Rolling Stone* was always a left-leaning publication inclined toward a hypocritical and sanctimonious worldview. *See* John Nolte, *Left-Wing Rolling Stone Founder Jann Wenner Booted From Rock Hall of Fame for Racist Comments*, BREITBART (Sept. 17, 2023), https://www.breitbart.com/entertainment/2023/09/17/nolte-left-wing-rolling-stone-founder-jann-wenner-booted-rock-hall-fame-racist-comments/ (last visited Aug. 10, 2025).  However, in recent years, the magazine has become a far-left fever swamp with a well-documented bias against conservatives, and *rabid* bias against President Trump and his supporters—in other words, a bias against the *majority* of Americans, who resoundingly returned President Trump to the White House on November 5, 2024 with 312 electoral votes and a popular vote margin exceeding 2,200,000. *See, e.g.*, Ad Fontes Media (*Rolling Stone* rated as having a "Strong Left" bias with only "mixed" reliability), https://adfontesmedia.com/rolling-stone-bias-and-reliability/ (last visited Aug. 10, 2025); AllSides (*Rolling Stone* rated as having a "Left" bias rating, https://www.allsides.com/news-source/rolling-stone (last visited Aug. 10, 2025); Media Bias/Fact

Check (*Rolling Stone* rated as having "Left Bias"), https://mediabiasfactcheck.com/rolling-stone/ (last visited Aug. 10, 2025).

13.     Defendant, Greene, is an individual person, a citizen of New York, and is employed by Penske as a writer for *Rolling Stone*.

14.     Defendant, Fred, is an individual person and a citizen of Ohio, and is Eric's brother, Amy's brother-in-law, and Clayton and Kathryn's uncle.

15.     Defendant, Clayton, is an individual person and a citizen of California, and is Eric's son, Amy's stepson, Fred's nephew, and Kathryn's brother.

16.     Defendant, Kathryn, is an individual person and a citizen of Ohio, and is Eric's daughter, Amy's stepdaughter, Fred's niece, and Clayton's sister.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §1332, as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

18.     Defendants Penske and Greene are subject to personal jurisdiction in the Northern District of Ohio, because Greene, at the behest of his superiors at *Rolling Stone*, interviewed Fred, Clayton, Kathryn, and Susan within this District in order to prepare the Article (the "Interview").

19.     Defendants Fred and Kathryn are subject to personal jurisdiction in the Northern District of Ohio because they reside in this District.

20.     Defendant Clayton is subject to personal jurisdiction in the Northern District of Ohio because he participated in the Interview, and otherwise has sufficient contacts with this forum.

21.     Venue is proper in this district under 28 U.S.C. §1391(b)(2) and (b)(3) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District by virtue of the Interview being conducted in this District, and by virtue of Fred, Kathryn, and Susan providing substantial communications to Greene and other employees of *Rolling Stone* emanating from this District.

22.     Jurisdiction and venue are also proper in view of the fact that Kathryn and Clayton have a pending suit against Amy in this District regarding the Carmen Family Gift Trust (the "Trust"), captioned *Kathryn Carmen and Clayton Carmen v. Amy Carmen*, United States District Court for the Northern District of Ohio, Eastern Division (Case No. 1:24-cv-01331, Hon. David A. Ruiz, U.S.D.J.).

## **FACTUAL ALLEGATIONS**

### ***Eric's Remarkable Music Career***

23.     Eric was a one-of-a-kind American, Ohioan, and Clevelander. Born in Cleveland to a family of Russian Jewish immigrants, Eric Howard Carmen quickly revealed himself to be a child musical prodigy; his parents enrolled him in the Dalcroze Eurhythmics program at the Cleveland Institute of Music at age three, and at six years old, he took violin lessons from his aunt Muriel Carmen, who was the first female violist during her 43 years performing in the Cleveland Orchestra.

24.     Eric first achieved fame as the lead vocalist of the beloved power-pop band *The Raspberries*, which originated in Cleveland, and with whom he recorded the hit "Go All the Way" in 1972 and four albums from 1970 to 1975.

25.     "Go All the Way" climbed to #5 on the *Billboard* Hot 100, #4 on the *Cash Box* Top 100, and #3 on *Record World*, selling more than 1,300,000 copies and earning the band a Recording Industry Association of America ("RIAA") certified gold record.

26.     In 1975, he embarked on what would quickly become an iconic solo career. Eric achieved global success with such world-famous hits as "All by Myself" (1975), "Never Gonna Fall in Love Again" (1976), "She Did It" (1977), "Hungry Eyes" (1987), and "Make Me Lose Control" (1988).

27.     "All by Myself" reached #2 on the *Billboard Hot 100* and sold over 1,000,000 copies in the United States, and was certified gold by the RIAA in 1976. The song was particularly noteworthy for Eric's creativity; he brilliantly borrowed a few bars of the melody from the second movement of Sergei Rachmaninoff's Piano Concerto No 2 in C minor for its verse, and added a classical-esque piano interlude. In 1996, the world was reminded of Eric's genius when Celine Dion covered it, sending the song once again soaring up the charts around the world. "All by Myself" became one of Dion's biggest hits in the United States, reaching #1 on the *Hot Adult Contemporary Tracks* and the *Latin Pop Airplay*, peaking at #4 on the *Billboard Hot 100*, and becoming a top 10 hit in France, the United Kingdom, Belgium, and Ireland, and #1 in Canada.

28.     "Make Me Lose Control" climbed to #3 on the *Billboard Hot 100*; and, demonstrating Eric's remarkable staying power even in death, the song was featured on the official soundtrack of the 2024 *Marvel Cinematic Universe* smash-hit film *Deadpool & Wolverine*.

29.     Even as great as Eric's other songs were, hit pop song "Hungry Eyes," featured in the famed Patrick Swayze film *Dirty Dancing* (1987), became Eric's most memorable single, peaking at #4 on the *Billboard Hot 100* and #3 on the *Cash Box Top 100*, and penetrating the American *zeitgeist* like few other songs to this day.

30.     After Eric's death, Amy, who has worked tirelessly to protect Eric's legacy, posted a tribute to his official website and social media, writing: "It is with tremendous sadness that we share the heartbreaking news of the passing of Eric Carmen. Our sweet, loving and talented Eric passed away in his sleep, over the weekend. It brought him great joy to know, that for decades, his music touched so many and will be his lasting legacy. Please respect the family's privacy as we mourn our enormous loss."

31.     Today, Eric's legacy lives on through his own music, through the music of other artists with whom he collaborated, and through the millions of lives that he touched. This is evident in the numerous online fan groups dedicated to Eric.

### *Separating Defendants' Fantasy from Brutal Reality: The Tragedy of Eric's Family Life*

32.     The lasting tragedy of Eric's life was this: he was at once blessed and cursed; blessed with the gift of uncanny musical genius but cursed with burden of exploitative family members who used Eric as their cash register. For as much happiness as Eric gave to strangers around the world, those closest to him supplied mostly misery. Only late in life, when he met Amy, whom he described as his "soulmate," did Eric find the personal fulfillment that he so richly deserved.     Eric     Carmen,     (@RealEricCarmen)     TWITTER     (Oct.     20,     2016) https://web.archive.org/web/20200813024010/https://twitter.com/RealEricCarmen/status/789295 306575720450 (last visited Aug. 10, 2025) ("Meet Mrs. Eric Carmen. Last week I married my beautiful soulmate and best friend. Love at last!").

33.     But, even as Amy finally filled the void in Eric's life with light, he was forced to contend with ceaseless darkness and pain caused by his greedy family.

34.     Indeed, it would be fair to say that "Hungry Eyes" was not just one of Eric's most famous songs—sadly, "Hungry Eyes" also serves as an apt description of the hunger in Fred,

Clayton, and Kathryn's eyes every time they looked at Eric—an insatiable hunger for Eric's money.

35.     On July 11, 2007, on the advice of Fred—his brother, confidant, and attorney—Eric created the Trust, for which Eric was the sole beneficiary during his lifetime. The Trust was governed by a "Trust Agreement for the Carmen Family Gift Trust" (the "Trust Agreement") executed that same day. In the Trust Agreement, at Fred's self-serving behest, Eric designated Fred as the trustee. Under the Trust Agreement, Fred was given wide discretion as trustee to operate the Trust to make investments, apportion income and principal, and hold and transfer real estate, among other powers—supposedly for Eric's benefit.

36.     The main purposes of the Trust were to protect all of Eric's assets that were contributed to the Trust and to provide a stream of income to Eric during his life. In essence, the Trust was intended to pay for all of Eric's expenses and taxes.

37.     And, the assets of the Trust were considerable. Eric typically received between $600,000 to $800,000 per year in well-earned royalty payments. Eric also contributed all of the rights and ownership to his music copyrights and other property to the Trust.

38.     Sadly, Eric's faith in Fred proved misplaced. Over a period of years, Fred paid himself hundreds of thousands of dollars in excessive and questionable "legal fees," while other attorneys hired by Fred were paid hundreds of thousands of dollars to handle Eric's actual legal work, most of which was related to frivolous matrimonial litigation instigated by Susan. Eric only discovered the staggering extent of Fred's misdeeds on August 25, 2015 after Fred produced the Trust's ledgers. Prior to that point, Fred had operated under a cloak of secrecy while he mismanaged the Trust to his benefit and to Eric's detriment, having never provided financial reports.

39.     Fred's "legal fees" and encouragement of prolonged litigation caused Eric significant financial distress. As controller of Eric's finances, Fred took the liberty of seeking an advance on the royalties for Eric's musical work so that he could pay himself extraordinarily high legal fees. Fred's conduct forced Eric to rely on a personal loan just to pay his own bills.

40.     Fred's greed was stupendous, perhaps matched in magnitude only by his callous disrespect for Eric's hard work. His fees were well more than any reasonable measure.

41.     In March 2014, Fred even used Trust monies to loan himself a very considerable amount without Eric's knowledge; on numerous occasions, Fred paid Trust obligations using his own credit cards (thus, obtaining the benefit therefrom), or through other personal means, and would then reimburse himself. On multiple occasions, Fred paid for personal items and luxuries using Trust monies.

42.     After Fred refused Eric's lawful request that he step down, a judge removed him from his role as trustee in late 2015, finally taking the keys to the kingdom away from this traitorous brother. After Fred's removal, successor trustee Sheldon Berns (uncle of Fred and Eric) was followed by successor trustee Jonathan Berns (cousin of Fred and Eric). While they held authority, both Sheldon and Jonathan worked hard to find attorneys for the purpose of uncovering what they believed was malfeasance on Fred's part. In June 2017, Eric appointed Amy as trustee, after which she appointed a financial institution trustee. Eric reformed the Trust on August 11, 2017, appointing Amy as a special trustee. Amy remained in this role until Eric's death. The Trust is presently the subject of the pending litigation referenced in paragraph 22, *supra*.

