# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**AMY CARMEN,**

                Plaintiff,

      v.

**PENSKE MEDIA CORPORATION,** *et al.*,

                Defendants.

**Case No. 1:25-cv-1671**
**Judge Charles Esque Fleming**

## DEFENDANTS PENSKE MEDIA CORPORATION AND ANDY GREENE'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Pursuant to Federal Rule of Civil Procedure 12(B)(6), Defendants Penske Media Corporation ("Penske Media") and Andy Greene ("Greene") respectfully request an order from this Court dismissing the claims filed by Plaintiff Amy Carmen ("Amy" or "Plaintiff") against Penske Media and Greene with prejudice. The reasons for this motion are more fully set forth in the attached Memorandum in Support.

Respectfully submitted,

*/s/ Kevin T. Shook*
Kevin T. Shook (0073718)
Amy E. Mildebrath (0104565)
FROST BROWN TODD LLP
10 West Broad Street, Suite 2300
Columbus, Ohio 43215
P: (614) 464-1211; F: (614) 464-1737
kshook@fbtlaw.com
amildebrath@fbtlaw.com

*Attorneys for Defendants Penske Media Corporation and Andy Greene*

## <u>TABLE OF CONTENTS</u>

**Page**

I.     INTRODUCTION ....................................................................................................1

II.    STATEMENT OF FACTS...................................................................................2

    A.    Underlying Family Dispute ....................................................................2

    B.    The Challenged Statements....................................................................4

III.    STATEMENT OF LAW ......................................................................................9

    A.    12(b)(6) Standard ..................................................................................9

    B.    Defamation ..........................................................................................10

    C.    False Light ...........................................................................................13

IV.    ANALYSIS .......................................................................................................14

    A.    Plaintiff's defamation claim should be dismissed................................14

        1.    Many Challenged Statements are not "of and concerning" Plaintiff. .......14

        2.    Many Challenged Statements are true or substantially true. ..................16

        3.    Many Challenged Statements are non-actionable statements of opinion. ........................................................................................20

        4.    Many Challenged Statements do not carry a defamatory meaning...........23

        5.    Ohio law does not recognize defamation by omission. ..........................25

        6.    The Article as a whole is an accurate and balanced standard piece of investigative journalism. ...................................................26

    B.    Plaintiff's false light claim should also be dismissed..........................28

V.    CONCLUSION .................................................................................................30

CERTIFICATE OF SERVICE ...................................................................................31

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adams v. Karl*,
    2024 WL 4243773 (S.D. Ohio 2014) ...............................................................................20

*Am. Chem. Soc. v. Leadscope, Inc.*,
    978 N.E.2d 832 .................................................................................................................26

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...........................................................................................................9

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...........................................................................................................9

*Bentkowski v. Scene Mag.*,
    637 F.3d 689 (6th Cir. 2011)..................................................................................*passim*

*Boulger v. Woods*,
    917 F.3d 471 (6th Cir. 2019)............................................................................... 11, 12

*Bruss v. Vindicator Printing Co.*,
    109 Ohio App.3d 396 (7th Dist. 1996) ...........................................................................10

*Carr v. Educ. Theatre Ass'n*,
    215 N.E.3d 584 (Ohio Ct. App. 2023)..............................................................................12

*Carver v. Grace*,
    2024 WL 4953428 (E.D. Louisiana 2024) .......................................................................20

*Couch v. Verizon Communications*,
    105 F.4th 425 (D.C. Cir. 2024).......................................................................................20

*Croce v. New York Times Co.*,
    345 F.Supp.3d 961 (S.D. Ohio 2018) ......................................................................*passim*

*Croce v. New York Times Co.*,
    930 F.3d 787 (6th Cir. 2019)..................................................................................*passim*

*Croce v. Sanders*,
    843 F. App'x 710 (6th Cir. 2021).....................................................................................11

*Dinkel v. Lincoln Publishing (Ohio), Inc.*,
    638 N.E.2d 611 (Ohio Ct. App. 1994) .............................................................................15

ii

*Dombrowski v. Pfister*,
    380 U.S. 479 (1965) ........................................................................................9

*Dragulesco v Virginia Union University*,
    223 F.Supp.3d 499 (E.D. Va. 2016) ...............................................................21

*Dudee v. Philpot*,
    133 N.E.3d 590 (Ohio Ct. App. 2019) .................................................... 13, 29

*Dupler v. Mansfield Journal Co., Inc.*,
    413 N.E.2d 1187 (Ohio 1980) .......................................................................10

*Early v. Toledo Blade*,
    130 Ohio App.3d 302 (6th Dist. 1998) ...........................................................20

*Ferreri v. Plain Dealer Publ'g Co.*,
    756 N.E.2d 712 (2001) ...................................................................................22

*Green v. Mason*,
    504 F.Supp.3d 813 (S.D. Ohio 2020) .................................................. 10, 12, 23

*Guisinger v. E.A. Tow Transport, Inc.*,
    2018 WL 2432751 ...........................................................................................21

*Gunasekera v. Irwin*,
    551 F.3d 461 (6th Cir. 2009)............................................................................9

*Haywood v. Lucent Technology*,
    169 F. Supp.2d 890 (N.D. Ill. 2001) ..............................................................20

*Hersh v. Grumer*,
    176 N.E.3d 1135 (Ohio Ct. App. 2021) ..........................................................11

*Lambert v. Garlo*,
    484 N.E.2d 260 (Ohio Ct. App. 1985) ..................................................... 10, 14

*Masson v. New Yorker Mag., Inc.*,
    501 U.S. 496 (1991) .......................................................................................16

*McCafferty v. Newsweek Media Grp., Ltd.*,
    955 F.3d 352 (3d Cir. 2020).............................................................................22

*McClure v. Ohio Dep't of Rehab. & Correction*,
    2020-Ohio-1035 (10th Dist. Franklin) ...........................................................12

*McKimm v. Ohio Elections Comm.*,
    729 N.E.2d 364 (Ohio 2000)...........................................................................23

*Miller v James*,
   751 F.Supp. 3d 21 (N.D. N.Y. 2024) ................................................................21

*Molnarova v. Swamp Witches Inc.*,
   LLC, 2024 WL 4198149 (S.D. Ohio 2024) ......................................................20

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964) ...........................................................................................10

*Paige v. Youngstown Bd. of Education*,
   1994 WL 718839 (7th Dist. 1994) .....................................................................20

*Patrick v. Cleveland Scene Pub. LLC*,
   582 F. Supp. 2d 939 (N.D. Ohio 2008), *aff'd*, 360 F. App'x 592 (6th Cir.
   2009) ...................................................................................................................29

*Philadelphia Newspapers Inc. v. Hepps*,
   475 U.S. 767 (1986) .....................................................................................11, 16

*Rizvi v. St. Elizabeth Hosp. Med. Ctr.*,
   2001-Ohio-3412 (7th Dist. Mahoning) ..............................................................20

*Sabino v. WOIO, L.L.C.*,
   56 N.E.3d 368 (8th Dist. 2016) .........................................................................23

*Scott v. News-Herald*,
   496 N.E.2d 699 (Ohio 1986) .............................................................................11

*Shifflet v. Thomson Newspapers (Ohio), Inc.*,
   431 N.E.2d 1014 (Ohio 1982) ...........................................................................16

*SPX Corp. v. Doe*,
   253 F.Supp.2d 974 (N.D. Ohio 2003) ...............................................................11

*Stholmann v. WJW TV, Inc.*,
   2006 WL 3518121 (8th Dist. 2006) ...................................................................22

*Swartz v DiCarlo*,
   2017 WL 1284724 (S.D. Ohio 2017) ................................................................22

*Vail v. The Plain Dealer Publ'g Co.*,
   649 N.E.2d 182 (Ohio 1995) .............................................................................21

*Wampler v. Higgins*,
   752 N.E.2d 962 (Ohio 2001) .............................................................................21

*Ward v. Jeff Props., LLC*,
   2010 WL 346459 (N.C. Ct. App. 2010) ............................................................21

*Welling v. Weinfeld*,
  866 N.E.2d 1051 (Ohio 2007) .......................................................... 13, 14, 28, 29

*Whittiker v. Deutsche Bank Nat. Tr. Co.*,
  605 F. Supp. 2d 914 (N.D. Ohio 2009) ................................................................. 4

*Woods v. Sharkin*,
  192 N.E.3d 1174 (Ohio Ct. App. 2022) ("Ohio does not recognize defamation
  by implication.") ................................................................................... 12, 13

*Worldnet Software Co. v. Gannett Satellite Info. Network, Inc.*,
  702 N.E.2d 149 (Ohio Ct. App. 1997) ........................................................ 10, 14