43.     Fred, Susan, Clayton, and Kathryn were certainly "beneficiaries"—not of the Trust—but of Eric's extraordinary talent and unending generosity. Susan was well-cared for by Eric. Clayton and Kathryn grew up wanting for nothing, had all manner of doors opened for them,

and otherwise benefitted from the various other perks attendant to Eric's international fame. But as the old adage goes, access to fame and fortune often only serves to make a person more of what they already were. Unfortunately, Fred, Susan, Clayton, and Kathryn were already bad apples rotten to their core.

44.     Indeed, as set forth in this Complaint, and contrary to the false statements in the Article, Eric's relationships with his estranged family members were "just business." Despite their repeated statements to the contrary, Fred, Clayton and Kathryn's treatment of Eric confirmed that they viewed him as a "golden ticket" and nothing more. Indeed, each of these three revealed in their own way that they had truly depraved thoughts of hatred about Eric and Amy.

45.     The sad truth is that Eric's brother, ex-wife, and children were, and still are, deeply immoral people whose rottenness had been festering for years leading up to Eric's death. Their collective mistreatment of Eric went far beyond Fred's financial malfeasance.

46.     Even before she and Eric divorced in 2011, Susan had aggressively worked to alienate Clayton and Kathryn from Eric in all ways—except financial. After Susan spent an unsuccessful four years in court attempting to take the rights to Eric's music catalog from her ex-husband in their divorce, she kicked her alienation efforts into overdrive, with great success. As Clayton observed, Eric typically interacted with his children *through Amy.* She was the lingering connection between Eric and his children, not the scheming stepmother that the Article described.

47.     Much to Susan's delight, Clayton and Kathryn routinely displayed a shocking level of disrespect toward Eric regardless of the incredible opportunities that he provided for them, as memorialized in numerous contemporaneous communications.

48.     For example, in an email dated November 18, 2014, Eric wrote to Clayton, copying Susan and Kathryn, *inter alia*: "You, once again, drove home the point that nothing I do for you

makes any difference. Not spending a thousand dollars on dinner and seats for the Cav's Home Opener. Not the quarter of a million dollars on your tuition at Hawken [Hawken Upper School in Gates Mills, Ohio], so that I could give you the best education possible, to give you an 'edge' in the world. Not buying you a $30,000 car to keep you safe, and paying your insurance. Not paying for your car to be repaired. Not handing you $500, the night before you left for your California trip. Nothing. Ever."

49.  On March 19, 2015, Eric wrote to Clayton, copying Susan, *inter alia*: "Over the past four or five years I have forgiven you for cheating in school, twice, charging $900 on my iTunes account so you could pre-order crap like Earl Sweatshirt, stealing $120 out of my wallet, and charging all your gas, Starbucks, and a lot of other things on my credit card every time you 'volunteered' to go pick up the dinners I was paying for."

50.  Indeed, far from being mistreated, Clayton and Kathryn were the recipients of Eric's generosity time and time again.

51.  For example, on or about August 31, 2013, Eric bought a BMW X3 for Clayton's birthday as his first car; however, it did not take Clayton—who routinely abused alcohol and marijuana—long to severely damage the vehicle through multiple accidents and other mishaps, intentional vandalism, and substance abuse in the vehicle. Clayton and Susan also refused to change the vehicle's oil or to maintain current registration. Ultimately, in September 2016, Eric repossessed the BMW from Clayton in badly damaged condition. Eric was shocked to see that the BMW was in complete disrepair, with the vehicle needing to be transported on a flatbed to avoid further engine damage, including the possibility of an explosion. At this time, the BMW was blowing white smoke out of the tailpipe, had a damaged suspension, and had a registration eight

months expired. Eric would be required to spend over \$6,000 to render the vehicle safely operable again.

52.    Meanwhile, Clayton and Kathryn would routinely instigate arguments with Eric which Kathryn would secretly record by standing on a staircase for a full wide shot of each incident, so that Clayton could extort even more money from Eric by threatening to sell the videos to the tabloids or share them with family or Eric's friends in an attempt to torment and embarrass their father.

53.    All that mattered to Susan, Clayton, and Kathryn was extracting as much money as possible from Eric, who they saw as less than human, regardless of the pain it caused him. As Eric wrote in an email to Clayton, his children "suffered from a case of 'malignant entitlement.' "

54.    After footing the bills for (1) lengthy proceedings during his divorce from Susan, (2) Fred's financial malfeasance, and (3) his children's lavish lifestyle, Eric was nearly insolvent and was forced to take personal loans to support himself, pay alimony, child support, and cover Clayton and Kathryn's private school tuition. Fred, Susan, Clayton, and Kathryn showed no remorse for the strain they were putting on Eric and remained waiting for the next handout.

55.    Clayton and Kathryn's conduct was not merely disrespectful, immoral, and opportunistic; they also routinely engaged in criminal conduct.

56.    In 2014, Kathryn began selling drugs out of Eric's home while he was sleeping, simultaneously engaging in criminal activity and endangering Eric.  Clayton and Susan both knew about Kathryn's so-called "side hustle," and yet they enabled her by keeping her amateur pharmacy a secret from Eric and by declining to make any attempt to stop the illicit sales for many months. Even after Eric took the house keys away from Clayton and Kathryn, because he could not trust

them, they continued to break into his home on days they were court ordered to be with their mother, causing Eric to re-key the home several times and overhaul his alarm system.

57.     The criminality of the wayward teens continued as they turned to stealing and selling Eric's possessions on *eBay*; followed by a drunken New Year's Eve party at the home in 2015 without Eric's consent. When Clayton, Kathryn, and Susan's cover-up of this raging party was blown (approximately one year after the party), the three co-conspirators rapidly turned on each other, revealing that they did not even consider Eric to be a part of "their family."

58.     Even after the party, Susan, Clayton and Kathryn continued to attempt to cover their tracks. Susan hired a handyman to drywall the hole in Eric's wall caused by one of Clayton's drunken high school classmates. Clayton and Kathryn continued to break into Eric's home in an attempt to cover up the disaster, causing the alarm to go off several times over multiple days, which in turn caused local police to respond to the scene and question Clayton. He lied to the police, telling them that he had come over to pick up a shirt for school, and that he lived there. Eric then received a panicked call from Clayton advising that the police were on scene and he needed to know how to turn the alarm off.

59.     Demonstrating a total lack of remorse, Clayton took pictures of the hole that his friend had punched in Eric's wall, then continued to joke about it on Twitter for several months, at Eric's expense.

60.     In another unfortunate incident, Kathryn lied to police about her name and address when they attempted to drive her home after she broke curfew while loitering with friends, leading to a notation on an incident report noting that she had engaged in "falsification." At this point, Eric was tired of being a captive passenger for Kathryn's misadventures.

61.    Kathryn's pattern of delinquent conduct continued when she posted videos of herself cutting and snorting oxycontin during a sleepover at a friend's house. Horrified at the incident, the host family understandably banned Kathryn from ever stepping foot in their home again and forbade their daughter from even speaking to Kathryn at school. Eric, exasperated by Kathryn's pattern of dangerous behavior, started testing Kathryn for drugs and routinely searching her room.

62.    The catastrophic spiral of Clayton and Kathryn reached a shocking new low when Eric and/or his housekeepers found Kathryn's diary in 2016, revealing that Eric's own children had been planning his murder.

63.    Indeed, the difference between the fantasy portrayed by *Rolling Stone* of Fred, Susan, Clayton, and Kathryn versus the horror of who they really were and still are, could not be starker; a brother who repaid trust with malfeasance, an ex-wife who encouraged her children to behave like anti-social terrors, and the malignantly entitled children who plotted their father's demise.

64.    The pertinent *murder* entry in Kathryn's diary discovered by Eric and/or his housekeepers, written on February 12, 2016, read as follows:

> I need my Phone. Amy & Eric are attentive. Too attentive. I can't stop dwelling on how much ***I hate them***. ***Clay & I have discussed killing Eric*** then driving his Jag to California. ***Our plan sounds better & better***. They started taking my computer from me at night again. I'm forced to take one from school. I found out I'm done with S.O.R. [School of Rock]. I got so angry tonight I couldn't stop shaking. I can't be responsible for my own actions at this point. I suspect they might be on to me by now. They've been searching my bedroom since I tested positive for drugs. They told me I have no privacy after that. I have to control my anger somehow. I think about going back to my Mom's but I don't know if that's an option. I miss Jackson sometimes. Amy is going to take care of her mother soon. She's having knee surgery. ***It may be time to strike***. We'll see how things go.
>
> (Emphasis added).

65.     While Kathryn's words need no elaboration, it should be noted that Eric, distraught upon reading Clayton and Kathryn's murder plot, soon after, searched her room and discovered the missing key to Eric's "Jag" in Kathryn's backpack, even though Kathryn did not have a drivers' license. This discovery further reinforced that the siblings' murder plan had progressed from idle musings to concrete action, and it caused Eric to view his children in a new, even more disturbing light.

66.     Time went on, and as their spree of mayhem continued, a pattern emerged: Clayton and Kathryn were highly dangerous *and* extremely foolish. At one point, while enrolled in Cleveland State University, Kathryn vandalized Eric's *Wikipedia* page to malign him, gaining access to Wikipedia by pretending to be a young Asian boy. The member of *Wikipedia's* staff assigned to monitor Eric's page contacted Eric on three separate occasions, informing him that his page had been "vandalized." It wasn't hard to solve the mystery, being that Kathryn used the school's own internet service to carry out the defamation, necessitating a lawsuit by Eric to obtain the vandal's IP address along with a formal cease-and-desist letter from Eric to Kathryn in October 2018. Shockingly, as a result of the lawsuit, *Wikipedia* disclosed that the source of edits was none other than Kathryn Carmen, and that the edits were transmitted from a computer located at Cleveland State University. On July 24, 2019, following the incident, Eric expressed his disdain for Kathryn in an email response to her hybrid Father's Day card/request for financial support, writing:

> Yes, I also saw your tweet, that read, "My father literally disgusts me." So, think of all of these horrible things the next time you want something from me, and don't bother asking. Ask your sainted mother, instead.
>
> The fact that we were forced to pay thousands of dollars in legal fees to get you to stop your criminal behavior is reprehensible. Why would I ever, willingly, do another thing to help either you, or your brother?...

Is it any wonder, that I no longer want anything to do, with any of you? [Amy] was kind and wonderful to all of you. You three, are an enormous embarrassment to yourselves…

None of this up for negotiation, Kathryn. Once again, I'm done here.

67.    The next spring, Clayton, in his junior year, was suspended from Ohio State University for a cheating scandal in which he attempted to bribe a university-employed math tutor to take exams for him.