*Yeager v. Local Union 20*,
  453 N.E.2d 666 (Ohio 1983) ..................................................................... 10, 23

*Young v. CSL Plasma, Inc.*,
  2017 WL 5157230 (6th Cir. 2017) ............................................................. 16, 19

**Statutes**

R.C. 2714.05 ............................................................................................... 15

**Other Authorities**

First Amendment ............................................................................ 1, 9, 10, 30

*Eric Carmen Was a Power Pop Legend. Then He Vanished*" ("Article") in *Rolling
  Stone*, a Penske Media publication ................................................................ 1, 29

Fed. R. Civ. P. § 12(b)(6) ............................................................................. 9

<u>MEMORANDUM IN SUPPORT</u>

## I.    INTRODUCTION

In January 2025, journalist Andy Greene published, "*Eric Carmen Was a Power Pop Legend. Then He Vanished*" in *Rolling Stone*, a Penske Media publication (the "Article").[1] Far from a hit piece, the Article is a well-sourced, balanced look at Eric Carmen's legacy as a pop icon, his pivot away from music, political views, and family tensions. As Greene wrote, "[t]he complex portrait that emerged varies wildly, depending on who's doing the telling." The piece draws from extensive interviews, including Plaintiff Amy Carmen's own account.

Amy Carmen brought this lawsuit claiming the Article defamed her reputation and portrayed her in a false light.[2] Her 55-page Complaint is long on rhetoric, but short on substance. She attempts to skirt the well-established rule that the deceased cannot be defamed by recasting the Article as a statement about her character. That effort fails. Defamation claims must be based upon statements that are "of and concerning" the plaintiff. Further any statements in the Article that arguably reference Amy are nonactionable because they are either true or substantially true based on her own statements, protected expressions of opinions or devoid of defamatory meaning.

Moreover, under the Sixth Circuit's framework established in *Croce v. New York Times Co.*, 930 F.3d 787 (6th Cir. 2019), the Article—when viewed as a whole—is a standard piece of investigative journalism, protected by the First Amendment. It doesn't defame Plaintiff or portray her in a false light—it merely reflects the family controversies that her own Complaint confirms. Neither the individual statements nor the Article as a whole support a viable claim for defamation. For all of the above reasons, the Complaint fails to state a claim. Greene and Penske Media (collectively, the "Rolling Stone Defendants") should be dismissed as a matter of law.

---

[1]    The Article was published by Rolling Stone LLC, which is a subsidiary of Penske Media Corporation.
[2]    Plaintiff's Complaint brings a separate count for defamation against the other defendants in this case.

1

II.     STATEMENT OF FACTS

A.      Underlying Family Dispute

The following facts are all drawn directly from the Complaint and must be accepted as true for the purposes of this Motion.

In the 1970s, 80s, and 90s, Eric Carmen rose to fame with hits like "Hungry Eyes" and "All by Myself." (Comp. ¶ 26.) He met and married Susan Carmen née Wirtenberg in 1993, and the pair had two children, Kathryn and Clayton. (*Id.* ¶ 4.) After a long legal battle, Susan and Eric divorced in 2011. (*Id.*)

After the divorce, Eric's relationship with his brother, ex-wife, and children deteriorated. He repossessed a BMW he had once gifted Clayton (*Id.* ¶ 51), sent emails to his children and ex-wife lamenting "nothing I do for you makes any difference" (*Id.* ¶ 48), and began "routinely searching" Kathryn's room after discovering that she was using or selling drugs in the house (*Id.* ¶ 61). One search revealed a passage from Kathryn's teenage diary in which she wrote "Clay & I have discussed killing Eric[.]" (*Id.* ¶ 64.) The passage is now central to ongoing litigation. (*Id.*)

In 2015, Clayton and Kathryn threw a "drunken New Year's Eve party" at Eric's home, without Eric's permission, and attempted to cover up the party for over a year. (*Id.* ¶ 57.) That same year, Eric discovered that his brother and attorney, Fred Carmen, was mismanaging a trust Eric had created. Eric fired Fred and sued him for financial malfeasance. (*Id.* ¶ 80.) The lawsuit settled, but the relationship was permanently fractured.

By 2018 to 2019, Eric's relationships with his children were all but over. Eric sent Kathryn a cease-and-desist letter for vandalizing his Wikipedia page and sent her an email that he was "done" with her. (*Id.* ¶ 66.) He likewise sent Clayton an email calling his son a "destructive, irresponsible liability." (*Id.* ¶ 73.)

2

Amid this family turmoil, Eric's relationship with Amy Carmen blossomed. The pair met in 2014 and married in 2016. (*Id.* ¶ 9.) During his kids' teenage years, Amy tried to support Clayton and Kathryn by helping them with homework, preparing meals, fixing Kathryn's hair for school, and driving the kids and their friends around. (*Id.* ¶ 117.) Despite Amy's attempts, tensions persisted, and Clayton and Kathryn remained at odds with Eric and his wife. Eventually, tensions became so high that Amy and Eric could not bear it any longer. When Clayton appeared at Eric and Amy's house one night, Eric and Amy refused to open the door, kept their curtains closed, and called the police to report a trespasser. (*Id.* ¶ 100.)

To escape this family drama, Eric and Amy decided to move to Pheonix, Arizona, without telling Eric's family. (*Id.* ¶ 74.) Six years later, Eric passed away. (*Id.* ¶ 9.) By that time, Eric had not been in regular contact with his children or brother for nearly a decade. Eric's family blames Amy for their estrangement; Amy blames Eric's family.

Regardless, when Eric died, Amy called Clayton and Fred to inform them of the loss (*see id.* ¶¶ 100, 101), then set about planning Eric's memorial service (*id.* ¶ 113). But even after Eric's death, tensions were not resolved. Amy intentionally left Eric's family off the guest list for his memorial service and told Clayton and Kathryn they were not invited. (*Id.*) Instead, Amy invited Eric's friends, many of whom are celebrities, and secured a venue that provided security for the funeral. (*Id.*) Compounding this tension, a lawsuit between members of the Carmen family and Amy remains ongoing. (*Id.* ¶ 172.)

When Andy Greene set out to investigate Eric Carmen's life and legacy, he quickly encountered this kaleidoscope of conflicting opinions. Depending on the person being interviewed, Eric was either a doting husband (Comp. Ex. A, PAGEID # 74),[3] or a neglectful father (Comp. ¶ 76); a principled political activist (*id.* ¶ 6), or a far-right conspiracy theorist (*id.* ¶ 103); a struggling alcoholic (Comp., Ex. A, PAGEID # 74), or one in recovery (*id.* PAGEID # 76). Greene's Article presented these divergent views, ultimately observing that "[t]he one thing nobody disputes is that Carmen was a perfectionist and musical genius." (*Id.* PAGEID # 74.) The resulting portrait is of a gifted artist with complex familial relationships whose traditional guarded personal life gave way to outspoken political commentary in his later years. Amy Carmen now brings this case claiming the Article was a "hit piece attacking Eric [Carmen] and his widow." (*Id.* ¶ 6.)

### B.  The Challenged Statements

Plaintiff's Complaint alleges she was defamed by fifteen separate statements in the Article (the "Challenged Statements"). All are multiple sentences long, and the Complaint raises various issues as to each statement. For ease, below is a chart containing each Challenged Statement broken into relevant parts and a brief explanation why each statement is not actionable. This brief will identify the Challenged Statements by the numbers assigned in this chart.

| # | Challenged Statement | Basis for dismissal |
|---|---|---|
| 1a | As soon as he answered his phone, Clayton Carmen knew he was getting bad news. | Not of and concerning Plaintiff<br><br>Opinion |

---

[3]    A copy of the *Rolling Stone* Article is attached to the Complaint as Exhibit A and attached hereto as **Exhibit 1**. Documents attached to a Complaint are considered part of the pleadings if they are referred to in the complaint and are central to the plaintiff's claim. *See, e.g., Whittiker v. Deutsche Bank Nat. Tr. Co.*, 605 F. Supp. 2d 914, 924 (N.D. Ohio 2009). The Article is referred to, incorporated in, and attached to Plaintiff's Complaint and is central to her claims. Accordingly, the Court may consider the attached Article in ruling on this Motion.