68.    The following brazen text exchange, dated March 5, 2019, between Clayton and an Ohio State University employed math tutor named Jack, sealed Clayton's fate:

> <u>Clayton</u>: Hey Jack, my name's Clayton, I'm a junior at OSU looking for some calc help (got your info off the MSLC private tutor page), are you interested at all?
> <u>Jack</u>: I'm sorry! I'm booked this semester!
> <u>Clayton</u>: all good
>            kinda looking more for situational help than a regular thing I don't know if that's more of a possibility
> <u>Jack</u>: Potentially. I'd just need to be notified a week or two in advance to when you'd like to meet. I have people trying to schedule day of appointments and it just doesn't work haha.
> <u>Clayton</u>: So I'm currently taking calc 1131 online through a different institution, ***I'm not really looking for tutoring so much as I'm looking for someone to take a couple online tests for me***. If that's something you're not interested in, all good, but ***I'd pay twice as much as your regular hourly rate***.
> I can give 3+ weeks notice if you're interested.
> <u>Jack</u>: Sorry I cannot do that for you.
> <u>Clayton</u>: No worries, thanks for the response!

(Emphasis added).

69.    For Clayton's naked academic dishonesty, Ohio State University found him guilty of "Academic Misconduct" and "Enlisting an Exam Substitute," and suspended for one full academic term. The terms of his suspension included that he "may not enter upon the campus and/or other university property during suspension for ANY purpose" and placement on permanent disciplinary probation.

70.     Demonstrating a complete lack of remorse, on appeal, Clayton characterized his cheating as having "asked a math tutor if they would consider helping me with an upcoming online assessment." Clayton was learning the hard way that without being able to strong-arm his father for money, he was unable to hack it in the real world. At least his appeal was partially successful— he was able to convince University officials to alter his suspension by one semester so that he could attend a summer study abroad program in London. Fittingly, he would be studying "Children's Literature" while in London, analyzing such demanding works as *Alice in Wonderland* and *Peter Rabbit*.

71.     According to emails between Clayton and Eric, Clayton's suspension was not his first brush with academic dishonesty; he had been caught cheating twice at Hawken.

72.     Stunningly, Clayton was far from humbled by his latest cheating episode. Instead, in 2019, he hired an attorney to threaten Eric with a lawsuit after Eric told him he would need to pay his own rent for the semester that Ohio State had suspended him. This was not the first time Clayton hired an attorney to extort money from his father, rather, this was the third and final time. The first time was in 2016, when Eric requested that Clayton apply for financial aid given Eric's dire financial circumstances at the time (caused by Fred's malfeasance and Susan's longstanding litigiousness). The second time was in 2018, when Clayton refused to apply for on-campus housing, an attempt to get Eric to sign a lease for him. At the time, Eric wrote to Clayton that he would not sign a lease for someone who vandalized his home, earned a lowly 1.9 GPA the previous semester, and had admitted to photoshopping fake grades to deceive Eric about the true nature of his horrible academic performance, which included failing calculus three times and passing only eight credit hours his entire sophomore year after he stopped attending class mid-term. Ultimately,

Clayton agreed to be his own guarantor for a luxury one-bedroom furnished apartment, but with Eric and Amy paying a substantial security deposit and all of the rent.

73. In an email exchange from February 2018, Eric admonished Clayton for the fact that he had become a "destructive, irresponsible liability." Eric further observed that Clayton described himself as an "amazing" kid, despite the fact that he didn't even call his father after the death of his grandmother (Eric's mother), couldn't even be bothered to send a text message or a sympathy card, and certainly didn't feel the need to attend her funeral.

74. By this time, Eric genuinely feared his rampaging children, and his attempts to smooth things over were met with laughter, mockery, and other disrespect. This led him to leave Ohio for Arizona with Amy, where they focused on their privacy and personal safety. Contemporaneous communications with local law enforcement and friends back home confirm as much. For example, in a September 14, 2018 email to his friend Bernie Hogya, Eric wrote: "Because of ongoing issues with my ex and my kids, some, sadly, involving our personal safety, I'd greatly appreciate it if you and [your wife] could keep the fact that Amy and I have relocated quiet. We have taken great measures to keep our whereabouts secret." The appalling reality of Eric's departure from his lifelong home state of Ohio cannot be emphasized enough: he and Amy were *refugees* from his *terrifying* children.

75. On August 19, 2016, in another incident demonstrating just how dangerous Eric's family members could be, Clayton and Susan assaulted a process server hired by Eric to deliver a package to Susan containing court-mandated medical bills that she had refused to pay, as well as a monthly alimony check. Clayton and Susan fled the scene (Susan's home) by automobile before police could arrive. As the process server swore to in a statement to police:

> I arrived at 446 W Glengary Crcl. to deliver an envelope with documents to Susan J Carmen. During this time I walked up to the front door and rang the

doorbell. Susan then opens the door. When I said I have a delivery for Susan Carmen, she then asked who it was from, I told her and she asked if I was a process server and I said yes. She then said "I don't want it, get the "F" off my property. I then dropped the documents at the foot of the door and politely said have a good day like I normally would. It was at that point that she rushed out the door, grabs the documents from the foot of the door and "slaps me in the chest with them [Susan and Clayton] attempting to get me to take them back when I wouldn't take them back. She then takes the paperwork, runs to my vehicle and sticks the paperwork through my half open window onto my passenger seat. It was then that I took the paperwork dropped it back at the foot of the door and then attempted to leave. At this point Susan's son Clayton comes outside, grabs the paperwork and sticks them through my window. During this time I am being screamed at by Susan and Clayton and when I tried to stick the documents out my window so I could leave, Clayton grabs the paperwork and tried to force it back int the car. Once he figured out that I was not going to take the documents back he then opens my door, throws the paperwork in the back seat and then slams the door. After which Susan steps in and she does the same. During this occurrence I called '911' and was able to get ahold of Highland Heights Police Dispatcher. While I was on the phone with the dispatcher, Susan and Clayton continue to slam my door open and close, yelling and screaming at me using profanity. It was then that Susan opens my door and stands between it and me, it being the door. What made me uncomfortable was that I am a concealed carry permit holder and my firearm was in the driver side door pocket. I then asked her to step back and let he know she was too close to my firearm, during which I am still on the phone with the dispatcher.  I then pulled out of the driveway with documents in my car and pulled on the street in order to wait for police assistance. Susan then starts to leave, pulls up next to my window and she was still yelling at me. I was then instructed to keep my window rolled up and ignore them until police arrive. That is when she pulls back in her driveway and Highland Heights Police pull up and deescalate the situation.

76.     Meanwhile, Clayton and Kathryn spent their time sounding off on social media about how much they hated their father. Kathryn posted such gems as "Jokes on you I don't have a dad" and "My father literally disgusts me." On another occasion, Clayton mused on *Instagram*, just days after Eric died: "My dad was a brilliant musician and a terrible father...."

77.     Most people would have appreciated the opportunities afforded to them by their privileged upbringing. Rather than making the most of these opportunities, Clayton and Kathryn, along with Susan, went the litigation route in 2019—not because Eric did anything wrong, but

because it would hurt and embarrass him (Eric was famously private). The gist of their lawsuit, identified in detail *infra*, was that they were entitled to indefinite sponsorship. Additionally, Clayton and Kathryn contended that Eric was obligated to fully subsidize their living expenses into adulthood and infinity. Following negotiations, Eric and Amy bought their peace at substantial cost, and the parties then agreed to go their separate ways.

78.     After this litigation, Eric often mused "Who sues their own father?" and frequently said "If I knew that my children would turn out to be Lyle Menendez and Squeaky Fromme, I never would have had kids."

79.     Indeed, given the sundry misconduct by Eric's family members, litigation was practically inevitable. Two lawsuits ensued.

80.     First, in November 2015, Eric was compelled to sue Fred for his financial malfeasance, which occurred in the lawsuit captioned *Eric H. Carmen, et al. v. Fred N. Carmen*, Cuyahoga County Court of Common Pleas, Probate Division, Case No. 2015-ADV-211860 ("Lawsuit #1), resolved January 24, 2018 by "Confidential Settlement Agreement and Mutual Release of All Claims" ("Settlement Agreement #1). Fred paid Eric a huge amount of money that barely covered Eric's legal fees and still did not make Eric financially whole.

81.     Second, in October 2019, Susan, Clayton, and Kathryn brought a frivolous lawsuit for rent payments captioned *Susan Carmen, Clayton Carmen, and Kathryn Carmen v. Eric Carmen*, Cuyahoga County Court of Common Pleas, General Division, Case No. CV 19 922580 ("Lawsuit #2") resolved March 25, 2020 by Settlement Agreement ("Settlement Agreement #2", together with Settlement Agreement #1, the "Settlement Agreements").

82. One of the terms of Settlement Agreement #1 was "Mutual Non-Disparagement", which provided, in sum and substance, that Fred would not publish, orally or in writing to any third party any disparaging material about Eric and Amy. ("Non-Disparagement Provision #1").

83. As set forth *infra*, Fred maliciously breached Non-Disparagement Provision #1 when he communicated with Greene about Eric and Amy for the Article, a clear indication of actual malice towards Amy, and at minimum, negligence.

84. Settlement Agreement #2 also contained a non-disparagement provision, which provided, in sum and substance, that Susan, Clayton and Kathryn would not publish, orally or in writing to any third party any disparaging material about Eric and Amy, during their lives or posthumously. ("Non-Disparagement Provision #2," together with "Non-Disparagement Provision #1," the "Non-Disparagement Provisions.").

85. As set forth *infra*, Susan, Clayton and Kathryn maliciously breached Non-Disparagement Provision #2 when they communicated with Greene about Eric and Amy for the Article, a clear indication of actual malice towards Amy, and at minimum, negligence.

86. The Lawsuits were the culmination of years of abusive, appalling, atrocious, deceitful, exploitative, and terrorizing conduct by Fred, Susan, Clayton, and Kathryn, all of whom were and still are highly disturbed and depraved individuals.

87. Notably, Amy informed Greene and *Rolling Stone* about the Settlement Agreements and Non-Disparagement Provisions during their pre-Article correspondence. Yet, in a sign of actual malice and at minimum, negligence, they declined to mention the existence of these Agreements in the Article, or to respect these Agreements.

88. Unsurprisingly, Clayton and Kathryn could not let Eric rest in peace. In addition to their posthumous libel of their father in the Article, they launched a frivolous lawsuit against Amy

on June 28, 2024 (referenced *supra* paragraph 22), captioned *Kathryn Carmen and Clayton Carmen v. Amy Carmen*, Cuyahoga County Court of Common Pleas, Probate Division, 2024ADV290042 (Lawsuit #3; together with Lawsuit #1 and Lawsuit #2, the "Lawsuits"). Clayton and Kathryn claim, without evidence, that they are entitled to their late father's assets. Amy removed the case to the United States District Court for the Northern District of Ohio, Eastern Division, where the case is pending as of the present date (Case No. 1:24-cv-01331, Hon. David A. Ruiz, U.S.D.J.).

### *The Interview and The Article*

89.     Greene traveled to Ohio to interview Fred, Susan, Clayton, and Kathryn. The Interview took place sometime between July 6 and July 12, 2024, with Fred, Susan, and Kathryn in-person, and Clayton appearing via Zoom.