|  |  | No defamatory meaning |
|---|---|---|
| 1b | It was March 2024, and by then, nearly a decade had passed since he had seen his father, Eric Carmen—the power-pop trailblazer and Raspberries frontman best remembered for the hits 'Go All the Way,' 'All by Myself,' and 'Hungry Eyes.' Clayton's stepmother, Amy, was on the other end of the line. | Not of and concerning Plaintiff<br><br>No defamatory meaning<br><br>No defamation by omission |
| 1c | The 27-year-old hadn't seen her since his high school days, when Clayton knocked on the door of the house that Amy shared with his dad in an attempt to finally reconcile their differences. | Truth<br><br>Opinion<br><br>No defamatory meaning |
| 1d | Carmen and Amy responded to the overture by closing the curtains, calling the police, and reporting a trespasser. | Truth<br><br>Opinion |
| 2a | Eric Carmen's brother, Fred, received a similar call from Amy. Fred hadn't communicated with his older brother since 2016, even though they were as close as siblings could be for the first 55 years of his life. | Not of and concerning Plaintiff<br><br>Truth.<br><br>No defamatory meaning.<br><br>No defamation by omission |
| 2b | Fred blames Amy for inspiring a series of lawsuits that separated Eric from his brother, his son, and 24-year-old Kathryn Carmen, Eric's only other child." | Truth<br><br>Opinion |
| 3 | "And how did the family schism widen to the point that Amy is now accusing Clayton and Kathryn of once plotting their father's murder, in one of multiple lawsuits Amy has been involved in following Carmen's death?" | Truth |
| 4 | "His brother, children, and ex-wife, Susan, describe a bitter, paranoid conspiracy theorist haunted by the past, lost in the face of shifting musical tastes, hopelessly addicted to alcohol, and manipulated by Amy to turn on his family." | Not of and concerning Plaintiff<br><br>Opinion |

| | | |
|---|---|---|
| | | Accurate Balanced Report/Croce v NY Times |
| 5 | 'The comparison I always make is to *The Parent Trap*. I always think of her [Amy] as the evil stepmom/ girlfriend,' Clayton says. 'When my dad was around, she was very smiley, happy, and sweet. But my sister and I knew from the very beginning that she was really, really, really bad news.' | Opinion<br><br>Accurate Balanced Report/Croce v NY Times |
| 6 | 'My father was just a very manipulatable, paranoid, isolated person,' he continues. 'And suddenly someone comes into his life and, instead of his kids, who will push back on him, she's a sycophant. She'll say yes to whatever he wants. She'll agree with him on his zaniest, most deranged conspiracy theories. She was just what he wanted.' | Not of and concerning Plaintiff<br><br>Opinion<br><br>Accurate Balanced Report/Croce v NY Times |
| 7a | The diary entry was cited as evidence that Kathryn and Clayton were 'planning Eric's murder' in a recent legal filing by Amy's attorneys. | Not of and concerning Plaintiff<br><br>Truth<br><br>No defamatory meaning |
| 7b | 'Amy took multiple photos of my diary to drive a wedge into the relationship with my father,' Kathryn writes in an email to Rolling Stone. | Truth<br><br>Opinion |
| 7c | 'These antics started as soon as she moved into the home. She would often comb through my brother and I's rooms looking for anything that could harm a parent-child relationship.' | Truth<br><br>Opinion |
| 7d | I am truly saddened that Amy would try to publicly misuse the private ramblings of a child who was experiencing so much heartbreak and pain at home…. Of course my brother and I never had any intention of causing physical threat to our father as she's suggesting. | Opinion<br><br>Accurate Balanced Report/Croce v NY Times |
| 8 | "In April 2018, [Eric] and Amy left Ohio to resettle in Arizona, but withheld telling the other members of the Carmen family; they resisted any attempt by Clayton and Kathryn to reconnect, as well." | Truth |

| | | |
|---|---|---|
| | | No defamatory meaning<br><br>Accurate Balanced Report/Croce v NY Times |
| 9a | Not long afterward, Carmen met Amy, and as they dated and eventually married, he slowly became estranged from his brother, his ex-wife, and both of his kids. | Truth<br><br>No defamatory meaning<br><br>Accurate Balanced Report/Croce v NY Times |
| 9b | Fred Carmen says that was by Amy's design. 'The plan was to first pull me away from Eric and then pull the children away from Eric, so that she was the sole source of everything, and that she would control him,' he says. 'To her credit, she was very effective. Again, Eric is a conspiracy theorist. She made him believe his entire family was engaged in a conspiracy against him.' | Opinion<br><br>Accurate Balanced Report/Croce v NY Times |
| 10a | Both sides of the Carmen family divide cite a wild party that Clayton threw at Eric and Amy's house when they were out of town as a turning point in their relationship. | Truth<br><br>No defamatory meaning |
| 10b | 'I should have had you charged with breaking and entering, and vandalism,' Eric wrote to his son in a 2018 email. 'From that point on,' says Susan, 'neither Clay nor Kath could go over to the house unless they were invited. It was like they were strangers in their own home.' | Not of and concerning Plaintiff<br><br>Truth<br><br>Opinion |
| 11a | At this same time, Eric Carmen filed a lawsuit against Fred, alleging mismanagement of his finances, improperly using money to provide care for their mother, and excessively charging him legal fees throughout the divorce period. | Not of and concerning Plaintiff |
| 11b | Fred says he first got wind that this might be coming when Carmen and Amy were at his house for a party. 'My nephew came to me,' says Fred. 'He said, 'You need to watch out for Amy. I just heard her say to my dad there was no way you could have paid for your new deck on your | Opinion<br><br>No defamatory meaning<br><br>Accurate Balanced |

| | | |
|---|---|---|
| | own.' 'That was the kind of thing Amy was saying to him to make him conclude I was stealing from him.' | Report/Croce v NY Times |
| 12 | When Clayton graduated from high school and planned on enrolling at NYU, he says, he learned that his father wasn't willing to pay for it. Per what Amy calls 'a very questionable prenuptial agreement' with his ex-wife Susan, Eric had to provide tuition for an in-state school. But Eric wouldn't pay for Ohio State, either, leading to a legal battle between the father and the son. 'I never, ever, ever wanted it to come to that,' says Clayton, 'but those were the options I was facing, and it was like, this isn't little, menial [expletive], this is my college education, and this is something that gives me the basis to start the rest of my life.' | Not of and concerning Plaintiff<br><br>Opinion<br><br>No defamatory meaning.<br><br>Accurate Balanced Report/Croce v NY Times |
| 13a | Amy says that Clayton never took his academic career seriously; he was once penalized by the school's Committee on Academic Misconduct (Clayton doesn't deny this: 'I fully [expletive] up,' he says). | Truth<br>Not of and concerning Plaintiff |
| 13b | She provided an email Eric sent to his son regarding college housing. 'Right now the only achievement I'm interested in is you getting good grades and graduating in eight semesters,' Eric wrote. 'We are talking about your college education. The education for which I am paying.' Clayton's tuition bill remained a point of acrimony. | Truth<br>Not of and concerning Plaintiff<br><br>No defamatory meaning |
| 13c | He claims that Eric and Amy instituted grade minimums, and forced him to live in the cheapest dorm and use the skimpiest meal plan. 'The two of them really terrorized me for my first couple years of college and made me jump through hoops,' he says." | Opinion<br><br>Accurate Balanced Report/Croce v NY Times |
| 14 | To make sure Clayton, Kathryn, and Fred wouldn't come [to a memorial service], she stationed armed guards outside the doors. 'At what point does a person take a step back and say, 'OK, I literally hired armed guards to keep my deceased husband's children away from attending their father's funeral?' says Clayton. | Truth<br>Opinion<br><br>Accurate Balanced Report/Croce v NY Times |
| 15a | The bad blood continued on Aug. 8, when the Rock & Roll Hall of Fame held 'Eric Carmen Day' and posthumously awarded him a key to the city of Cleveland. | Truth<br><br>Opinion |

| | | |
|---|---|---|
| | | No defamatory meaning<br><br>Accurate Balanced Report/Croce v NY Times |
| 15b | For the first time in years, Amy was in the same room with Susan, Clayton, and Kathryn. 'Kathryn had been told she'd have time to share some remarks she wrote,' says Clayton, who recently took a job at the talent agency CAA, in the music brand-partnerships division, 'but Amy threw a tantrum backstage and delayed the ceremony by 45 minutes, so my sister and I watched from the crowd without any acknowledgment and had to watch Amy speak and accept the award on my dad's behalf. | Truth<br><br>Opinion<br><br>No defamatory meaning<br><br>Accurate Balanced Report/Croce v NY Times |

## III.    STATEMENT OF LAW

### A.    12(b)(6) Standard

Under Federal Rule of Civil Procedure 12(b)(6), a lawsuit will be dismissed if a complaint fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A complaint must allege sufficient facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a Rule 12(b)(6) motion, the Court construes the complaint in the light most favorable to the non-moving party, accepting as true all of plaintiff's factual allegations. *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009).