90.     Greene also induced Amy to communicate with him about the Article, albeit under the false pretenses that he was planning to write a glowing piece about Eric, that he actually cared what Amy had to say, and that the content of the Article was not pre-determined. In order to secure Amy's participation, Greene lied to her on multiple occasions (set forth in greater detail *infra*): (1) "I'm a native Clevelander and longtime fan of [Eric]" (Email, June 17, 2024); (2) "This is a passion project for me, and I want to make it really special for his fans" (Email, June 17, 2024); (3) "I'll still do everything I can to honor Eric's life and his incredible musical achievements" (Email, June 20, 2024); (4) "I'm not a tabloid writer. I'm not going to give anyone a platform to smear Eric or spread lies. The article will be carefully fact-checked. And if I have any sense someone has an axe to grind or is feeding me incorrect info, I'll disregard everything they tell me and not quote them" (Email, June 20, 2024).

91.　　Far from fact-checking, Greene ignored public records, legal records, social media, reliable news reporting, and common sense to make sure that Eric was portrayed as a neglectful father, bad husband, paranoid ex-celebrity, and worst of all in the eyes of Greene and Penske, one who dared to cross the imaginary line that forbids artists and entertainers from supporting the Republican Party on pain of revisionist demolition of their careers, all with Amy as Eric's co-conspirator, eager enabler, whisperer of secrets, and peddler of conspiracy.

92.　　Greene proved to be anything but a man of his word. In reality, he was no fan of Eric's and the only passion he had was to take a hatchet to Eric's legacy by doing exactly what he promised not to do—give a platform to the other Defendants—who were all too happy to smear Eric and spread lies without any fact-checking.

93.　　The Article opens with a brief summary below the title "*Eric Carmen Was a Power-Pop Legend. Then He Vanished*," recognizing Eric as a "musical genius," followed by an iconic 1970's photograph of a handsome and mysterious Eric with a cigarette in his mouth, and a caption beneath the photograph that refers to Eric as a "power-pop trailblazer." So far, so good: *Rolling Stone* was on the money right out of the gates, as Eric *was* a musical genius and a trailblazer.

94.　　But this token praise ceded the stage to predictable storm clouds with words that clue readers into where the Article was really headed, which was landing a politically motivated punch on a dead man and his widow: "In the final years of his life, the musical genius behind songs like 'Go All the Way' and 'All by Myself' was estranged from much of his family—***and went down a rabbit hole of far-right conspiracies***." (Emphasis added).

95.　　And, unfortunately, like clockwork, after this ominous opener that was at least colored with *token* praise, the *Rolling Stone's* editorial train, with conductor Greene at the controls, quickly derailed and plunged into a canyon of falsehoods and misdirection.

96.     At one point in the Article, Greene embarrassingly wondered: "Why did the singer, fiercely private, go so public in his support of Donald Trump during his final years, posting furious MAGA missives that horrified many longtime friends and fans?" The timing of this Article was no accident. During Eric's lifetime, he could have explained and defended his lawful support for a two-term president. But, being that Greene waited until just after Eric passed away, he was free to leverage his massive platform to manufacture a superficially believable narrative about Eric and Amy's support for so-called MAGA conspiracies which could not be challenged. This was no fair fight.

97.     Further confirming Greene's intent to embarrass Eric, and by extension Amy, Greene insinuated in the Article that Eric washed out of a tour with Ringo Starr's All-Starr Band after eight weeks on the road in 2000, and was replaced due to a drinking problem. In fact, the entire tour *was* eight weeks long—beginning on May 1, 2000 and concluding on July 1, 2000. Bernie Hogya, *Ringo Starr and His All-Starr Band,* May 1, 2000, https://archive.ph/20130409080824/http://www.ericcarmen.com/press/000501.htm  (last visited Aug. 10, 2025). It included 32 shows across the country, which Eric successfully performed, despite the grueling pace.  Nobody was fired, nor was the tour cut short.  As for the "replacement" of Eric, the Article neglected to mention that the *entire band* was comprised of new artists the following year.  Jack Bruce, Dave Edmunds, and Simon Kirke were all "replaced" in 2001, because it was a new tour.  Of course, had that been acknowledged, the Article wouldn't have conveyed the misimpression that Eric was thrown out of the All-Starr band for being a drunk.  To underscore this point, Ringo gave Eric an autographed drum head accompanied by a signed, framed photo from the tour, which is dated "2000" and reads: "To Eric. You are the Eric. Love, Ringo."  It was given at the end of the tour, and proudly displayed in Eric's home until he passed away. Moreover,

a healthy-looking Eric was later photographed happily with Ringo in 2019, and Ringo even invited Eric back to perform at the Greek Theater for the All-Starrs 30th Anniversary show finale.

98.     The reference to being "*the* Eric" was a joke between Eric and Ringo; Ringo was favorably comparing Eric to the "other Eric," Eric Clapton.  Had Greene "carefully fact-checked" his story as promised—even with the people with whom he was already communicating, like Amy or Eric's archivist, Bernie Hogya—this would have been readily known.  Instead, Greene took the false statements of ex-wife Susan and disgruntled ex-manager David Spero (who hadn't worked for Eric for twenty-five years) at face value and used them to add color to his defamatory portrait.

99.     But, of greater import than *Rolling Stone's* embarrassing and grossly exaggerated accounts of Eric's drinking, the Article contains numerous statements that are either outright fabrications, misleading to the point of falsehood, or portray Amy in a falsely negative light and Eric's family members (including Defendants Fred, Clayton, and Kathryn) in a falsely positive light. Furthermore, the collective effect of these statements is to weave an elaborate tapestry of lies portraying Amy in a false light and as the villain in the Carmen family story detailed in this Complaint. These false and misleading statements (catalogued *infra*), are independently and collectively actionable, and are referred to as the "Actionable Statements."

**The Actionable Statements**

100.    Actionable Statement #1:

> As soon as he answered his phone, Clayton Carmen knew he was getting bad news. It was March 2024, and by then, nearly a decade had passed since he had seen his father, Eric Carmen—the power-pop trailblazer and Raspberries frontman best remembered for the hits 'Go All the Way,' 'All by Myself,' and 'Hungry Eyes.' Clayton's stepmother, Amy, was on the other end of the line. The 27-year-old hadn't seen her since his high school days, when Clayton knocked on the door of the house that Amy shared with his dad in an attempt to finally reconcile their differences. Carmen and Amy responded to the overture by closing the curtains, calling the police, and reporting a trespasser.

26

Actionable Statement #1 was, and is, false and misleading in multiple respects. Most importantly, in truth, Clayton did not consider Eric's death to be "bad news." Also, this Statement (a) left unmentioned that "a decade had passed" since Clayton saw Eric not because of anything Eric or Amy did, but rather solely because of Clayton's misdeeds; (b) Clayton never knocked on the door of Eric and Amy's home to "reconcile their differences"; instead, Clayton was banging on doors and windows the day after he and his mother had assaulted a process server; (c) Clayton never made an "overture" to Eric and Amy; (d) Eric chose not to open the door to an angry Clayton and instead called the Gates Mills Police to report a trespasser, not to stop an "overture"; and (e) Eric and Amy did not "close the curtains" as a reaction to Clayton's trespassing—they kept their curtains closed to prevent disclosure of their home life to curious members of the public. Indeed, Eric was attempting to protect himself and Amy from his own out-of-control, entitled son.

101.    <u>Actionable Statement #2</u>:

> Eric Carmen's brother, Fred, received a similar call from Amy. Fred hadn't communicated with his older brother since 2016, even though they were as close as siblings could be for the first 55 years of his life. Fred blames Amy for inspiring a series of lawsuits that separated Eric from his brother, his son, and 24-year-old Kathryn Carmen, Eric's only other child."

Actionable Statement #2 was, and is, false and misleading in multiple respects, including (a) it left unmentioned was the fact that Fred and Eric hadn't communicated since 2015 because Fred committed malfeasance with respect to Eric's money and Eric was compelled to sue Fred for this conduct, not because of any actions undertaken by Amy; (b) Amy did not "inspire" any lawsuits, rather, Eric was compelled to sue Fred for financial malfeasance, and Susan, Clayton, and Kathryn chose to sue Eric for what they believed was rent money owed for Clayton's furnished apartment, while he was suspended from Ohio State University for cheating (*see* the two Lawsuits referenced *supra*; (c) there was no "series of lawsuits that separated Eric from" his family, only the Lawsuits, referenced *supra*; (d) Fred's financial malfeasance separated him from Eric, not lawsuits

"inspired" by Amy; (e) Clayton and Kathryn's sociopathic misdeeds, and their own desire for estrangement, are what separated them from Eric, not lawsuits "inspired" by Amy. Indeed, members of Fred's own family, including his uncle Sheldon Berns and his cousin Jonathan Berns, actively worked to retain counsel on Eric's behalf to investigate the eight years that Fred had been trustee, well before Amy was in the picture.

102.    Actionable Statement #3: "And how did the family schism widen to the point that Amy is now accusing Clayton and Kathryn of once plotting their father's murder, in one of multiple lawsuits Amy has been involved in following Carmen's death?" This Statement was, and is, false and misleading in multiple respects, including (a) Amy is not "accusing" Clayton and Kathryn of "once plotting their father's murder"—they *did* plot Eric's murder, as Rolling Stone well knew from Kathryn's murderous diary entry (which *Rolling Stone* **published in the Article**); and (b) Amy has not been nefariously "involved" in "multiple lawsuits" since Eric's death—she is the *defendant* in a frivolous lawsuit brought by Clayton and Kathryn for control of the Trust, even though they were never beneficiaries of the Trust. She also was forced to seek a restraining order preventing public disclosure (including to tabloids and other opportunistic journalists) of emergency response teams' response to her 911 call reporting Eric's passing.

103.    Actionable Statement #4: "His brother, children, and ex-wife, Susan, describe a bitter, paranoid conspiracy theorist haunted by the past, lost in the face of shifting musical tastes, hopelessly addicted to alcohol, and manipulated by Amy to turn on his family." This Statement was, and is, false and misleading because Amy did not manipulate Eric to turn on his family—Fred, Susan, Clayton, and Kathryn chose to estrange themselves from Eric through their sundry misdeeds detailed in this Complaint, and moreover, Clayton and Kathryn had displayed their utter disdain for Eric, time and time again, while he was alive, from the time they were very young,

until the time they reached adulthood; Eric often said they displayed "malignant entitlement," even using this term in an email to his son, after Clayton told Eric's cousin that suing his own father was "just business."

104.   Actionable Statement #5:

'The comparison I always make is to *The Parent Trap*. I always think of her [Amy] as the evil stepmom/girlfriend,' Clayton says. 'When my dad was around, she was very smiley, happy, and sweet. But my sister and I knew from the very beginning that she was really, really, really bad news.'

This Statement, which quotes Clayton, was, and is, false and misleading in multiple respects, including (a) Amy always treated Clayton and Kathryn appropriately, kindly, and with respect, and certainly in no way that could be construed as "evil"; (b) Clayton and Kathryn were the only ones who engaged in "evil" behavior, selling drugs from Eric's house, plotting Eric's murder, using Eric's home for a drunken party, vandalizing his home, repeatedly breaking and entering into the home, terrorizing Eric and Amy, and engaging in academic cheating; and (c) Amy never changed her behavior based on whether Eric was present or not present.