Courts generally favor dismissal of flawed defamation claims against the media at the earliest opportunity possible to avoid the chilling effect that the cost of litigation and discovery can have on the First Amendment right to freedom of the press. *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965) ("The chilling effect upon the exercise of First Amendment rights may derive

from the fact of the prosecution, unaffected by the prospects of its success or failure."); *see also Dupler v. Mansfield Journal Co., Inc.*, 413 N.E.2d 1187, 1191 (Ohio 1980) ("Summary procedures are especially appropriate in the First Amendment area.").

Defamation claims are particularly appropriate for dismissal at the pleading stage because the determination of whether an alleged statement is actionable defamation is a question of law for the court. *See Yeager v. Local Union 20*, 453 N.E.2d 666, 669 (Ohio 1983); *see also Bruss v. Vindicator Printing Co.*, 109 Ohio App.3d 396, 400 (7th Dist. 1996) ("[I]t is for the court to decide as a matter of law whether certain statements alleged to be defamatory are actionable or not.").

### B.     Defamation

Defamation is the publication of false statements that injure a *living* person's reputation. *Green v. Mason*, 504 F.Supp.3d 813, 829 (S.D. Ohio 2020) (quotation omitted); *Lambert v. Garlo*, 484 N.E.2d 260, 263 (Ohio Ct. App. 1985) ("One who publishes defamatory matter concerning a deceased person is not liable either to the estate of the person or to his descendants or relatives."). The prima facie elements of a defamation claim are: (1) a false statement of fact, (2) that is "of and concerning" the plaintiff; (3) holds a defamatory meaning, (4) was published, (5) is the proximate cause of damage to the plaintiff, and (6) the defendant acted with the requisite degree of fault. *See Green*, 504 F.Supp.3d at 829.

To satisfy the first two elements of defamation, a statement must be "of and concerning" or "about" the plaintiff, must be false, and must communicate a fact. *Worldnet Software Co. v. Gannett Satellite Info. Network, Inc.*, 702 N.E.2d 149, 152 (Ohio Ct. App. 1997) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 267 (1964)). A statement is not considered "false" even if it is misleading or fails to disclose all relevant facts, so long as there is some truth in it. *Croce v. New York Times Co.*, 345 F.Supp.3d 961, 982 (S.D. Ohio 2018) (internal quotations removed) ("*Croce I*"). To be true, the "gist" and "sting" of the statement must be substantially (though not literally)

10

true. *Id.* at 983. The plaintiff has the burden to prove material falsity by clear and convincing evidence. *Philadelphia Newspapers Inc. v. Hepps*, 475 U.S. 767, 776 (1986).

Further, in Ohio, when a statement communicates an opinion, rather than a fact, the statement is entitled to absolute protection and cannot be defamatory. *Croce v. Sanders*, 843 F. App'x 710, 713 (6th Cir. 2021). To determine whether a statement is a protected opinion or an actionable fact, courts consider the totality of the circumstances, including (1) the specific language used, (2) whether the statement is verifiable, (3) the general context of the statement, and (4) the broader context of the statement. *Boulger v. Woods*, 917 F.3d 471, 478 (6th Cir. 2019).

As to the first opinion factor, because "speculation, hyperbole, and vague insinuation do not count as facts" the use of words with nonspecific, subjective language does not give rise to actionable claims for defamation. *Croce I*, 345 F.Supp.3d at 989; *Boulger*, 917 F.3d at 479.

For the second opinion factor, the Ohio Supreme Court has concluded that if a "statement lacks a plausible method of verification, a reasonable reader will not believe that the statement has specific factual content." *Bentkowski v. Scene Mag.*, 637 F.3d 689, 694 (6th Cir. 2011) (quoting *Scott v. News-Herald*, 496 N.E.2d 699, 707 (Ohio 1986)). Personal feelings, however described, so long as they do not give rise to factual implications, are not verifiable. *Hersh v. Grumer*, 176 N.E.3d 1135, 1145 (Ohio Ct. App. 2021) ("Subjective emotions are not verifiable."); *Boulger*, 917 F.3d at 481 ("[A] non-verifiable statement would be one that refers to an individual's 'internal motivation[.]'"). A statement is verifiable only if: (1) the author represents that he has knowledge or evidence that substantiates the statements, and (2) there is a plausible method to verify them. *Boulger*, 917 F.3d at 481 (citing *SPX Corp. v. Doe*, 253 F.Supp.2d 974, 980–81 (N.D. Ohio 2003)).

Courts analyze the third and fourth opinion factors together. "[D]ifferent types of writing have . . . widely varying social conventions which signal to the reader the likelihood of a statement's being either fact or opinion." *Bentkowski*, 637 F.3d at 695.

To satisfy the third element of defamation, the Plaintiff must claim the alleged statements carry a defamatory meaning. There are two types of defamation: defamation *per se* and defamation *per quod*. Plaintiff alleges defamation *per se*. For a defamation *per se* claim, the statements must be defamatory on their face. This means that the statements either (1) import charge of indictable offence involving moral turpitude or infamous punishment, (2) impute some offensive or contagious disease calculated to deprive person of society, (3) tend to injure the person in her trade or occupation, or (4) subject the person to public hatred, ridicule, or contempt. *Green*, 504 F.Supp.3d at 833. Whether a statement is defamatory on its face is a question of law for the Court. *McClure v. Ohio Dep't of Rehab. & Correction*, 2020-Ohio-1035, ¶ 11 (10th Dist. Franklin).

Finally, as to the fourth element, an actionable claim for defamation requires a false statement that is *published*. A failure to publish certain facts is not actionable and it does not render an otherwise truthful statement false. *Croce I*, 345 F.Supp.3d at 982; *Carr v. Educ. Theatre Ass'n*, 215 N.E.3d 584, 590 (Ohio Ct. App. 2023); *see also*, *Woods v. Sharkin*, 192 N.E.3d 1174, 1190 (Ohio Ct. App. 2022) ("Ohio does not recognize defamation by implication.").

If any of the challenged statements fails to satisfy any one of the elements of defamation, the statement is not actionable. *Boulger*, 917 F.3d at 478.

More broadly, the Sixth Circuit has found, where a reasonable reader would construe a challenged article as "a standard piece of investigative journalism that presents newsworthy allegations made by others, with appropriate qualifying language" the article, and the statements contained therein, are not defamatory as a matter of law. *Croce v. New York Times Co.*, 930 F.3d

787, 793 (6th Cir. 2019) ("*Croce II*"). The qualifying language must alert the reader that the statements contained in the publication are only allegations that the plaintiff disputes. *See Croce I*, 345 F.Supp.3d at 977. In this context, the challenged article is "an accurate and balanced report of the positions and arguments of both sides to [a] controversy" and is not actionable. *Id.* at 980.

Here, each of the Challenged Statements fail to meet at least one of the first four elements of defamation. Further, when viewed in its entirety, the Article is a standard piece of investigative journalism that accurately reports third-party allegations from individuals on both sides of the family conflict that impacted Eric Carmen's final years and continues today. Plaintiff's defamation claims against the Rolling Stone Defendants should be dismissed with prejudice as a matter of law.

## C.     False Light

To establish a claim for false light invasion of privacy, a plaintiff must show: (1) the defendant gave publicity to a private matter concerning the plaintiff; (2) the publicity placed the plaintiff in a false light; (3) the false light would be highly offensive to a reasonable person; and (4) the defendant acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed. *Woods*, 192 N.E.3d at 1197 (citing *Welling v. Weinfeld*, 866 N.E.2d 1051, 1059 (Ohio 2007)). To be actionable, the statements at issue must be false. *Id.*

For a statement to be highly offensive "the plaintiff must be justified in the eyes of the community in feeling seriously offended and aggrieved by the publicity; the statement must be such a major misrepresentation of [her] character, history, activities or beliefs that serious offense may reasonably be expected." *Dudee v. Philpot*, 133 N.E.3d 590, 605 (Ohio Ct. App. 2019) (internal citations and quotations omitted).

False light and defamation claims are largely coextensive. *Welling*, 866 N.E.2d at 1055. There are only two scenarios in which false light fits and defamation fails: the first involves false and intimate portrayals—e.g., falsely depicting someone as a victim of sexual harassment, as

13

destitute or suffering a mental illness, while the second scenario involves portrayal of a plaintiff in a falsely positive light. *Id.*

Here, Plaintiff's own allegations establish that the Article is a substantially true account. Accordingly, the Article is not "a major misrepresentation of her character, history, activities, or beliefs." Moreover, the Article does not involve false and intimate portrayals of Plaintiff, nor does she allege that the Article portrays her in a falsely positive light. Finally, Plaintiff has not alleged facts tending to show that the Defendants published the Article with actual malice. For each of these independent reasons, Plaintiff's false light claim fails as a matter of law.