105.   Actionable Statement #6:

'My father was just a very manipulatable, paranoid, isolated person,' he continues. 'And suddenly someone comes into his life and, instead of his kids, who will push back on him, she's a sycophant. She'll say yes to whatever he wants. She'll agree with him on his zaniest, most deranged conspiracy theories. She was just what he wanted.'

This Statement, which quotes Clayton, was, and is, false and misleading in multiple respects, including (a) Amy was never a "sycophant" for Eric who said "yes to whatever he wants," but rather, Amy and Eric enjoyed a cooperative and loving relationship; (b) Amy never manipulated Eric in any way; (c) Clayton and Kathryn did not "push back on [Eric]" as part of some sort of imaginary respectful intellectual discourse between Eric and his children—they dishonored him, disowned him, hated him, terrorized him, and threatened him at every opportunity.

106.  <u>Actionable Statement #7</u>:

> The diary entry was cited as evidence that Kathryn and Clayton were 'planning Eric's murder' in a recent legal filing by Amy's attorneys. 'Amy took multiple photos of my diary to drive a wedge into the relationship with my father,' Kathryn writes in an email to Rolling Stone. 'These antics started as soon as she moved into the home. She would often comb through my brother and I's rooms looking for anything that could harm a parent-child relationship. I am truly saddened that Amy would try to publicly misuse the private ramblings of a child who was experiencing so much heartbreak and pain at home.… Of course my brother and I never had any intention of causing physical threat to our father as she's suggesting.'

This Statement was, and is, false and misleading in multiple respects, including (a) Clayton and Kathryn *were* planning Eric's murder, were already avid drug users and in Kathryn's case a drug dealer; Kathryn had been running a criminal enterprise out of Eric's home, unbeknownst to Eric, until Clayton informed Eric about it; and the two siblings had continually been breaking and entering in Eric's home, and the final time was for a huge, drunken New Year's Eve party, while he was on vacation, which resulted in several police calls and vandalism to his beautiful home; (b) Kathryn's diary was recovered and revealed by Eric and his housekeepers during his regular searches of her bedroom, not by Amy; (c) Amy did not take multiple photos of Kathryn's diary "to drive a wedge into the relationship" with Eric; in fact, Eric took photos of the diary as evidence of a very real murder plot, a plot that demonstrated beyond any doubt that there was already far more than a "wedge" in the relationship between the siblings and Eric; (d) Amy did not engage in any "antics" to harm Eric's relationship with his children—Clayton and Kathryn hated their father and intentionally destroyed that relationship on their own, going back as far as 2011 and 2012, well before Amy and Eric were together; (e) the diary entry was not a "private rambling" but an accurate reflection of a murder plot that Clayton and Kathryn had discussed on numerous occasions and for which Kathryn had already stolen the keys to Eric's Jaguar; and (f) Clayton and

30

Kathryn, drug users and Kathryn a drug dealer, with no moral compunctions, who also frequently burglarized Eric's home, had every intention of harming Eric.

107.    Actionable Statement #8: "In April 2018, [Eric] and Amy left Ohio to resettle in Arizona, but withheld telling the other members of the Carmen family; they resisted any attempt by Clayton and Kathryn to reconnect, as well." This Statement was, and is, false and misleading in multiple respects, including (a) Eric and Amy did not leave Ohio to "resettle in Arizona"—they left Ohio to escape Clayton and Kathryn's reign of terror; (b) Eric and Amy "withheld telling the other members of the Carmen family" because of the clear and present danger to their safety presented by Clayton and Kathryn; (c) Clayton and Kathryn did not make any attempts to "reconnect," only attempts to threaten Eric and shake Eric down for money; (d) Eric and Amy did not "resist" any sincere attempts to reconnect, because Clayton and Kathryn made no sincere attempts to reconnect with their father on a level other than financial; Eric also had zero desire to respond to his family's feigned reconnection efforts because his relationships with his brother and children were so toxic, so irreparably damaged and beyond salvation, that the thought of opening the door to them again made him ill.

108.    Actionable Statement #9:

> Not long afterward, Carmen met Amy, and as they dated and eventually married, he slowly became estranged from his brother, his ex-wife, and both of his kids. Fred Carmen says that was by Amy's design. 'The plan was to first pull me away from Eric and then pull the children away from Eric, so that she was the sole source of everything, and that she would control him,' he says. 'To her credit, she was very effective. Again, Eric is a conspiracy theorist. She made him believe his entire family was engaged in a conspiracy against him.'

This Statement was, and is, false and misleading in multiple respects, including (a) Eric did not "slowly bec[o]me estranged from his brother, his ex-wife, and both of his kids" because of anything Amy did—they were the ones who actively sought estrangement from Eric and Amy,

unrepentantly took money from Eric, and hated Eric and Amy; (b) Amy had no "design" or "plan" to cause the Carmen family estrangement—Fred, Susan, Clayton, and Kathryn saw to this on their own; (c) Amy did not make Eric "believe his entire family was engaged in a conspiracy against him"—Clayton and Kathryn really did plot Eric's murder, really did deal drugs out of his home, really did burglarize his home, really did throw a drunken party at the home, really did terrorize Eric and Amy, really did threaten Eric and Amy, and Fred really did commit malfeasance with respect to Eric's money.

109. <u>Actionable Statement #10</u>:

> Both sides of the Carmen family divide cite a wild party that Clayton threw at Eric and Amy's house when they were out of town as a turning point in their relationship. 'I should have had you charged with breaking and entering, and vandalism,' Eric wrote to his son in a 2018 email. 'From that point on,' says Susan, 'neither Clay nor Kath could go over to the house unless they were invited. It was like they were strangers in their own home.'

This Statement was, and is, false and misleading in multiple respects, including (a) the drunken party was not the "turning point" in the relationship, nor did Eric or Amy consider the party to be the "turning point," in fact, prior to the party, Clayton and Kathryn had dealt drugs out of Eric's home and burglarized the home on numerous occasions, and had already plotted his death; (b) Eric and Amy did not turn Clayton and Kathryn into "strangers in their own home"—they did that with their repeated criminal actions.

110. <u>Actionable Statement #11</u>:

> At this same time, Eric Carmen filed a lawsuit against Fred, alleging mismanagement of his finances, improperly using money to provide care for their mother, and excessively charging him legal fees throughout the divorce period. Fred says he first got wind that this might be coming when Carmen and Amy were at his house for a party. 'My nephew came to me,' says Fred. 'He said, 'You need to watch out for Amy. I just heard her say to my dad there was no way you could have paid for your new deck on your own.' 'That was the kind of thing Amy was saying to him to make him conclude I was stealing from him.'

This Statement was, and is, false and misleading in multiple respects, including (a) Fred did not "first [get] wind" that Eric was going to sue him at a house party, or from anything Amy did or said—Fred knew all along that he was committing malfeasance with respect to Eric's money; (b) Amy never said anything to Clayton about Fred's deck; and (c) Fred *did* commit malfeasance with respect to Eric's money.

111.  Actionable Statement #12:

> When Clayton graduated from high school and planned on enrolling at NYU, he says, he learned that his father wasn't willing to pay for it. Per what Amy calls 'a very questionable prenuptial agreement' with his ex-wife Susan, Eric had to provide tuition for an in-state school. But Eric wouldn't pay for Ohio State, either, leading to a legal battle between the father and the son. 'I never, ever, ever wanted it to come to that,' says Clayton, 'but those were the options I was facing, and it was like, this isn't little, menial [expletive], this is my college education, and this is something that gives me the basis to start the rest of my life.'

This Statement was, and is, false and misleading in multiple respects, including (a) Eric never refused to pay for any legitimate tuition expenses; (b) Eric was unable to pay for Clayton to attend NYU because of the near-insolvency caused by Susan's litigiousness, and most notably Fred's egregious conduct as trustee; (c) Clayton initiated legal action against his father for his inability to pay for NYU tuition, further exacerbating Eric's financial distress; and (d) Eric only objected to paying tuition expenses after it became clear that Clayton was a cheater at Ohio State University. Indeed, around this time, Eric and Amy married at a small ceremony held in their own living room since Eric was struggling to support himself financially. Also, Amy helped support Eric wherever she could, including by helping cover household expenses such as utility bills and groceries.

112.  Actionable Statement #13:

> Amy says that Clayton never took his academic career seriously; he was once penalized by the school's Committee on Academic Misconduct (Clayton doesn't deny this: 'I fully [expletive] up,' he says). She provided an email Eric sent to his son regarding college housing. 'Right now the only achievement I'm interested in is you getting good grades and graduating in

> eight semesters,' Eric wrote. 'We are talking about your college education. The education for which I am paying.' Clayton's tuition bill remained a point of acrimony. He claims that Eric and Amy instituted grade minimums, and forced him to live in the cheapest dorm and use the skimpiest meal plan. 'The two of them really terrorized me for my first couple years of college and made me jump through hoops,' he says."

This Statement was, and is, false and misleading in multiple respects, including (a) Eric and Amy did not institute grade minimums or force Clayton to live in the cheapest dorm, or use "the skimpiest meal plan," they simply demanded that Clayton take college seriously and not engage in academic fraud; (b) Eric and Amy never "terrorized" Clayton—this is the height of irony, considering that Clayton terrorized them to such a degree that Eric and Amy had to leave his native Ohio; and (c) Eric and Amy never made Clayton "jump through hoops," unless by this, Clayton means they made him do his own work, refrain from cheating, and attend class—which, according to his transcripts, he stopped doing in week ten of his Fall semester in 2017.

113.    Actionable Statement #14:

> To make sure Clayton, Kathryn, and Fred wouldn't come [to a memorial service], she stationed armed guards outside the doors. 'At what point does a person take a step back and say, 'OK, I literally hired armed guards to keep my deceased husband's children away from attending their father's funeral?' says Clayton.

This Statement was, and is, false and misleading in multiple respects, including (a) Eric was a reluctant public figure, so Amy chose to have a beautiful but private celebration of Eric's life, which was held in the amphitheater and event space at a museum that happened to be open to the public that day, and was attended by several notable guests who were Eric's friends; (b) Amy did not station armed guards at Eric's celebration—the venue was responsible for providing security and staffing the event; (c) Kathryn had informed Amy that, before the celebration, Eric's "blood family" members had already gathered for their own tribute; and (d) although Amy appropriately did not invite anyone who had harmed Eric during his life, including Fred, Susan, Clayton, and

34

Kathryn, Amy did not forcibly prevent Eric's family members from attending the celebration. Amy wrote a letter in response to Clayton and Kathryn's disparagement of their father and sent it shortly before the celebration of Eric's life that she had arranged. The letter politely explained that because they had disparaged their father online, Clayton and Kathryn were not invited to the event. In response to this letter, Clayton and Kathryn became increasingly belligerent and began to threaten Amy. She responded to these threats by asking Clayton and Kathryn to reconsider their plan to attend the event without invitation, but did not hire any special security for the event or take other measures to exclude them. After Amy shared this letter with Greene and Penske, it was summarily ignored.