## IV.     ANALYSIS

### A.     Plaintiff's defamation claim should be dismissed.

Plaintiff's defamation claim should be dismissed because neither the individual Challenged Statements, nor the Article as a whole, supports a viable claim for defamation. Specifically, dismissal is warranted because: (1) Many Challenged Statements are not "of and concerning" Plaintiff; (2) Many Challenged Statements are true or substantially true based upon Plaintiff's own allegations; (3) Many Challenged statements are protected opinion; (4) Many Challenged Statements do not carry a defamatory meaning; (5) Ohio law does not recognize defamation by omission; and (6) the Article, as a whole, is an accurate and balanced standard piece of investigative journalism.

#### 1.     Many Challenged Statements are not "of and concerning" Plaintiff.

To state a viable defamation claim, Plaintiff must identify statements that are "of and concerning" her. *See Worldnet Software*, 702 N.E.2d at 152. And under settled Ohio law, the deceased cannot be defamed. *Lambert*, 484 N.E.2d at 263. The Complaint focuses extensively on alleged damage to Eric Carmen's legacy—who, as a deceased individual, cannot be defamed— and improperly attempts to reframe commentary about him as defamatory of Plaintiff. At least

eleven of the Challenged Statements, or their subparts, should be dismissed on this ground alone. (Stmts. 1a, 1b, 2a, 4, 6, 7a, 9a, 10b, 11a, 12, 13a and 13b.)

Many of the Challenged Statements focus squarely on Eric: they describe his estrangement from his family (Stmts. 1b, 2a, 9a, 11a), his refusal to pay for his son's college (Stmt. 12), his alleged paranoia and alcoholism (Stmts. 4, 6) and include excerpts from emails he sent (Stmts. 10b, 13b). None of these statements are about Amy Carmen.

The Complaint embraces this flaw. It repeatedly emphasizes that Eric was a "target of Defendants' cowardly attacks" and alleges that that Clayton, Kathryn, Fred, and Susan's statements were aimed to "malign" both Eric and Amy. (Comp. ¶ 5.) The Complaint references Eric nearly twice as much as it references Amy. (392 vs. 205). To the extent Plaintiff objects to how the Article portrays Eric, those objections are legally irrelevant and must be dismissed.

Other Challenged Statements are about other family members or only reference Plaintiff in passing without any defamatory sting directed at her. For example, Statement 1a exclusively concerns Clayton and his feelings toward his father's death. Statements 1b and 2a reference Amy only to say that she notified family members of Eric's passing. Statement 7a discusses a diary entry stating that Kathryn and Clayton were plotting Eric's murder.[4] Statements 10b and 11a[5] never mention or allude to Amy at all. Statements 12 13a, and 13b are about the cost of Clayton's college education. They reference Amy only to note that she believed Clayton didn't take his education

---

[4]    Additionally, under Ohio's Fair Report Privilege "the publication of a fair and impartial report of the … filing of any affidavit, pleading, or other document in any … civil cause in any court of competent jurisdiction, or of a fair and impartial report of the contents thereof, is privileged" and cannot be defamatory. R.C. 2714.05. The privilege applies if the publication (1) deals with a matter of public concern and (2) is "a fair and substantially accurate account" of court filings. *See Dinkel v. Lincoln Publishing (Ohio), Inc.*, 638 N.E.2d 611, 613 (Ohio Ct. App. 1994). Here, the Article accurately reports that there is ongoing litigation that references these diary entries. These statements are protected by Ohio's Fair Report Privilege.
[5]    Additionally, Ohio's Fair Report Privilege applies to Statement 11a. *See supra* footnote 4.

seriously and she provided an email on that topic. None of these statements are *about* Plaintiff. For this reason alone, the defamation claims based upon these statements should be dismissed.

### 2. Many Challenged Statements are true or substantially true.

Truth is an absolute defense to defamation. *Shifflet v. Thomson Newspapers (Ohio), Inc.*, 431 N.E.2d 1014, 1017 (Ohio 1982). A statement is "substantially true" when the "gist" and "sting" of the statement is true, even if it contains minor factual errors. *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 517 (1991). It is the plaintiff who bears the burden of pleading and proving material falsity. *Philadelphia Newspapers*, 475 U.S. at 776. To be materially false, the statements must have a different effect on the mind of the reader than that which the truth would have produced. *Croce II*, 930 F.3d at 798.

Here, Plaintiff has not met that burden. In fact, her own Complaint confirms the truth of the following seventeen Challenged Statements or their subparts: 1c, 1d, 2a, 2b, 3, 7a, 7b, 7c, 8, 9a, 10a, 10b, 13a, 13b, 14, 15a and 15b.

Statements 1c and 1d describe an incident in which Clayton visited Amy and Eric Carmen's home. The Complaint itself asserts that Clayton approached the residence, that the curtains were closed, and that, in response to the visit, Amy and Eric called the police and reported a trespasser. (Comp. ¶ 100.) While the Complaint disputes the specific wording used—whether Clayton "knocked' or "banged" on the door, and whether the curtains were "closed" or "kept" closed— such semantic differences do not alter the gist or sting of the statement. The core assertion—that Eric and Amy refused to allow Clayton Carmen into their home and reported him to the police— is both undisputed and substantially true. (*See id.*)

Statements 2a and 2b are also substantially true. Statement 2a merely states that Amy called Fred to inform him of Eric's passing and that Fred and Eric hadn't communicated since 2015. (*Id.* ¶ 101.) The Complaint does not allege that either of these facts are false. *Young v. CSL Plasma,*

*Inc.*, 2017 WL 5157230, at *1 (6th Cir. 2017) (affirming dismissal for failure to identify a false statement of fact). As to 2b, Plaintiff admits she is involved in multiple lawsuits with the Carmen family that stem from longstanding conflict. (*Id.* ¶ 79 ("Indeed, given the sundry misconduct by Eric's family members, litigation was practically inevitable.").) The gist of Statement 2b—that litigation fractured the family—is confirmed by the Complaint. While Plaintiff objects to the Article's use of the phrase "series of lawsuits," that word choice does not alter substance of the statement, which is accurate. She also challenges as defamatory the statement that "Fred blames Amy" for "inspiring" the litigation. But the Article makes clear this was a contested legal battle and Amy, for her part, blames Fred. (See Comp., Ex. A, PAGEID # 74 ("But please, be sure to blame the new wife.").) The Complaint itself underscores the personal nature of these disputes, describing the lawsuits as the result of "abusive, appalling, atrocious, deceitful, exploitative, and terrorizing conduct by Fred, Susan, Clayton and Kathryn." (Comp. ¶ 86.) In short, the Complaint confirms the very dynamics that the Article reports. And Fred's attribution of blame is also a protected opinion, clearly presented as his personal view, as discussed in Section A.3.

Statement 3 is true or substantially true because the Complaint expressly confirms that Amy has accused Clayton and Kathryn of plotting their father's murder. (*Id.* ¶¶104, 106 (accusing Clayton and Kathryn of plotting Eric's murder).)[6]

Statements 7a, b, and c, are also true or substantially true. The Complaint acknowledges that Eric and his housekeepers conducted "regular searches" of Kathryn's bedroom, that one such search yielded a diary entry, that Amy had access to that entry, and that she is now using it in litigation. (*Id.* ¶¶ 64, 104, 106.) The gist of these statements is that Amy accessed Kathryn's

---

[6]      Additionally, Ohio's Fair Report Privilege applies to this statement. *See supra* footnote 4.

personal diaries and has used—and continues to use—the contents against her in court. (*See id.*) As the Complaint itself concedes, the core facts described in these Statements are accurate.

Statement 8 is true or substantially true as the Complaint concedes that Amy and her late husband moved from Ohio to Arizona, did not tell family members about the move, and did not reconnect with Clayton or Kathryn once they moved. (*Id.* ¶ 74.)

Statement 9a is also true or substantially true because the Complaint acknowledges that after Amy and Eric met and married, Eric became estranged from his family. (*See id.* ¶¶ 9, 51, 62, 75.)