114.    <u>Actionable Statement #15</u>:

> The bad blood continued on Aug. 8, when the Rock & Roll Hall of Fame held 'Eric Carmen Day' and posthumously awarded him a key to the city of Cleveland. For the first time in years, Amy was in the same room with Susan, Clayton, and Kathryn. 'Kathryn had been told she'd have time to share some remarks she wrote,' says Clayton, who recently took a job at the talent agency CAA, in the music brand-partnerships division, 'but Amy threw a tantrum backstage and delayed the ceremony by 45 minutes, so my sister and I watched from the crowd without any acknowledgment and had to watch Amy speak and accept the award on my dad's behalf.'

This Statement was, and is, false and misleading in multiple respects, including (a) Amy did not throw "a tantrum backstage"; (b) Kathryn was never slated to speak at the event; and (c) Amy did not delay the ceremony. This is confirmed by the Vice President of the Rock & Roll Hall of Fame, who spoke with Amy after the Article appeared and confirmed that no "tantrum" was thrown and that Amy caused no delay. Critically, Greene was an intern during college at the Rock & Roll Hall of Fame and could have easily called anyone there to confirm Clayton and Kathryn's claims. And yet, he failed to accurately re-tell the story in the Article.

115.    The painful truth is that Fred preyed on Eric, and that Clayton and Kathryn were vicious, entitled, and greedy terrors now masquerading in the Article as the stereotypical concerned

children pushed away by an evil stepmom. In a rare moment of honesty, Kathryn even gives up the game, admitting in the Article: "Celine Dion did us a lot of favors. ***I grew up very, very privileged***." (Emphasis added). Indeed, one thing the Article gets right is that Celine Dion's smash-hit cover of "All by Myself" was "inescapable on Top 40 radio during the late Nineties. The recording made [Eric] millions—money that went very far in the Rust Belt town of Cleveland." In other words, Eric's musical genius afforded Susan, Clayton, and Kathryn an affluent upbringing far above their neighbors' standard of living; and that money proved too enticing to Fred to ignore as he helped himself to the Trust.

116. Susan also gives up the game when she states in the Article: "To young kids, he [Eric] was great. He adored [Clayton and Kathryn]." Kathryn even admitted that she considered her father to be a "teddy-bear dad." Indeed, on top of being a provider, Eric was a loving father. He just had the terrible bad luck of being surrounded by a family of ingrates. Susan's alienation of his children certainly did Eric no favors.

117. Also largely ignored by the Article, and an inconvenient truth for Fred, Susan, Clayton, and Kathryn is the fact that Amy was a devoted stepmother who worked hard to include Clayton and Kathryn in Eric and Amy's lives, to no avail. As Amy said: "I [tried] to include Clayton and Kathryn in our lives . . . . I was very happy to help both of them with their homework, and prepare meals. I straightened Kathryn's hair before school, as she ate the breakfast I prepared for her, and I welcomed and taxied their friends. I helped Eric cover the ceiling of Kathryn's bedroom with red and white balloons to surprise her on Valentine's Day."

### Greene and Penske's Actual Malice: Their Deceitful Trickery of Amy and Selective Ignorance of Her Inconvenient Truths

118. From the time the idea for the Article was conceived, Greene and Penske planned to smear Eric and Amy, without regard to the truth. An essential part of this plan was to deceive

36

Amy so that she would participate in the process, thus giving the Article a superficial patina of evenhandedness, notwithstanding their intent to distort or ignore Amy's responses, particularly where she offered truths that did not harmonize with Greene and Penske's fake narrative.

119.    In order to deceive Amy and gain her trust, Greene would present himself as a fan of Eric aggrieved by the "injustice" of inadequate posthumous portrayals of Eric, as a music historian seeking to memorialize Eric's "true pop genius," and as a native Clevelander.

120.    The correspondence between Greene and Amy started on June 17, 2024, at 6:57 a.m., when Greene wrote in an email to Amy entitled "Interview Request – Rolling Stone":

> Hey Amy,
>
> I'm a writer at Rolling Stone working on a feature about the life of Eric Carmen. I live in New York, but I'm a native Clevelander and a longtime fan of Carmen. When he died, I was dismayed to see that many of the obits boil his career down to just "Hungry Eyes," "All By Myself," and "Go All The Way." It felt like an injustice.
>
> My goal is to tell the full story of his life and remind people that he was a true pop genius. I'm booking interviews with people that knew him the best. If you have time in the next month or so, I'd love to step up a conversation with you.
>
> I'm happy to answer any questions. Thanks!

In reality, Greene was not a longtime fan of Eric, and did not believe that the depictions of Eric in his obituaries had been an "injustice"; moreover, Greene's goal was not to tell the full story of Eric's life but instead to manufacture a scandal that would allow him (and Rolling Stone) to capitalize on Eric's legacy.

121.    Amy replied at 7:52 a.m. later that morning:

> Hi Andy,
> Thank you for your email. I appreciate the opportunity to talk about my husband's genius musical ability with you. I may also be able to provide insight on others to interview who, as you say "knew him best."

There were several people who were interviewed at the time of his passing who may have known him at some point, but were [not close] to him. I believe that's why many articles appeared to be brushing the broad strokes of his success and his life.

He was a very private guy, with a handful of people who really knew him, understood his need for perfection and appreciated it in his music.

I look forward to speaking with you, Andy.

Thank you,

Amy Carmen

122.     Greene responded at 10:26 am with more fake encouragement:

Hey Amy,

I'm glad to hear you're on board. It will be a huge benefit to the article. I'm going to be in Cleveland between July 6th and July 12th. Do you happen to still live in the area? If not, we can find a time to get on Zoom after I get back.

I'd definitely appreciate that list of other people you think I should interview. I want to speak with as many people as possible that truly knew him.

Thanks for getting back so quickly, and thanks for agreeing to talk. I really appreciate it.

123.     About half an hour later, at 11:06 a.m., Amy, believing that Greene had good intentions, responded with open arms:

I live in the Phoenix area. If you are in the area anytime soon, you can meet me here. His gold/platinum albums and beautiful Bosendorfer piano are here. He is everywhere in our home. I welcome you to come here.

If it's OK, with you, I can compile a small list of people you might consider interviewing and why they were important in his life and career. You can decide, obviously whether to talk to them or not.

124.     Greene replied again at 11:41 a.m., with a tone of inauthentic commitment to fairness and outright lie that preserving Eric's legacy was a "passion project":

I don't think I'll be able to make it to Phoenix. I would love that list of people you think I should interview, and any contacts you have for them. That would be a huge help.

Let's touch base when I get back from Cleveland. I'd like to interview you near the end of the process so I could ask very detailed questions, and bounce things off you I've heard from other people.

Again, I really appreciate your help. This is a passion project for me, and I want to make it really special for his fans.

Talk soon.

125.    Continuing to be led on by Greene, an unsuspecting Amy, led to believe that Greene wanted to tell the true story of her beloved Eric's life, responded at 11:50 a.m. with further assurances of her cooperation:

It's my pleasure, Andy. It's now a passion project for me too. I will get you that list as soon as possible.

FYI, I'm in the middle of cleaning out my Mom's home. She passed away in January. I have a few days before all of her things need to be out. But I will find time to thoughtfully provide names/contacts and a bit of background then you can decide.

Have a great day,

Amy

126.    Pretending to care about Amy in an effort to win her trust, Greene professed sympathy for her mother in a follow-up email at 12:10 p.m. that day:

I'm so sorry to hear about your mother. I can't even imagine what you've gone through this past year. There's no rush on any of this, whenever you have time.

Thank you again. Take care!

127.    Three days later, on June 20, at 2:12 p.m., Greene further professed his devotion to Eric's legacy and journalistic integrity, writing that he "went into this article as a big fan of Eric Carmen's music who knew almost nothing about his life," that his "goal [was] the definitive

39

profile," that he was "a music journalist," had "been doing this job at Rolling Stone for 20 years," and was "not a tabloid writer." Greene offered further false assurances, stating that he was "***not going to give anyone a platform to smear Eric or spread lies. The article will be carefully fact checked. And if I have any sense someone has an axe to grind or is feeding me incorrect info, I'll disregard everything they tell me and not quote them.***" Greene further promised to "do everything [he could] to honor Eric's life and his incredible musical achievements." (Emphasis added).

128.     Despite having information from Amy—the person closest to Eric in his final years and his most trusted confidant—Greene and Penske instead chose to rely on the speculative and self-serving comments made by Eric's brother and long-estranged adult children. Furthermore, Greene and Penske represented these comments as objective factual insights, rather than speculation from individuals who hadn't spoken to Eric in nearly a decade.

129.     Greene repeatedly acknowledged that Amy was the best source for information relating to Eric's life and legacy, especially from his more private final years. However, determined to provoke scandal rather than reflect truth, Greene and Penske chose to use the inflammatory statements given by those who had a posthumous agenda, informed only by limited or outdated contact with Eric, while deliberately excluding Amy's firsthand perspective.

130.     The Article demonized Amy for her interest in her husband's life and for her attempts to protect him from his highly volatile children. After repeatedly assuring Amy that her late husband's legacy would be accurately represented, and that they would disregard any accounts from people "with an axe to grind," Greene and Penske elected to exclusively rely on narratives promoted by people that Eric himself had cut off.

131.    Despite Greene's request to "bounce things off" Amy that he had "heard from other people," and his assurances that this was a "passion project" and the goal was the "definitive profile," the Article characterized statements made by people whom Eric had permanently excised from his life as objective factual truth, and cast Amy's point of view as hyperbolic commentary.

132.    Penske and Greene had actual knowledge that Amy was the most credible and accurate source of information about Eric's final years. They also knew that Clayton and Kathryn were conflicted at best, and that their recital of facts would be tainted by long-standing interpersonal and financial tensions with Eric, accompanied by years of limited contact.

133.    Despite this knowledge, Penske and Greene consciously avoided seeking clarifying input from Amy, and professed a false commitment to sound journalism while ignoring easily verifiable facts and that comprised the majority of Amy's written responses. To make matters worse, Greene had received many documents from Amy that confirmed the accuracy of her side of the story, and still chose to print the stories that were told by family members with an ostensible axe to grind.

134.    This conduct amounts to actual malice, and at minimum, negligence, since Defendants Penske and Greene made a knowing publication of falsehoods or acted with reckless disregard for the truth, or at minimum, were negligent. Defendants crafted and published a narrative they knew was misleading, relying on unreliable sources and intentionally shielding themselves from contradictory facts that would undermine the sensational impact of the article.

135.    In sum, the Article was not a mere journalistic oversight. For Penske and Greene, it was a calculated decision designed to sacrifice truth for controversy at the direct expense of a grieving widow. For Clayton, Kathryn, Fred, and Susan, it was a final opportunity to settle old

scores, rewrite the history of their fractured relationships with Eric, and assert their own financial interests without his objection.