Statement 10a is substantially true. The Complaint acknowledges that Clayton "really did" throw a drunken party at Amy and Eric's home. (Comp. ¶ 108.) While Plaintiff may not describe this party as a "turning point" in her relationship with Clayton, the Complaint references the event no fewer than twelve times when criticizing Clayton's "malfeasance," and "repeated criminal actions." (*Id.* ¶¶ 57, 58, 104, 106, 108, 109, 172, 182.) Based upon Plaintiff's own allegations, whether the party was a "turning point" in their relationship or just another moment makes no difference to the gist or sting of the statement. Based on the face of the Complaint, describing the party as a "turning point" is either a substantially true characterization, a non-verifiable protected opinion, as discussed in Section A.3 below, or lacks any defamatory meaning as described in Section A.4 below. This Challenged Statement is nonactionable for any one of those reasons.

Statement 10b is also true or substantially true. It quotes an email from Eric stating he should have charged Clayton for breaking and entering and includes the opinion of Eric's ex-wife that, from that point forward, Clayton and Kathryn "were like strangers in their own home." (Comp. ¶ 109.) The Complaint acknowledges both the existence of the email and concedes that

Clayton and Kathryn were estranged from their own home—qualifying only that the estrangement stemmed from their own "repeated criminal actions." (*Id.*)

Statements 13a and b are true or substantially true, hardly concern the Plaintiff, and contain no language that the Complaint specifically argues is false or defamatory. Statement 13a is just a quote from Amy claiming that Clayton never took his academic career seriously, and Statement 13b only references Amy to indicate that she was the source of an email from Eric on that topic. The Complaint confirms Amy's view that Clayton did not take his academics seriously and does not allege she was not the source of the email. (Comp. ¶ 112.) Plaintiff's Complaint fails to identify any false statement of fact in either statement. *Young*, 2017 WL 5157230, at *1 (affirming dismissal for failure to identify a false statement of fact).

Statement 14 is substantially true because the Complaint acknowledges that Plaintiff did not invite Eric's "blood family" to his memorial service; Plaintiff specifically wrote a letter to Clayton and Kathryn asking them not to attend because they disparaged their father on-line; Plaintiff chose the location of the memorial service; and Plaintiff selected a venue for the service that provided security. (Comp. ¶ 113.) Thus, the gist of the statement, that Amy did not want Eric's family to attend the service, and that security was present, is substantially true.

Finally, Statement 15a contains no statement of fact about the Plaintiff that the Complaint even alleges to be false. In fact, the Complaint makes no reference to statement 15a at all besides quoting it as a portion of Challenged Statement 15. The same is true with respect to Statement 15b. As to 15b, the Complaint only alleges the following to be false: (i) whether Kathryn was scheduled to speak, and (ii) whether Amy threw a "tantrum" and delayed the ceremony. Point (i) carries no defamatory meaning and is not "of and concerning" Plaintiff as discussed in Sections A.1 and A.4. Point (ii) is protected opinion as discussed more fully in Sections A.3. Neither Statements 15a, nor

15b can support a viable claim for defamation because the Complaint does not (and cannot) identify a false statement of fact in either passage. *Adams v. Karl*, 2024 WL 4243773, at \*8-9 (S.D. Ohio 2014) (dismissing Complaint for failure to identify false statement of fact).

Plaintiff's own allegations in the Complaint confirm the substantial truth of each of these statements. She has not, and cannot, argue that any of the above statements are materially false, and her defamation claim thus fails as a matter of law as to each of these statements.

### 3. Many Challenged Statements are non-actionable statements of opinion.

Opinions are nonactionable and afforded absolute protection under the Ohio Constitution. *Bentkowski*, 637 F.3d at 693. Courts analyze statements of opinion by looking to (i) the specific language used, (ii) whether the statement is verifiable, and (iii) the general and broader context of the statement. *Id.* at 693–94. The following fourteen Challenged Statements or subparts are protected opinion that should be dismissed on that basis alone: 1a, 1c, 1d, 2b, 4, 5, 6, 7b, 7c, 7d, 9b, 10b, 11b, 12, 13c, 14, 15a and 15b.

The Complaint seeks to impose liability for language that is protected opinion as a matter of law. Words like "overture" (Stmt. 1d), "bitter,"[7] "paranoid"[8] "conspiracy theorist"[9] (Stmt. 4), "evil stepmom"[10] "really, really, really bad news"[11] (Stmt. 5), "sycophant"[12] (Stmt. 6), "antics"[13]

---

[7]     *See Haywood v. Lucent Technology*, 169 F. Supp.2d 890, 915-916 (N.D. Ill. 2001) (finding statement that plaintiff was "unstable" to be protected opinion).
[8]     *See Molnarova v. Swamp Witches Inc.*, LLC, 2024 WL 4198149, \*9 (S.D. Ohio 2024) (finding the term "insane" to be non-verifiable protected opinion).
[9]     *See Couch v. Verizon Communications*, 105 F.4th 425, 435 (D.C. Cir. 2024) (finding statements that plaintiff was a "conspiracy entrepreneur" to be protected opinion).
[10]    *See Carver v. Grace*, 2024 WL 4953428, \*6 (E.D. Louisiana 2024) (finding hyperbolic language like "put the devil in jail" to be protected opinion).
[11]    *See Early v. Toledo Blade*, 130 Ohio App.3d 302 (6th Dist. 1998) (finding statements that officers made "bad decisions" to be protected opinion).
[12]    *See Paige v. Youngstown Bd. of Education*, 1994 WL 718839, \*3 (7th Dist. 1994) (finding statement plaintiff was a "senile, old bitch" was a protected opinion).
[13]    *See Rizvi v. St. Elizabeth Hosp. Med. Ctr.*, 2001-Ohio-3412, ¶ 17 (7th Dist. Mahoning) (finding statement that someone was "crazy" to be protected opinion).

(Stmt. 7c), "private ramblings"[14] (Stmt. 7d), "questionable" (Stmt. 12), "terrorized"[15] and "skimpiest"[16] (Stmt. 13c), "bad blood" (Stmt. 15a), and "tantrum"[17] (Stmt. 15b) are all imprecise, hyperbolic, and lack objective meaning, as courts in this Circuit have repeatedly held in cases involving similar statements, as cited in the footnotes. *See also, e.g., Wampler v. Higgins*, 752 N.E.2d 962, 979 (Ohio 2001) (finding that the phrases "ruthless speculator" "self-centered greed" and "exorbitant rent," while "plainly pejorative in tone," were sufficiently imprecise to constitute protected opinion). Whether someone is behaving as an "evil stepmother" is both obvious hyperbole and subjective; the line between being supportive and being a "sycophant" is in the eye of the beholder (Stmt. 6); whether someone is trustworthy or a person to "watch out for"[18] is purely subjective (Stmt. 11b); whether a strict parent "terrorized" their child during college and whether a meal plan is "skimpy" depends on the person you ask (Stmts. 13c); there is no clear line between someone lodging a complaint and throwing a "tantrum" (Stmt. 15b); making an "overture" could refer to asking for money or asking to mend a broken relationship (Stmt. 1d). *See also, e.g., Wampler*, 752 N.E.2d at 979 (finding that the words faceless, mindless, ruthless, and heartless are "not amenable to objective proof or disproof" and are thus statements of opinion). These imprecise words reflect the subjective assessments of their speakers. They indicate to the reader that the matters discussed do not convey facts, but protected opinions. *See Vail v. The Plain Dealer Publ'g Co.*, 649 N.E.2d 182, 186 (Ohio 1995) (finding that the phrase "anti-homosexual diatribe" was

---

[14]     *See Ward v. Jeff Props., LLC*, 2010 WL 346459, *5 (N.C. Ct. App. 2010) (finding statements that plaintiff's conduct was pestering, nonsense was protected opinion).
[15]     *See Miller v James*, 751 F.Supp. 3d 21, 39 (N.D. N.Y. 2024) (finding the term "terrorist" to be protected opinion")
[16]     *See Trump v. Cable news Network, Inc.*, 684 F.Supp.3d 1269, 1276 (S.D. Florida 2023 (finding the phrase "the Big Lie" to be protected opinion).
[17]     *See Dragulesco v Virginia Union University*, 223 F.Supp.3d 499, 509-510 (E.D. Va. 2016) (finding statements that plaintiff was having "temper tantrums" and "meltdowns" to be protected opinion).
[18]     *See Guisinger v. E.A. Tow Transport, Inc.*, 2018 WL 2432751, *2 (finding statement that plaintiff was a "shady mofo" and "dirtbag" was a protected opinion).

protected opinion because it "conjures a vast array of highly emotional responses that will vary from reader to reader."); *see also Ferreri v. Plain Dealer Publ'g Co.*, 756 N.E.2d 712, 721 (2001) ("There are no objective tests to establish whether someone's conduct is 'scandalous,' whether an individual is 'beyond the call of reason,' has the 'qualities that make a mere lawyer into a good jurist,' or 'cares a good deal more about himself and his image' than children.").