136. Unsurprisingly, the Article reached nearly every corner of the internet. Eric's iconic status, his "mysterious" desire to live a private life, and Penske and Greene's recital of Fred, Clayton, and Kathryn's falsities proved to be a potent attention-grabbing combination.

137. *Rolling Stone* first published the Article on January 19, 2025, posting it to its website and advertising it on social media accounts, receiving ~40,000 views on X alone. *See*, https://x.com/RollingStone/status/1880979022190109149, ROLLING STONE @RollingStone (last visited Aug. 10, 2025); https://x.com/RollingStone/status/1883301323950748125, ROLLING STONE @RollingStone (last visited Aug. 10, 2025).

138. The Article was widely republished and discussed by many users on the internet's watering hole: *X* (formerly *Twitter*).

139. Penske amplified reader engagement with the Article by posting about it *twice* on the *Rolling Stone X* account to over 6,000,000 followers. *See*, https://x.com/RollingStone (last visited Aug. 10, 2025).

140. Penske also advertised the Article to its 5,300,000 *Facebook* followers, but tailored those excerpts to a more politically incensed audience, saying that "Eric Carmen descended into far-right conspiracy theories near the end of his life, appalling his kids: 'Our jaws were on the ground as we saw everything unfold with his politics.' " and " 'The more that Trump appeared on my TV, the more I would pick up on certain little things about him that reminded me of my dad,' says Carmen's son." *Rolling Stone*, FACEBOOK (Jan. 19, 2025) https://www.facebook.com/RollingStone/posts/eric-carmen-descended-into-far-right-conspiracy-theories-near-the-end-of-his-lif/978725704115496/ (last visited Aug. 10, 2025); *Rolling Stone*,

FACEBOOK (Jan. 19, 2025) https://www.facebook.com/RollingStone/posts/after-creating-the-blueprint-for-power-pop-eric-carmen-vanished-we-spent-months-/978494317471968/ (last visited Aug. 10, 2025).

141.    Penske, which has a self-described "global audience of over 60 million people per month" repeatedly published the Article to convince their readers that their "*unrivaled access and authority*" would offer a truthful glimpse of Eric's private life. https://www.pmc.com/our-brands/rolling-stone (last visited Aug. 10, 2025) (emphasis added).

142.    In addition, multiple media outlets republished, adopted, and endorsed the false, defamatory, disparaging, and artificially inflammatory statements in the Article, including to hundreds of millions of global users via Yahoo! Entertainment and Apple News. Max Tani, *As clicks dry up for news sites, could Apple's news app be a lifeline?*, SEMAFOR (May 19, 2024) https://www.semafor.com/article/05/19/2024/as-clicks-dry-up-for-news-sites-could-apples-news-app-be-a-lifeline (last visited Aug. 10, 2025); *see also,* Andy Greene, *Eric Carmen Was a Power-Pop Legend. Then He Vanished*, YAHOO! ENTERTAINMENT (Jan. 19, 2025) https://www.yahoo.com/entertainment/eric-carmen-power-pop-legend-140000043.html?guccounter=1&guce_referrer=aHR0cHM6Ly9sLmZhY2Vib29rLmNvbS8&guce_referrer_sig=AQAAACu95t2UUFFALsRdF4OIDfYZmb9eGitr2TXYSkOGAa1up2s5lCnvHSpTA6CoSi8kVu0HAbeoR2Ua3B-oo3dmNAo1OXtY1n-RlUjc9i90AxOVbbRVSm1jQIl1Z-112YU1KJIu1sNKM2NQFUEWe6wkMqYu024xY23tG7W9agBAYcQW (last visited Aug. 10, 2025); https://x.com/AppleNews/status/1882452644494483490, APPLE NEWS @AppleNews (last visited Aug. 10, 2025).

143.    Following Penske and Greene's publication of the Article, Eric's private life was the topic *du jour* across local news, social media, independent music forums, fan groups, and

discussion boards alike. *See, e.g.,* Joey Morano, *Family drama unfolds after Eric Carmen's death, Rolling Stone reports*, CLEVELAND.COM (Jan. 22, 2025) https://www.cleveland.com/entertainment/2025/01/family-drama-unfolds-after-eric-carmens-death-rolling-stone-reports.html (last visited Aug. 10, 2025); Steve Hoffman Music Forums, (https://forums.stevehoffman.tv/threads/eric-carmens-pop-genius-sad-decline-and-unexplained-death.1222106/) (last visited Aug. 10, 2025); 'The Gear Page,' https://www.thegearpage.net/board/index.php?threads/eric-carmens-pop-genius-sad-decline-and-unexplained-death.2633243/ (last visited Aug. 10, 2025); Endless Harmony (https://endlessharmony.boards.net/thread/3506/carmen-story-rolling-stone-yahoo) (last visited Aug. 10, 2025); Paul Colombo, FACEBOOK.COM (THE ERIC CARMEN EXPERIENCE), (Jan. 19, 2025), https://www.facebook.com/groups/94846496584/posts/10162101973366585/?_rdr (last visited Aug. 10, 2025); r/Cleveland (post by @cbothsides97) REDDIT (Jan. 2025), https://www.reddit.com/r/Cleveland/comments/1i5atyj/rolling_stone_eric_carmen_was_a_power_pop_legend/ (last visited Aug. 10, 2025); r/Longreads (post by @haloarh) REDDIT (Jan. 2025), https://www.reddit.com/r/Longreads/comments/1i6x3cc/eric_carmen_was_a_powerpop_legend_then_he/ (last visited Aug. 10, 2025).

144.    The Article caused many of Eric's longtime fans to accuse Amy of being "an abusive manipulative controller," and to lament her for being Clayton and Kathryn's "evil stepmother." *See* Yahoo! Entertainment, Steve Hoffman Music Forums. Even commenters who tried to give Amy the benefit of the doubt accused her of "undermin[ing] and eventually destroy[ing] his relationship with his children." *Id.* Less discerning members of the public called her "the cause for his isolation," characterized her as "the problem," "a narcissist," and as a

"vindictive, hateful person" who was only out to take Eric's money away from his darling children, and hoped for savage karmic retribution against Amy.

145.    One of Eric's fans expressed their belief that "Amy positioned herself so she could basically run the show. I think she tainted how everyone saw Eric, maybe she even posted on his Twitter account to make him seem unhinged. So much of this article doesn't sound like him. . . ." Mariah Philips, FACEBOOK.COM (THE ERIC CARMEN EXPERIENCE), (Jan. 19, 2025), https://www.facebook.com/groups/94846496584/posts/10162101973366585/?_rdr (last visited Aug. 10, 2025).

146.    The cacophony of reader comments unanimously confirms that "the second wife [Amy] does not come off as a good person" in the Article. *See*, Longreads, *supra*. Defendants' statements led the public to believe that Amy was "[expletive] around with the will while [Eric] had diminished capacity" and that the truth would be revealed "from the kids.*" See,* Cleveland, *supra*.

147.    Although these many examples are only a fraction of the impressions and engagement that has been generated by the Article, the false, defamatory, disparaging, and inflammatory statements contained therein have been viewed by thousands upon thousands of people.

148.    Defendants' conduct directly caused tens of millions of people to read overtly false and defamatory statements about Amy and Eric, and introduced a false narrative into popular culture, casting a shadow on his sparkling accomplishments. As one fan put it, "there was nothing in the article that I needed to know… which begs the question, what's the point? What I kept hearing in my head while reading that article was Don Henley singing Dirty Laundry." *Supra*, Endless Harmony (comment by Paul JB) (Jan. 25, 2025) (last visited Aug. 10, 2025).

149.    All the above-referenced iterations of the Article, posts about the Article, and false statements arising from the Article have resulted in enormous financial and reputational damages to Amy, totaling in excess of $75,000, exclusive of interest and costs, and reasonably believed to be substantially higher. These damages were and are a direct and proximate result of the explicit and implicit defamatory statements in the Article.

150.    Amy has been subjected to contempt, embarrassment, humiliation, scorn, shame, and ridicule about her character and integrity.

151.    She will also be severely impaired in any future professional endeavors.

152.    Further, the Defendants' wrongful conduct has directly and proximately caused Amy to suffer significant mental anguish and emotional distress.

153.    Amy has suffered an impairment of her reputation in the community, including among those individuals who were and are fans of Eric's work.

154.    Critically, prior to the Article, Amy was living a carefully guarded private, non-public life. Solely due to the unwanted invasion of her privacy by Defendants, she has now become the subject of vitriol and public ridicule.

155.    Amy was not, and is not, a public figure. She is a private individual.

156.    As the Article acknowledged, Eric and Amy made extensive efforts to "vanish" from the public eye. The Article served to un-do all of Eric and Amy's careful separation from public life. Instead, it presented a caricature of Amy, drawn from unquestioned falsities proffered by long-estranged family members with both personal and financial axes to grind.

157.    As a direct and proximate result of Defendants' wrongful conduct described herein, Amy has been forced to endure an unwelcome, nonconsensual, and involuntary invasion of her

cherished and carefully guarded privacy as a private individual who was not, and is not, a public figure.

158.    As a direct and proximate result of the Defendants' wrongful conduct, and because of Plaintiff's need to protect and enforce her legal rights, Plaintiff has retained the undersigned attorneys and is required to pay attorneys' fees to prosecute this action.

159.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has been damaged in an amount that exceeds the sum of $75,000, exclusive of interest and costs, and is reasonably believed to be substantially higher.

## CLAIMS FOR RELIEF

### COUNT I
#### *Defamation Per Se Under Ohio Law*
(Plaintiff v. Defendants Penske and Greene)

160.    Plaintiff realleges her allegations contained in the preceding paragraphs as if fully set forth herein.

161.    "Defamation is a false publication that injured a person's reputation." *Dale v. Ohio Civ. Serv. Emp. Assn.*, 57 Ohio St. 3d 112, 117 (1991).

162.    "Defamation *per se* occurs when material is defamatory on its face . . . . [w]ritten material is libelous per se if, on its face, it reflects a person's character in a manner that will cause [her] to be ridiculed, hated, or held in contempt, or in a manner that will injure [her] in his trade or profession." *Becker v. Toulmin*, 165 Ohio St. 549, 556 (1956); *see also Louscher v. Univ. of Akron*, 2017-Ohio-4316.

163.    A cause of action for defamation by a private plaintiff against a media organization consists of five elements: "(1) the organization made a false statement, (2) the statement was defamatory, (3) the organization published the statement, (4) the plaintiff was harmed as a

proximate result of the publication, and (5) the organization acted with the requisite degree of fault in publishing the statement." *Anderson v. WBNS-TV, Inc.*, 158 Ohio St. 3d 307, 309 (2019).

164.    Regarding the requisite degree of fault, Ohio applies the negligence standard as the standard of liability for actions involving a private defamation plaintiff. *Embers Supper Club, Inc. v. Scripps-Howard Broadcasting, Inc.*, 9 Ohio St.3d 22, 25 (1984); *Landsdowne v. Beacon Journal Pub. Co.*, 32 Ohio St. 3d 176, 179 (1987) ("We are persuaded that the negligence standard of review is appropriate in this area.").  Here, Amy is a private plaintiff and not a public figure, and thus the negligence standard applies.