Second, many of the Challenged Statements concern subjective emotion or internal motivation and are non-verifiable. *See, e.g.*, *Swartz v DiCarlo*, 2017 WL 1284724, at *10 (S.D. Ohio 2017) (finding statement that plaintiff engaged in a gleeful death watch over his father to be protected opinion because "emotions and attitudes are not verifiable"). In Statement 1a, the Article states that Clayton took his father's death to be "bad news"; in Statement 6, Clayton is quoted to say that Amy was "just what [Eric] wanted"; in Statement 7d, Kathryn describes her feelings of "deep sadness" regarding Amy's behavior; in Statement 10b, Susan describes Clayton and Kathryn's feelings about Eric and Amy's home. None of these statements are actionable because "subjective emotions are not verifiable." *See, e.g., Stholmann v. WJW TV, Inc.*, 2006 WL 3518121, at *8 (8th Dist. 2006) (finding the term "tragic" to be a subjective emotion that is a protected opinion). Similarly, in Statement 1c, Clayton expresses his internal motivations for showing up at Eric and Amy's house, and in Statements 7b, 9b, and 14, Kathryn, Fred, and Clayton take guesses as to Amy's motivations. These are all subjective opinions—"[e]veryone is free to speculate about someone's motivations" based on their behavior. *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 359 (3d Cir. 2020). Accordingly, these statements are not defamatory.

Third, the general and broader context of the Article "place the reasonable reader on notice that what is being read is [an] opinion." *Bentkowski*, 637 F.3d at 695. The general context refers to the "larger objective and subjective context of the statements" and the broader context refers to

"the type of article and its placement in the newspaper and how those factors would influence the reader's viewpoint on the question of fact or opinion." *Id.* Many of the Challenged Statements are introduced in the context of words that place the reader on notice of an opinion. For example, the phrase "Fred blames" (Stmt. 2b) is context establishing that the Article is about to present Fred's opinion. And as discussed in more detail below in Section A.6, the Article's general context reveals that it is a standard piece of investigative journalism that offers a balanced account of two sides of a dispute. This context alerts the reader that the Article contains statements of opinion rather than fact. The Article's broader context—that it appears in the "Music" section of *Rolling Stone*— likewise alerts the reasonable reader that the Article contains statements of opinion, rather than fact. *Id.* (finding that this factor weighed "heavily" against actionability when the challenged article appeared in a section of the newspaper containing "humor, comments, and criticism."). Based on the foregoing analysis, none of these fourteen Challenged Statements or their subparts are actionable, and Plaintiff's defamation claim should be dismissed.

### 4.      Many Challenged Statements do not carry a defamatory meaning.

To be actionable as defamation, a statement must tend to harm a person's reputation in her trade or occupation, or expose her to "hatred, ridicule, or contempt." *Green*, 504 F.Supp.3d at 834; And where a statement is reasonably "susceptible [of] two meanings, one defamatory and one innocent, the defamatory meaning should be rejected, and the innocent meaning adopted." *McKimm v. Ohio Elections Comm.*, 729 N.E.2d 364, 372 (Ohio 2000) (quoting *Yeager*, 453 N.E.2d at 669). For example, even a news banner stating, "Child Porn Found on Computer" was entitled to an innocent construction and lacked defamatory meaning when viewed under the totality of the circumstances. *Sabino v. WOIO, L.L.C.*, 56 N.E.3d 368, 379-380 (8th Dist. 2016), Under this standard alone, the following ten Challenged Statements or their subparts should be dismissed: 1a, 1b, 2a, 8, 9a, 10a, 12, 13b, 15a and 15b.

The Complaint alleges the Article was "calculated to inflict maximum harm upon Amy" and describes it as "a Frankenstein's monster born of a warped alliance between embittered family members with axes to grind and an unscrupulous publisher clinging to every poisonous word. . . ." (Comp. ¶¶ 5, 7.) But the Court should adopt the straightforward, innocent construction of the Challenged Statements as noted below.

Statements 1a, 1b, and 2a merely note that Amy was the individual who informed Clayton and Fred of Eric's death, and Statement 1c references Amy only to say that she shared a home with her husband. Because they describe behaviors that are expected of a spouse, none of these statements are reputationally damaging. Statement 8 references Eric and Amy's move to Arizona. Plaintiff herself concedes the truth of most of that statement (see Section A.2 above), and asserts in the Complaint that they moved to "escape Clayton and Kathryn's reign of terror" (Comp. ¶ 107.) As a result, the Article's use of the milder term "resettle" cannot be alleged to carry a defamatory implication. Statement 10a describes a shift in Eric and Amy's relationship with Clayton after he hosted a party at the Carmen residence. The Complaint confirms that the party was "drunken" and resulted in "vandalism to [Eric and Amy's] beautiful home." (*Id.* ¶ 106.) The statement that her relationship with Clayton changed after he threw a wild and destructive party in her home cannot reasonably be expected to subject Plaintiff to hatred, ridicule or contempt. Statement 9a references Amy only to state that she and Eric were married. Statement 12 only references Amy to state that she believed Eric's prenuptial agreement with his ex-wife was "questionable." Statement 13b only references Amy as the source of an email for the Article. Statement 15a does not reference Amy at all. None of these statements carry a defamatory meaning.

Moreover, the mere fact that a statement is unfavorable does not mean it carries the degree of opprobrium necessary to support a defamatory meaning. For example, Statement 15b, which

24

says that Amy delayed Eric's memorial service 45 minutes, does not lower her reputation in the community.

None of these ten statements harm Plaintiff's reputation in her community or occupation, or subject her to hatred, ridicule, or contempt because they either convey innocuous facts or neutral characterizations that do not impugn Plaintiff's reputation.

### 5. Ohio law does not recognize defamation by omission.

The Complaint also seems to allege that the Article was defamatory not because of what it said, but because of what it failed to say. That theory also fails at the threshold. Defamation requires a published statement of fact; an omission, by definition is not published, and therefore not actionable. *See Croce I*, 345 F.Supp.3d at 982 ("A statement is not a false statement if, even though it is misleading and fails to disclose all relevant facts, the statement has some truth in it."). A plaintiff cannot manufacture a defamation claim by pointing to facts they believe should have been reported, particularly where the statements that were published are true or substantially true and the omitted facts don't alter their meaning. *Id.*

For example, Statements 1b and 2a are alleged to be defamatory because they "left unmentioned" the reasons for Clayton and Fred's estrangement from Eric. (Comp. ¶¶ 100, 101.) But the Article addresses those reasons in detail, presenting not only Clayton and Fred's accounts, but also Amy's perspective—that the children distanced themselves because they were "all about getting whatever they could get" until "the money train . . . ended." (Comp. Ex. A, PAGEID # 99.) More broadly, the Complaint fails to identify any omitted fact that, if included, would materially change the gist or sting of the Article. Instead, the Complaint confirms the substance of the Challenged Statements: that longstanding family discord led to Amy and Eric's estrangement from the rest of the family.

6. **The Article as a whole is an accurate and balanced standard piece of investigative journalism.**

Under well-established Sixth Circuit precedent, a publication is not defamatory as a matter of law when it presents newsworthy allegations from third parties with appropriate qualifying language. *Croce II*, 930 F.3d at 793; *see also Am. Chem. Soc. v. Leadscope, Inc.*, 978 N.E.2d 832, 853–54 (finding that an article was not defamatory as a matter of law when it "contained a balanced report of both parties' arguments and defenses."). Such a report is a nonactionable, standard piece of investigative journalism. *Croce II*, 930 F.3d at 793. This principle applies squarely here and forms a separate basis for dismissal of this lawsuit.

The Article explores Eric Carmen's departure from the music scene, and the family conflict that surrounded his final years. The subject matter—what happened to an American pop icon whose music shaped a generation—is undoubtedly newsworthy. The public has a legitimate interest in understanding the personal and professional legacy of a figure whose work remains culturally significant.

While the Plaintiff objects to opinions expressed by Eric's family members, the Article consistently presents both sides of the controversy including extensive quotations from the Plaintiff and Eric Carmen's friends and colleagues. For example:

- When Eric's family alleges that Amy manipulated him (<u>Stmt. 4</u>), the Article includes quotes from Eric's former bandmates and friends describing him as "madly in love" with Amy and her own assertion that she supported Eric and did not alienate him from his children.[19]

---

[19]     "His bandmates and friends who stayed with him to the end describe Carmen as a kind and generous suburban dad, happily retired, madly in love with Amy, and shattered by the loss of his relationship with his kids … Amy strongly denies turning Carmen against his children, and claims they wanted nothing from their father besides his money in the last decade of his life. 'I loved Eric and stood by him through the tough times, unlike his brother and his children,' she says. 'Eric had every reason for wanting to be estranged from [his family]. But please, be sure to blame the new wife.'" (Comp., Ex. A, PAGEID #74.)