165.    As to the first element, Penske and Greene made numerous false statements in the Article, to wit: Actionable Statements 1 through 15, *supra*.

166.    As to the second element, Actionable Statements 1 through 15 were defamatory because they wrongly portrayed Amy as dishonest, divisive, greedy, litigious, and manipulative; wrongly accused her of fault and misdeeds that were in fact caused by Fred, Clayton, or Kathryn; and wrongly blamed her for the numerous Carmen family disgraces, embarrassments, and tragedies that were in reality caused by Fred, Clayton, and Kathryn.

167.    As to the third element, Penske and Greene published the defamatory statements in *Rolling Stone*.

168.    As to the fourth element, Amy was harmed because she was exposed to contempt, hatred, and ridicule, and had her reputation for decency and honesty ruined, rendering Penske and Greene's conduct actionable as defamation *per se*.

169.    As to the fifth element, Penske and Greene acted negligently in publishing the Article because they failed to "act[] reasonably in attempting to discover the truth or falsity or defamatory character of the publication." *Embers,* 9 Ohio St.3d at 25.

170.    Indeed, Penske and Greene ignored a mountain of evidence that Amy and Eric were the victims of extensive illegal, immoral, and unethical conduct by Fred, Clayton, and Kathryn. With even the most minimal level of due diligence, Penske and Greene could have discovered that their sources—Fred, Clayton, and Kathryn—were all plagued with incurable credibility issues.

171.    But Penske and Greene were not interested in learning or printing the truth, because the truth would have gotten in the way of the story they wanted to publish, which was a hit piece against politically opposite Amy and Eric. As they surely know, "deliberately avoiding information that may undermine a published story may be grounds for a finding of malice." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989). Here, a finding of malice is not even required under Ohio law governing defamation actions by private plaintiffs; but given the yawning gap between Greene's promises to Amy and what he ultimately published, it is painfully obvious that there was no effort whatsoever to follow the truth.

172.    Instead, Penske and Greene negligently ignored numerous irrefutable and flashing-red warning lights about the credibility of their sources for the Article, including but not limited to: (a) Kathryn's written admission that she and Clayton planned to kill Eric; (b) Clayton's suspension for academic dishonesty; (c) Clayton's unauthorized drunken party at Eric's house; (d) Clayton and Kathryn's break-ins and drug sales at Eric's house; (e) the fact that Fred, Clayton, Susan, and Kathryn had all instigated and participated in litigation against Eric and Amy across the three Lawsuits; (f) the fact that Clayton and Kathryn are currently seeking to write their way back into Eric's estate plan with Lawsuit #3, having already sued Eric in Lawsuit #2, and now have compelling financial motivations to try and damage Amy's reputation; (g) the fact that Fred, Clayton, and Kathryn breached the Non-Disparagement Provisions of the Settlement Agreements

in order to communicate with Penske and Greene for the Article; and (h) Fred's malfeasance with respect to Eric's money and the ensuing Lawsuit #1.

173.     By reason of the foregoing, Amy is entitled to compensatory and punitive damages in an amount to be determined upon trial of this action.

## COUNT II
### *Defamation Per Se Under Ohio Law*
(Plaintiff v. Defendants Fred, Clayton, and Kathryn)

174.     Plaintiff realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

175.     A cause of action for defamation by a private plaintiff against non-media defendants involves essentially the same elements as a cause of action by a private plaintiff against media defendants: "(1) a false and defamatory statement; (2) about plaintiff; (3) published without privilege to a third party; (4) with fault of at least negligence on the part of the defendant; and (5) that was either defamatory per se or caused special harm to the plaintiff." *Davis v. Jacobs*, 126 Ohio App. 3d 580, 582 (Ohio App. 1998).

176.     The standard of fault is the same whether involving media or non-media defendants. "Fault is established by determining whether 'the defendant acted reasonably in attempting to discover the truth or falsity of defamatory character of the publication.' " *Franks v. The Lima News*, 109 Ohio App.3d 408, 412 (Ohio App. 1996) (quoting *Embers*, 9 Ohio St.3d at 25).

177.     As to the first element, Fred, Clayton, and Kathryn made numerous false statements to Penske and Greene for publication in the Article, to wit: Actionable Statements 1 through 15, *supra*.

178.     As to the second element, Actionable Statements 1 through 15 were defamatory because they wrongly portrayed Amy as dishonest, divisive, greedy, litigious, and manipulative;

wrongly accused her of fault and misdeeds that were in fact caused by Fred, Clayton, or Kathryn; and wrongly blamed her for the numerous Carmen family disgraces, embarrassments, and tragedies that were in reality caused by Fred, Clayton, and Kathryn.

179.    As to the third element, Fred, Clayton, and Kathryn sat for an interview and engaged in communications with Greene with the intention and knowledge that their statements would be published in *Rolling Stone*, and did so knowing that they were prohibited from doing so pursuant to the Non-Disparagement Provisions of the Settlement Agreements.

180.    As to the fourth element, Amy was harmed because she was exposed to contempt, hatred, and ridicule, and had her reputation for decency and honesty ruined, rendering the conduct of Fred, Clayton, and Kathryn actionable as defamation *per se*.

181.    As to the fifth element, Fred, Clayton, and Kathryn acted with a state of mind far worse than negligence in causing the Article to be published, because they knew they were providing self-serving and false information to Greene, and did so knowing they were prohibited from doing so under the Non-Disparagement Provisions of the Settlement Agreements. Clayton and Kathryn in particular acted with ill intent, given their current posture as litigants against Amy in Lawsuit #3 and knowing that generating negative press against Amy could aid them in Lawsuit #3.

182.    Fred, Clayton, and Kathryn presented a fantastical version of events to Greene which intentionally omitted material facts that would change a reasonable reader's perception of reality, including but not limited to: (a) Kathryn's written admission that she and Clayton planned to kill Eric; (b) Clayton's suspension for academic dishonesty; (c) Clayton's unauthorized drunken party at Eric's house; (d) Clayton and Kathryn's break-ins and drug sales at Eric's house; (e) the fact that Fred, Clayton, and Kathryn had all instigated and participated in litigation against Eric

and Amy across the three Lawsuits; (f) the fact that Clayton and Kathryn are currently seeking to wrestle control of the Trust from a private institution approved by Eric some eight years before his passing in Lawsuit #3, having already sued Eric in Lawsuit #2, and now have compelling financial motivations to try and damage Amy's reputation; (g) the fact that Fred, Clayton, and Kathryn breached the Non-Disparagement Provisions of the Settlement Agreements in order to communicate with Penske and Greene for the Article; and (h) Fred's malfeasance with respect to Eric's money and the ensuing Lawsuit #1.

183.     By reason of the foregoing, Amy is entitled to compensatory and punitive damages in an amount to be determined upon trial of this action.

### COUNT III
### *False Light Under Ohio Law*
(Plaintiff v. All Defendants)

184.     Plaintiff realleges her allegations contained in the preceding paragraphs as if fully set forth herein.

185.     In Ohio, "[o]ne who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of privacy if (a) the false light in which the other was placed would be highly offensive to a reasonable person and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Horenstein, Nicholson & Blumenthal, L.P.A. v. Hilgeman*, 178 N.E.3d 71, 96 (Ohio App. 2021) (citing Restatement of the Law 2d, Torts, § 652E (1977)).

186.     Here, all of the Defendants placed Amy before the public in a false light by portraying her in a highly offensive manner, to wit: as dishonest, divisive, greedy, litigious, and manipulative; as guilty of and at fault for the misdeeds that were in fact caused by Fred, Susan,

Clayton, or Kathryn; and as responsible for the numerous Carmen family disgraces, embarrassments, and tragedies that were in reality caused by Fred, Susan, Clayton, and Kathryn.

187.    Defendants created this portrayal of Amy both by publishing Actionable Statements 1 through 15 individually, and by the aggregate effect of all fifteen Actionable Statements coupled with the overall tone of the Article.

188.    Moreover, all of the Defendants certainly acted with reckless disregard as to the falsity of the Actionable Statements. Fred, Clayton, and Kathryn have much to gain financially by ruining Amy's reputation, they have every motivation to try and repair their own shattered reputations at Amy's expense, and, simply put, they hate Amy because she was the only family member who actually cared about Eric for who he was, not for how much money he had. Fred, Clayton, and Kathryn were so eager to recklessly damage Amy's reputation that they disregarded their legal obligations under the Non-Disparagement Provisions of the Settlement Agreements, while Penske and Greene were more than happy to accept their tainted communications to fabricate a sensational story.

189.    Each of the Actionable Statements present actionable facts under the analysis set forth in *Bentkowski v. Scene Magazine*, 637 F.3d 689, 693-94 (6th Cir. 2011).

190.    The language used in the Actionable Statements is rife with factual implications, including false allegations that Amy committed a variety of transgressions against Eric's family members solely for her own personal gain.

191.    The Actionable Statements are verifiable, especially since many of them relate to matters of public record. And so, readers are likely to view the Actionable Statements as conveying actual facts.

192.    By reason of the foregoing, Plaintiff is entitled to compensatory and punitive damages in an amount to be determined upon trial of this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff AMY CARMEN demands judgment against Defendants PENSKE MEDIA CORPORATION, ANDY GREENE, FRED N. CARMEN, CLAYTON E. CARMEN, and KATHRYN L. CARMEN, as follows:

(a) On all counts, an injunction requiring Defendants to print, publish, and circulate a statement setting forth the truth pertaining to the facts of this matter;

(b) On all counts, compensatory damages in an amount to be determined upon trial of this action, but in any event in excess of $75,000, exclusive of interest and costs;

(c) On all counts, punitive damages in an amount to be determined upon trial of this action;

(d) On all counts, the attorneys' fees and costs of this action;

(e) Such other relief as the Court deems just and proper.


Date: August 11, 2025                                      Respectfully submitted,

                                                           *Edward Paltzik*
                                                           _____
                                                           Edward Andrew Paltzik
                                                           Meredith R. Lloyd (Ohio Bar # 0102173)
                                                           Taylor Dykema, PLLC
                                                           914 E. 25th Street
                                                           Houston, TX 77009
                                                           (516) 526-0341
                                                           edward@taylordykema.com
                                                           meredith@taylordykema.com

                                                           *Counsel for Plaintiff Amy Carmen*

## **JURY DEMAND**

**JURY TRIAL DEMANDED**. Plaintiff hereby demands a jury trial on all issues and claims so triable.

*Edward Paltzik*

_____

Edward Andrew Paltzik
Meredith R. Lloyd (Ohio Bar # 0102173)
Taylor Dykema, PLLC
914 E. 25th Street
Houston, TX 77009
(516) 526-0341
edward@taylordykema.com
meredith@taylordykema.com

*Counsel for Plaintiff Amy Carmen*