- When Clayton calls Amy an "evil stepmother" (<u>Stmt. 5</u>) and "sycophant" (<u>Stmt. 6</u>), the Article immediately notes that she "emphatically denies this categorization."[20]

- <u>Statement 8</u> recounts Eric and Amy's move to Arizona, followed by her explanation of why Eric chose to cut ties with his family.[21]

- <u>Statements 9a and 9b</u> present Fred's belief that Amy isolated Eric, but the Article immediately provides her counter-opinion that she and Eric were excluded "as soon as everyone thought the money train ended."[22]

- <u>Statement 11b</u> includes Fred's claim that Amy spread rumors about financial misconduct, followed by her categorical denial.[23]

- <u>Statement 15b</u> accuses Amy of delaying a memorial ceremony, but the Article includes her explanation that the delay was not her fault.[24]

This balanced presentation of conflicting viewpoints, coupled with consistent attribution and qualifying language, places the Article squarely within the protections recognized by *Croce*.

---

[20] "Amy emphatically denies this categorization of their relationship. 'I never asked him for anything,' she says. 'Unlike the other barnacles in Eric's life, I didn't need anything.'" (PAGEID # 75.)

[21] "'This was Eric's choice,' Amy says. 'Eric had no desire to reestablish contact with any of them. Eric's legal counsel and all of his close friends know that they individually and collectively made his life a living hell.' According to their close friends, Carmen was extremely happy in the final six years of his life …'[Amy] was really good for him,' says Raspberries drummer Jim Bonfanti. 'She was a different person than Eric, but she's smart, and she really loved him. He was happy as I'd seen him.' Bernie Hogya … echoes Bonfanti's assessment. 'I'd never seen him happier,' he says. 'She really grounded him.'" (PAGEID # 76.)

[22] "'We were excluded from their lives' replies Amy. 'As soon as everyone thought the money train had ended, Clayton, Susan, and Kathryn were all about getting whatever they could.' In the early days of the marriage, Amy says, she was a devoted stepmother. 'I [tried] to include Clayton and Kathryn in our lives,' she says. 'I was very happy to help both of them with their homework, and prepare meals. I straightened Kathryn's hair before school, as she ate the breakfast I prepared for her, and I welcomed and taxied their friends. I helped Eric cover the ceiling of Kathryn's bedroom with red and white balloons to surprise her on Valentine's day.'" (PAGEID # 99.)

[23] "Amy says this is completely inaccurate. 'I only saw Fred's deck one time, and frankly it wasn't that impressive,' she says. 'I never told Eric or concluded that Fred 'was stealing from him.'" (PAGEID # 100.)

[24] "Amy says that any delay in the ceremony was not due to her, and claims it was the Rock & Roll Hall of Fame, not her, that opted to put Kathryn from the program last minute. Nobody in attendance had any idea there was backstage rancor." (PAGEID # 102.)

Moreover, the Article uses clear signals to alert the reader that it is reporting contested opinion (discussed above in Section A.3), rather than asserting objective facts. Phrases such as "Fred blames" (Stmt. 2b), "[Eric's family] describe[s]" (Stmt. 4), "I always think of [Amy] as" (Stmt. 5), and "[Clayton] claims" (Stmt. 13c) signal that the statements reflect the speaker's personal views. The Article even specifically explains that Greene's interviews revealed "a complex portrait that varies wildly, depending on who's doing the telling." (Comp., Ex. A., PAGEID # 74.) These are quintessential examples of the kind of qualifying language that inform a reasonable reader of the presentation of conflicting opinions, not objective facts. *Croce I*, 345 F.Supp.3d at 979 (finding that the words "allegations" "arguments" "claims" and "complaints" put the reasonable reader on notice that the author was expressing a statement of opinion).

Far from characterizing Plaintiff's perspective as hyperbolic or marginalizing her voice (Comp. ¶ 131), the Article gives weight to each side. A reasonable reader walks away with the impression that Eric and Amy became estranged from Eric's family—not that anyone involved was a hero or a villain. The Article was not a defamatory "hit piece," but a standard piece of investigative journalism protected by the First Amendment. The Rolling Stone Defendants should be dismissed on this separate and independent ground.

**B.      Plaintiff's false light claim should also be dismissed.**

Plaintiff's false light claim against the Rolling Stone Defendants should also be dismissed. A claim for false light invasion of privacy requires more than a negative or unflattering portrayal— it demands a showing that the defendants made false statements that would be highly offensive to a reasonable person. *Welling*, 866 N.E.2d at 1054. To prevail, a plaintiff must also show that Defendants acted with actual malice as to the truth of the statements. *Id.* Plaintiff's false light claim fails for the same reasons her defamation claim fails as set forth above, and for additional independent reasons.

28

First, Ohio courts recognize only two narrow scenarios where a false light claim may survive even if a defamation claim fails: (1) where the plaintiff is falsely portrayed in an intimate and deeply personal way; and (2) where the plaintiff is falsely cast in a positive light. *Id*. Neither applies here. The Article does not depict Plaintiff in any such intimate or falsely flattering manner. Because her defamation claim fails and because neither exception applies, her false light claim must also be dismissed.

Second, the Article does not rise to the level of being "highly offensive" as a matter of law. To be actionable, "the plaintiff must be justified in the eyes of the community in feeling seriously offended and aggrieved by the publicity; the statement must be such a major misrepresentation of his character, history, activities or beliefs that serious offense may reasonably be expected." *Dudee*, 133 N.E.3d at 605 (internal citations and quotations omitted). Here, the Article does not depict Plaintiff in a way that would cause a reasonable person to feel seriously aggrieved. It does not accuse her of criminal conduct or anything that would subject her to public hatred or disgrace. Instead, it presents a range of perspectives—some critical, some supportive—about a complex family dynamic. The Article includes Plaintiff's own voice, her denials and her explanations.

Third, to prove a false light claim, a plaintiff must show that the defendant acted with actual malice as to the truth of the statement—i.e., the defendant "possessed a high degree of awareness … of [a statement's] probable falsity." *Patrick v. Cleveland Scene Pub. LLC*, 582 F. Supp. 2d 939, 953 (N.D. Ohio 2008), *aff'd*, 360 F. App'x 592 (6th Cir. 2009) (internal quotations and citations omitted). Plaintiff's allegations—that the Rolling Stone Defendants knew of non-disparagement agreements, "deceived" her into participating in interviews, and relied on narratives of estranged family members (Comp. ¶¶ 118–30)—do not support a plausible claim that the Rolling Stone Defendants published the Article with actual malice as a matter of law.

Plaintiff's actual malice theory boils down to the notion that the Rolling Stone Defendants acted recklessly by publishing anything that contradicted her account of events. But that is not the law. Such a standard would silence any journalist who reports contested viewpoints and would eviscerate the First Amendment protections afforded to the press. Nothing in the Complaint suggests that the Rolling Stone Defendants harbored serious doubts as the truth of any facts in the Article. For each of these reasons, Plaintiff's false light claim should also be dismissed.

## V.    CONCLUSION

Plaintiff's claims for defamation and false light invasion of privacy fail as a matter of law. Each of the fifteen Challenged Statements is independently nonactionable. Further, the Article is a standard piece of investigative journalism that presents newsworthy allegations with appropriate qualifying language that signals to a reasonable reader that the piece reflects contested viewpoints.

Plaintiff's false light claim fails for the same reasons her defamation claim fails. Additionally, the Article does not contain any false statements that are highly offensive, and Plaintiff has not alleged facts that plausibly support the Article was published with actual malice.

Accordingly, all claims against the Rolling Stone Defendants should be dismissed with prejudice as a matter of law.

Respectfully submitted,

*/s/ Kevin T. Shook*
Kevin T. Shook (0073718)
Amy E. Mildebrath (0104565)
FROST BROWN TODD LLP
10 West Broad Street, Suite 2300
Columbus, Ohio 43215
P: (614) 464-1211; F: (614) 464-1737
kshook@fbtlaw.com
amildebrath@fbtlaw.com

*Attorneys for Defendants Penske Media Corporation and Andy Greene*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and accurate copy of the foregoing was served

on October 13, 2025 via the Court's ECF system to all counsel of record.

*/s/ Kevin T. Shook*

Kevin T. Shook (0073718)

0144420.0810621   4909-3050-1739v14