# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| Amy Carmen, | Case No 1:25-cv-01671 |
| _Plaintiff_, | Judge Charles Esque Fleming |
| v. | |
| | **DEFENDANTS CLAYTON CARMEN & KATHRYN CARMEN'S MOTION FOR EXPEDITED RELIEF UNDER OHIO REV. CODE 2747.01 _ET SEQ_, OR, IN THE ALTERNATIVE, FED. R. CIV. P. 12(B)(6) MOTION TO DISMISS** |
| Penske Media Corporation _et. al._, | |
| _Defendants_. | |

Defendants Clayton Carmen and Kathryn Carmen move for the dismissal with prejudice of Plaintiff Amy Carmen's Complaint under either Ohio's newly enacted Anti-SLAPP law, R.C. 2747.01 _et seq_, or, alternatively, under Federal Rule of Civil Procedure 12(b)(6). Clayton and Kathryn's statements are not actionable for several independent reasons: they are immune from suit under Ohio law, they are protected by the free speech guarantees in the First Amendment and the Ohio Constitution, and Amy Carmen's Complaint admits the truth of the allegedly defamatory statements.

For the sake of efficiency and judicial economy, Defendants Clayton and Kathryn Carmen incorporate by reference the Rolling Stone Defendants' arguments as to the non-actionability of the statements in their Motion to Dismiss (ECF Doc #12), and write separately to emphasize the substantive immunity Ohio law requires under Ohio's Anti-SLAPP , and to request the substantive relief under that section.

A Brief in Support is attached.

Respectfully submitted,

/s/ Alaina Alessio
Alaina Alessio
Certified Legal Intern
aalessio-lawclinic@case.edu

/s/ Anthony Falbo
Anthony Falbo
Certified Legal Intern
afalbo-lawclinic@case.edu

/s/ Atticus G. Williams
Atticus G. Williams
Certified Legal Intern
awilliams-lawclinic@case.edu

/s/ Hannah Taylor
Hannah Taylor
Certified Legal Intern
htaylor-lawclinic@case.edu

/s/ Joshua Marshall
Joshua Marshall
Certified Legal Intern
jmarshall-lawclinic@case.edu

/s/ Vincent Romero
Vincent Romero
Certified Legal Intern
vromero-lawclinic@case.edu

/s/ Sara Coulter
Sara Coulter (#0096793)
*First Amendment Fellow*
sara.coulter@case.edu

/s/ Andrew Geronimo
Andrew Geronimo (#0086630)
*Director & Supervising Attorney*
andrew.geronimo@case.edu

Dr. Frank Stanton First Amendment Clinic
Milton and Charlotte Kramer Law Clinic
Case Western Reserve University School of Law
11075 East Blvd.
Cleveland, Ohio 44106
P: (216)-368-6855 F: (216)-368-2086
*Attorneys for Defendants Clayton Carmen and Kathryn Carmen*

# TABLE OF CONTENTS

I.    Introduction………………………………………………………………...............1

II.   Law & Analysis ................................................................................................................4

    a. The Ohio General Assembly recently overhauled substantive Ohio defamation law to provide defendants like Clayton and Kathryn immunity from claims like Amy's, that involve expressive statements on a matter of public concern—substantive provisions that apply in this Court under *Erie*.................................................................................................5

    b. Reasonable *Rolling Stone* readers would not take Clayton's and Kathryn's statements as statements of objective fact, and thus they are protected opinions under Ohio law......7

        1.  Clayton and Kathryn's specific language indicates that their statements in the Rolling Stone article are opinions, and their beliefs are not capable of proof or disproof.................................................................................................................8

        2.  The broader and immediate context of Clayton's and Kathryn's statements puts reasonable readers on notice that his statements to the Rolling Stone contain opinions. ....................................................................................................................12

    c. Clayton and Kathryn's statements are substantially true...................................................14

        1. It is substantially true that Amy and Eric resisted efforts to reconnect, and the reasons why they did so does not render a statement defamatory.................................16

        2. It is substantially true that there were deep, emotional divides within the Carmen family, and the children's recounting of the role Amy played in that divide is substantially true—based on her own pled facts.............................................................18

        3. It is substantially true that Amy and Eric fought with Clayton over his education. 20

        4. It is substantially true that Clayton and Kathryn encountered difficulties at Eric's memorial ceremonies. ...................................................................................................20

    d. Amy failed to state a claim of defamation *per se*, as her claims rely on interpretation or innuendo—each purportedly defamatory statement requires extensive explanation to convey its allegedly defamatory meaning..............................................................................21

    e. Amy's defamation claims also fail to state a claim because she failed to plead actual malice.....................................................................................................................................23

    f. Amy has failed to state a claim for false light because, in addition to the defenses that overlap with her defamation claims, none of the statements are "highly offensive to a reasonable person.". ...........................................................................................................25

III.  Conclusion .....................................................................................................................27

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adelson v. Harris*, 774 F.3d 803 (2d Cir. 2014)........................................................................6

*Am. Chem. Soc. v. Leadscope, Inc.*, 133 Ohio St. 3d 366, 389 2012-Ohio-4193 .....................5

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .....................................................................................7

*Becker v. Toulmin*, 165 Ohio St. 549, 138 N.E.2d 391 (1956) ...........................................21, 22

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................................................7, 24

*Bentkowski v. Scene Magazine*, 637 F.3d 689 (6th Cir. 2011)...........................................9, 10, 12

*Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365 (6th Cir.2009)................................................5

*Boulger v. Woods*, 917 F.3d 471 (6th Cir. 2019)....................................................................9, 13

*Boyd v. Archdiocese of Cincinnati*, No. 25950, 2015 WL 1600303 (Ohio Ct. App. 2d. Dist. Apr. 10, 2015) ....................................................................................................................................14

*Croce v. New York Times Company*, 345 F.Supp.3d 961 (S.D. Ohio 2018) ......................14, 16

*Doe v. Univ. of Dayton*, 766 F. App'x 275 (6th Cir. 2019).......................................................24

*Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)..............................5

*Ferreri v. Plain Dealer Publishing Co.*, 142 Ohio App.3d 629, 640 (8th Dist. 2001)...........10

*Ferri v. Ackerman*, 444 U.S. 193 (1979) ...................................................................................6

*Garrison v. Louisiana*, 379 U.S. 64 (1964)..............................................................................23

*Green v. Mason*, 504 F.Supp.3d 813 (S.D. Ohio 2020) ..........................................................22

*Kathryn Carmen, et al. v. Amy Carmen*, U.S. District Court for the Northern District of Ohio, Eastern Division, Case No. 1:24-CV-01331 .......................................................1, 3, 18, 19

*Murray v. Chagrin Valley Publ'g Co.*, 8th Dist. Cuyahoga No. 101394, 2014-Ohio-5442...........24, 25

*Natl. Medic Serv. Corp. v. E.W. Scripps Co.*, 61 Ohio App. 3d 752 (1st Dist. 1989) .......................5, 16

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)..........................................................5, 24

*Ollman v. Evans*, 750 F.2d 970 (D.C. Cir. 1984) ......................................................................9

*Parks v. LaFace Records*, 329 F.3d 437 (6th Cir. 2003) ..........................................................24

*Scott v. News-Herald*, 25 Ohio St. 3d 243 (1986)...........................................................passim

*Serv. Emp. Int'l Union Dist. 1199 v. Ohio Elections Comm'n*, 158 Ohio App.3d 769 (10th Dist. 2004) ....................................................................................................................................16

ii

*SPX Corp. v. Doe*, 253 F.Supp.2d 974 (N.D. Ohio 2003) ...................................................8, 9

*St. Amant v. Thompson*, 390 U.S. 727 (1968) .....................................................................23

*Susan B. Anthony List v. Driehaus*, 779 F.3d 628 (6th Cir. 2015) ........................................16

*Vail v. The Plain Dealer Publishing Co.*, 72 Ohio St.3d 279 (1995) ........................................7

*Wampler v. Higgins*, 93 Ohio St.3d 111 (2001) ...................................................7, 9, 10, 13

*Welling v. Weinfeld*, 2007-Ohio-2451 ................................................................................25

*Woods v. Sharkin*, 2022-Ohio-1949 (8th Dist.) ...............................................................9, 25

*Worldnet Software Co. v. Gannett Satellite Information Network, Inc.* (1997), 122 Ohio App.3d 499 ...5

**Other Authorities**

Brooke White, *The SLAPP Happy State: Now Is the Time for Ohio to Pass Anti-SLAPP Legislation*, 74
   Case W. Rsrv. L. Rev. 559 (2023) ...............................................................................7

Federal Rule of Civil Procedure 12(b)(6) ..................................................................passim

Ohio Revised Code 2747.01 ..............................................................................3, 4, 5, 7

Restatement of the Law 2d ...........................................................................................27, 28

## Brief in Support

### I.      Introduction

Plaintiff Amy Carmen's 55-page Complaint seeks this Court's intervention to convert her subjective family disagreements with Defendants Kathryn and Clayton Carmen into tort liability. Clayton and Kathryn's speech are protected opinions under the First Amendment and Ohio law because they are rhetorical hyperbole. Further, they lack any facially defamatory meaning, and even to the extent they could be seen as containing factual allegations, Amy's own Complaint demonstrates their substantial truth. Amy's performative complaint seems intended to settle a political score against *Rolling Stone* magazine, to publicly disavow her late husband's children, to colorfully retell Amy's perspective on the Carmen family dispute, and to attempt to collaterally attack the factual allegations already set to be resolved in litigation regarding the propriety of changes to the trust funded by Eric Carmen. [1]

Any reasonable reader of "*Eric Carmen Was a Power-Pop Legend. Then He Vanished*" (the "Article" and subject of the Complaint) would understand that Kathryn and Clayton voiced their opinions on their late father, their childhood, and the highly contentious, protracted litigation that resulted from their fractured relationship with their father. As admitted in the Article, the "complex portrait that emerged varies widely, depending on who's doing the telling"[2]—and, of course, such disagreement is

---

[1] *See Kathryn Carmen, et al. v. Amy Carmen*, U.S. District Court for the Northern District of Ohio, Eastern Division, Case No. 1:24-CV-01331.

[2] Compl. Ex. A, PageID #74.

natural and expected among family disputes (even if that family dispute is a matter of public interest because of the fame of the parties involved and the public nature of litigation generally). Amy fails to state a claim for relief because the allegedly defamatory statements aren't actionable as a matter of law, and even if they were, they are substantially true as indicated by Amy's own factual averments in her Complaint. Even more, the Complaint repackages factual disputes central to an already pending trust dispute in a matter of general public interest immunizing it from suit under Ohio's common law, and more particularly under Ohio Revised Code 2747.01(E).

According to the allegations in the Complaint, Clayton and Kathryn are "bad apples rotten to their core" (Compl. ¶ 43), who "had truly depraved thoughts of hatred about Eric and Amy" (Compl. ¶ 44), were "highly dangerous," "deeply immoral people" (Compl. ¶ 45), who "engaged in evil behavior" (Compl. ¶ 104). Amy is entitled to these opinions. Likewise, Clayton and Kathryn are entitled to voice their opinions of their childhood, their father, and their stepmother, and to relay those perspectives to a journalist. But Amy is not entitled to relief or to a judicial judgement stating that, as a matter of objective fact, Clayton and Kathryn's opinions of her are false. Her claims involve speech immunized from suit by Ohio Revised Code 2747.01 et seq., and in any event are not actionable because the statements are either innocuous non-defamatory factual statements which, even if untrue, do not convey defamatory meaning (*see* Penske Mot. to Dismiss, Page ID#159-161), or, are rhetorical hyperbole, or are substantially true.  The Article, the challenged statements, and the Complaint present opposing sides of a public and emotional family dispute—a dispute that is itself subject

2

to resolution on substantially similar factual issues—and which reasonable readers would understand to convey Kathryn and Clayton's subjective views of their admittedly chaotic family life as minors. Such statements are not actionable—as defamation, false light, or otherwise. This Court should dismiss Amy's Complaint under either Ohio's Public Expression Protection Act, O.R.C. 2747.01 *et seq* or under Federal Rule of Civil Procedure 12(b)(6).

This suit is a textbook case for the application of Ohio's Public Expression Protection Act, O.R.C. 2747.01 *et seq*: Clayton and Kathryn voiced their opinions to a media outlet about their late father—a beloved and renowned musician with strong, widely known political convictions—their childhood, and highly contentious, protracted litigation that they are parties to. Amy filed this action even though the central factual disputes are already pending resolution in another matter in this judicial district involving Amy Carmen's alleged actions as Trustee of Eric Carmen's trust . *See Kathryn Carmen, et al. v. Amy Carmen,* U.S. District Court for the Northern District of Ohio, Eastern Division, Case No. 1:24-CV-01331, <u>Plaintiffs' First Amended Complaint for Legal and Equitable Relief</u>, ECF Doc #11. As a Defendant in that action, Amy invites this Court to expend judicial resources not only on statements that constitute clearly protected speech in the context of tort liability – but also to stand in judgment on matters already up for factual resolution in front of Judge Ruiz in the Collateral Action. *See id*. The burden of overlapping litigation frustrates judicial efficiency, especially when, as here, Amy Carmen has failed to state a claim upon which relief can be granted.

Ohio Law, including Ohio's anti-SLAPP statute, and the First Amendment protect Clayton and Kathryn's speech about their subjective experiences in an emotional family dispute in public litigation and covered pervasively by the national news. Not only has Amy failed to state a claim for defamation or false light, Clayton and Kathryn are entitled to the speech protections incorporated in Ohio's anti-SLAPP including "substantive immunity from suit" (O.R.C. 2747.01(E)), expedited relief (O.R.C. 2747.02), and attorney's fees (O.R.C. 2747.05(A)).

## II.    Law & Analysis

Amy's defamation claim fails at many turns. Of the statements attributable to Clayton and Kathryn, the vast majority are not "of and concerning" Amy, *see Penske's Mot. to. Dismiss*, Sect. IV(A)(1). And Clayton and Kathryn's statements as alleged in the Complaint are, in context, clearly the opinions of a speaker on one side of a family dispute. Amy has not identified any statement that is provably false and defamatory. Even if any of Clayton or Kathryn's statements made specific factual allegations that harmed Amy's reputation, those comments are substantially true based on the four corners of Amy's Complaint and thus constitutionally protected. Many of the statements do not carry a defamatory meaning and, to the extent Amy argues that they are defamation per se, rely on external evidence and interpretation and innuendo to be defamatory. *See also id*. at Sect. IV(A)(4). Finally, Amy fails to state a claim for defamation because she fails to plead actual malice. For all these reasons, Amy's defamation per se claims—and the integrated false light claim—should be dismissed under either Ohio's anti-SLAPP or Fed. R. Civ. P. 12(b)(6).

4

**a. The Ohio General Assembly recently overhauled substantive Ohio defamation law to provide defendants like Clayton and Kathryn immunity from claims like Amy's, that involve expressive statements on a matter of public concern—substantive provisions that apply in this Court under *Erie*.**

Federal courts sitting in diversity apply state substantive law. *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir.2009) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)). Amy concedes that Ohio law applies. *See* Complaint PageID#47-54 (pleading defamation and false light claims under Ohio law). To present a prima facie defamation claim under Ohio law, Amy must demonstrate that:[3]

1) Clayton or Kathryn made a false statement of fact;[4]
2) the statement was "of and concerning" Amy;[5]
3) the statement was defamatory;
4) the statement was published;
5) Amy suffered injury as a proximate result of the publication; and
6) Clayton or Kathryn acted with actual malice in publishing the statement.

Further, in 2025, the Ohio Legislature overhauled the extent to which Ohio law recognizes tort liability for certain expressive, publishing, and petitioning activities in Revised Code 2747.01 *et seq.*, and provided "substantive immunity from suit" for claims related to any "communication on an issue under consideration or review in a … judicial ... proceeding," and for a "person's exercise of the right of freedom of speech …

---

[3] *See Am. Chem. Soc. v. Leadscope, Inc.*, 133 Ohio St. 3d 366, 389 2012-Ohio-4193, ¶ 77 (citation omitted); see also *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964); *Scott v. News-Herald*, 25 Ohio St. 3d 243, 246 (1986).
[4] Regarding falsity, "[i]t is sufficient [in defending against a defamation action] to show that the imputation is substantially true, or as it is often put, to justify the 'gist,' the 'sting,' or the substantial truth of the defamation." *Natl. Medic Serv. Corp. v. E.W. Scripps Co.*, 61 Ohio App. 3d 752, 755 (1st Dist. 1989).
[5] To be actionable, a plaintiff must show that the alleged defamatory statement was "of and concerning" the plaintiff. *Sullivan*, 376 U.S. at 288; *Worldnet Software Co. v. Gannett Satellite Information Network, Inc.* (1997), 122 Ohio App.3d 499, 504

on a matter of public concern."[6] Thus, the Ohio General Assembly amended the common law by statute to confer substantive immunity for certain constitutionally protected activities, to give defendants the substantive right to quickly dispatch lawsuits involving such activities, and fee-shifting remedies designed to deter lawsuits involving protected speech under Ohio Law.

Although there is some disagreement about when state Anti-SLAPP laws apply in federal court,[7] Ohio law clarifies that the remedies Defendants Kathryn and Clayton seek are substantive in nature, and not procedural, and thus present no *Erie* problem. *See, e.g., Adelson v. Harris*, 774 F.3d 803, 809 (2d Cir. 2014) (holding that Nevada's anti-SLAPP remedies of "immunity from civil liability" and "mandatory fee shifting" were "unproblematic" for a federal court sitting in diversity). After all, ""[W]hen state law creates a cause of action, the State is free to define the defenses to that claim, including the defense of immunity, unless, of course, the state rule is in conflict with federal law." *Id.*, citing *Ferri v. Ackerman,* 444 U.S. 193, 198 (1979). But even without the "substantive immunity from suit" that Kathryn and Clayton are entitled to under Ohio law, Amy's claims should be dismissed for failure to state a claim.

---

[6] Clayton and Kathryn are entitled to relief under Ohio's Anti-SLAPP under both Under R.C. 247.01(B)(2) (statements made "on an issue under consideration or review in a legislative, executive, judicial, administrative, or other governmental proceeding," here, the Trust and other related litigation) and under R.C. 2747.01(B)(3) (Clayton and Kathryn's "exercise of the right of freedom of speech and of the press, the right to assemble and petition, and the right of association,
guaranteed by the United States Constitution or the Ohio Constitution, on a matter of public concern," here, the life and death of their father, a beloved pop star).

[7] Brooke White, *The SLAPP Happy State: Now Is the Time for Ohio to Pass Anti-SLAPP Legislation*, 74 Case W. Rsrv. L. Rev. 559, 573–77 (2023).

Under Federal Rule of Civil Procedure 12(b)(6), Courts will dismiss a lawsuit if a complaint fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)6). A complaint must allege sufficient facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### b. Reasonable *Rolling Stone* readers would not take Clayton's and Kathryn's statements as statements of objective fact, and thus they are protected opinions under Ohio law.

Amy asks this Court to hold Clayton and Kathryn liable for their deeply held, emotionally charged opinions of her. Clayton says that Amy was "really, really, really bad news." Compl. ¶104. Yet Amy also uses value-laden, imprecise, and inflammatory language in describing her own family members: "The Lawsuits were the culmination of years of <u>abusive</u>, <u>appalling</u>, <u>atrocious</u>, <u>deceitful</u>, <u>exploitative</u>, and <u>terrorizing</u> conduct by Fred, Susan, Clayton, and Kathryn, all of whom were and still are <u>highly disturbed and depraved</u> individuals." Compl. ¶86 (emphasis added).

Setting aside the double standards in Amy's Complaint, the Ohio Constitution immunizes opinions from liability. *See Scott v. News-Herald*, 25 Ohio St.3d 243, 250 (1986); *Vail v. The Plain Dealer Publishing Co.*, 72 Ohio St.3d 279, 281 (1995) (stating that the Ohio constitution provides a guarantee of protection for opinion); *Wampler v. Higgins*, 93 Ohio St.3d 111, 121–25 (2001) (holding that opinion protections apply to statements made by private citizens).

7

To determine if a statement qualifies as a protected opinion, Ohio courts utilize a four-part totality of the circumstances test that analyzes: (1) the specific language at issue; (2) the statement's verifiability; (3) the immediate context of the statement; and (4) the broader context of the statement. *Scott*, 25 Ohio St.3d at 250; *see also SPX Corp. v. Doe*, 253 F.Supp.2d 974, 981–82 (N.D. Ohio 2003) (dismissing a defamation suit after finding the allegedly defamatory statements were opinions under the Ohio totality of the circumstances test). The determination of whether a statement constitutes an opinion or fact is a question of law. *Scott*, 25 Ohio St.3d at 250. No one factor is determinative, the importance of each factor depends on the circumstances of the case. *Id.* In this case, all factors weigh in favor of constitutional protection.

First, the specific language in Clayton and Kathryn's statements indicates that they were venting deeply-held opinions based on a turbulent and emotional part of their childhood. Second, Clayton and Kathryn's statements are not verifiable, because they are not objectively capable of proof or disproof. Third, the context of their statements—contained in an article illustrating a celebrity's fractured family, with blatantly opposing perspectives, published by a magazine that the Complaint pleads has liberal biases (Compl. ¶ 6)—puts reasonable readers on notice that their statements constitute opinions.

> **1. Clayton and Kathryn's specific language indicates that their statements in the Rolling Stone article are opinions, and their beliefs are not capable of proof or disproof.**

Any reasonable reader would understand that Clayton and Kathryn's statements reflect deeply held personal beliefs based solely on the language they used—and are not

verifiable because they're not capable of proof or disproof. Under the specific language factor, courts determine whether the allegedly defamatory statement has a precise meaning and gives rise to a clear factual implication. *Boulger v. Woods*, 917 F.3d 471, 479 (6th Cir. 2019) (despite Nazi having a clear meaning, a statement questioning whether someone making a Nazi salute had no "precise meaning" and was not actionable). Reasonable readers cannot infer factual meaning from "loosely definable" or "variously interpretable" statements unless context dictates otherwise. *Wampler v. Higgins*, 93 Ohio St.3d 111, 128 (2001) (statements that landlord charged exorbitant rent and was a "ruthless spectator" were imprecise and subject to a multitude of interpretations and therefore not actionable). If a statement is reasonably susceptible to either a defamatory or innocent meanings, courts as a matter of law must construe the statement to have the innocent meaning. *Boulger*, 917 F.3d at 483.

As to the second factor, statements are verifiable if the person making the statement (1) represents that he has knowledge or evidence to substantiate the statement; or (2) there is a plausible method to verify the statement. *SPX Corp. v. Doe*, 253 F.Supp.2d 974, 980–81. If a "statement lacks a plausible method of verification, a reasonable reader would not believe that the statement has specific factual content." *Scott*, 25 Ohio St.3d at 251–52 (quoting *Ollman v. Evans*, 750 F.2d 970, 979 (D.C. Cir. 1984)). Readers cannot verify statements referring to an individual's "internal motivation" because no plausible verification method exists. *Bentkowski v. Scene Magazine*, 637 F.3d 689, 694 (6th Cir. 2011).

Here, the specific language in all the Statements attributable to Clayton and Kathryn indicate protected opinion, and none of their statements are verifiable. In Statement #1, whether Clayton considers his father's death to be "bad news" is classically protected opinion and cannot be verified.

Statements #2, #4, #5, #6, #7, #9, #13, and #15 all involve the children's subjective feelings towards their stepmom and are classic opinions. Amy decries Statements #2, #4, and #9 as actionable, but whether the children believed she manipulated their father, inspired lawsuits, or caused or contributed to estrangement lack a precise meaning and instead communicates their subjective views on the matters, informed as it was by their teenage years. Ohio Courts and this District have recognized that statements referring to internal motivations are classic non-verifiable statements. *See Bentkowski*, 637 F.3d at 694; *Ferreri v. Plain Dealer Publishing Co.*, 142 Ohio App.3d 629, 640 (8th Dist. 2001) (noting that there are no objective tests to determine whether something is "scandalous" or that an individual cares more about himself and his image than children because such determination is necessarily based on one's opinion); *Wampler*, 93 Ohio St.3d at 129 (holding that words such as "ruthless" and "heartless" are "standardless statements not amendable to objective proof or disproof").

Similarly, the charged and emotional language in Statement #5 is indicative of opinion and cannot be verified. Through allusions to classic storytelling and fairytale tropes, Clayton paints a tale of an "evil stepmom" who was "really, really, really bad news." A person reading "evil stepmom" may think of Cinderella's stepmother, they may think of their own personal experiences with a cruel or jealous family member, or

10

they may think that Clayton engaged in hyperbole to express his tension with and emotional distance from his stepmother. This is classic rhetorical hyperbole. He believed she was a "sycophant" (Statement #6), and Kathryn described "antics" (Statement #7) that she believes started when Amy moved in. Clayton's use of the word "terrorized" in Statement #13 is value-laden,[8] as is his description that Amy and his father made him jump through hoops. And whether the children believed Amy "threw a tantrum" (Statement #15) is subjective and not capable of proof or disproof.

The charged language used by the children would put a reasonable reader on notice—if the rest of the article didn't do so already—that the opinions contained in the article were the result of years of familial strife and both sides disagreed emphatically. Here, "evil," "sycophant," and "manipulate" are interpretable and do not have precise meanings. The children's statements do not give rise to a factual implication, rather they communicate a subjective view. What someone thinks is "evil" or "manipulating" behavior may be perfectly normal behavior to another person; indeed, Amy contends that she always treated Clayton and Kathryn "appropriately, kindly, and with respect, and certainly in no way that could be construed as 'evil'" (Compl. at ¶104), demonstrating that these statements are not capable of proof or disproof. Such statements are not capable of proof or disproof, because there is no objective measurement of what constitutes an "evil stepmom" or a "sycophant." Clayton and Kathryn's language communicates a subjective and value-laden belief about their

---

[8] And to the extent Amy suggests that Clayton's use of the word "terrorized" is defamation *per se*, her own Complaint alleges that it was *Clayton* who "terrorized" her and Eric to such a degree that they had to leave Eric's home state. *See* Compl. ¶112.

11

stepmother. Any reasonable reader would understand that such language merely communicates an opinion.

> ### 2. The broader and immediate context of Clayton's and Kathryn's statements puts reasonable readers on notice that his statements to the Rolling Stone contain opinions.

Finally, the context of Clayton's and Kathryn's statements undercuts their alleged factual nature. Given that the Article focuses on Eric Carmen and his family's disputes, reasonable readers would anticipate that the parties who have history of litigation and a clear deep-seated animosity for each other would offer unfavorable perspectives. Clayton and Kathryn's statements in the Article reflect the existing conflict between Amy and her stepchildren. Further, as pled in the Complaint, the broader context of the *Rolling Stone* magazine should put readers on notice that its articles contain non-actionable opinions, because, according to the Complaint itself, it is a "left-leaning publication." (Compl. ¶ 12).

The totality of the circumstances test analyzes the entire work at issue to determine the general context and the publication where a statement appears to analyze a statement's broader context. *Bentkowski*, 637 F.3d at 695. Speakers who make no attempt to hide their biases and who use "simile, hyperbole, and other figurative language to express ideas" "ridden with humor and sarcasm" alert reasonable readers that the speakers are giving their opinions, and "weigh strongly against actionability" — even when the specific statements seem potentially verifiable. *Id*. For context analyses, courts examine any language that surrounds the alleged defamatory remarks, as such language may place reasonable readers on notice that an author/speaker is giving their

opinion. *Wampler*, 93 Ohio St.3d at 130. As for the broader context, Courts examine how the type of medium at issue influences a reader's viewpoint on whether a statement is one of fact or opinion. *Boulger*, 917 F.3d at 482.

Clayton and Kathryn's statements appear within an article that describes a protracted family dispute that has continued after their father's death into trust litigation. Any reader of an article describing such a dispute should understand that the article might contain charged language. *See* Compl. Ex. A, at 34 (referencing "both sides of the Carmen family divide"). Given the two sides' hostility to each other, reasonable readers would view Clayton and Kathryn's statements with skepticism. They make no attempt in their statements to hide their bias against Amy. In fact, the statements make it readily apparent that they harbor a strong bias against their stepmother. For example, Clayton told the *Rolling Stone* reporter that "I knew from the very beginning that [Amy] was really, really, really bad news." Compl. ¶ 104. Such a statement puts any reasonable reader on notice that Clayton *never liked* Amy. With such a strong first impression coloring his view of his stepmother, reasonable readers cannot consider Clayton to be a reliable reporter on anything about Amy.

Amy's complaint proves that broader context of the *Rolling Stone* magazine should put reasonable readers on notice that it contains opinions. Amy's complaint calls the *Rolling Stone* a "left-leaning publication inclined toward a hypocritical and sanctimonious worldview," containing a "well-documented bias against conservatives, and *rabid* bias against President Trump and his supporters." Compl. ¶ 12. If the *Rolling Stone* contains the "well-documented" strong bias that the complaint alleges, then

13

reasonable readers should understand that its articles may contain opinionated statements. Further, if the magazine contains "hypocritical and sanctimonious worldviews," reasonable readers should understand that many statements within the publication are not factual assertions, rather they are value-judgments about the world. Additionally, the Article appears in the "music" section of the magazine. Such sections of the magazine typically contain opinions on music, whether in the form of music reviews or opinions about music artists. Reasonable readers would understand that an article contained in that section would necessarily contain opinions.

For all the reasons mentioned above, Clayton and Kathryn's statements are protected opinions.

### c. Clayton and Kathryn's statements are substantially true.

Amy's Complaint admits facts that show the substantial truth of Clayton and Kathryn's statements. Dismissal on the pleadings is appropriate when a plaintiff admits facts in their complaint showing the substantial truth of the allegedly defamatory statements. *Croce v. New York Times Company*, 345 F.Supp.3d 961, 983 (S.D. Ohio 2018) ("Here, Defendants aren't disputing any facts; they're just taking what Dr. Croce alleged and showing how he pleaded himself into this defense. Thus, a motion to dismiss is a proper vehicle to address the issue."); *see also Boyd v. Archdiocese of Cincinnati*, No. 25950, 2015 WL 1600303, at *12 (Ohio Ct. App. 2d. Dist. Apr. 10, 2015).

Amy's Complaint effectively undercuts her defamation claims by substantiating the factual bases of the allegedly defamatory statements. She takes issue with Kathryn and Clayton saying she contributed to a divide in the family. Yet she pleads as factual

14

assertions in her Complaint that they were "monstruous children" (Compl. at ¶3) who "remorselessly and relentlessly terrorized Eric and Amy with a demonic fervor and purpose" (*id.*). She claims they had an "all-consuming animus" (*id.* at ¶4) towards her late husband "that has been erupting from their volcano of hatred for years" (*id.*). She pleads – again, as a factual assertion – that these "embittered" (*id.* at ¶7) family members had "axes to grind" (*id.*) and "pathological and compulsive urges" (*id.* at ¶6) to "malign" (*id.*) their father. Amy, who brings a defamation claim against her stepson for saying she was "really, really, really bad news" harbors opinions of her own about her stepchildren: they were "already bad apples rotten to their core" (*id.* at ¶43) who had "truly depraved thoughts of hatred about Eric and Amy" (*id.* at ¶44). Amy continues her diatribe against her stepchildren in the Complaint, calling them "deeply immoral people whose rottenness had been festering for years leading up to Eric's death." *Id.* at ¶45.

Regardless of Amy's pleading to the contrary, her own factual allegations show that she is not someone who contributed positively to the relationship between her stepchildren and their father. It is substantially true that the Carmen family suffered from a deep, emotional divide—and whether Amy worked to fix the divide, or contributed to the rift, does not materially change the truth of statements to that effect. Indeed, Amy's colorful descriptions of her stepchildren contained in her pled facts seem to suggest that she was not looking to bridge any gaps in the family, which is further underscored by her description of why statements were false. Throughout, she

highlights minor "misrepresentations" or "omissions" while not disputing the overall truthful "gist" of the statements.

A plaintiff must plead and prove that the gist of a statement is materially false to prevail on a defamation claim. "In other words, truth isn't hard to find in Ohio; the Sixth Circuit calls it a low threshold. All that's needed is either ambiguity, some truth, or that the gist or sting of the statement is substantially true." *Croce v. New York Times Company*, 345 F.Supp.3d 961, 982-983 (S.D. Ohio 2018) (quoting *Susan B. Anthony List v. Driehaus*, 779 F.3d 628, 633 (6th Cir. 2015) (internal quotation marks omitted)). A plaintiff's prima facie defamation claim fails "when the record reveals that the published reports were fairly accurate or substantially true." *Croce*, 345 F.Supp.3d at 983 (quoting *Nat'l Medic*, 61 Ohio App.3d at 755). Additionally, "[a] statement is not a 'false statement' if, even though it is misleading and fails to disclose all relevant facts, the statement has some truth in it." *Serv. Emp. Int'l Union Dist. 1199 v. Ohio Elections Comm'n*, 158 Ohio App.3d 769, 772 (10th Dist. 2004) (cleaned up); *see also Nat'l Medic Serv. Corp. v. E.W. Scripps Co.*, 61 Ohio App.3d 752, 755 (1st Dist. 1989) (in defending a defamation action, it is sufficient to show the imputation is "substantially true."). Amy's defamation claim against her stepchildren is contradicted by her own lawsuit, which confirms the truth of what they said.

### 1. It is substantially true that Amy and Eric resisted efforts to reconnect, and the reasons why they did so does not render a statement defamatory.

The claims in Statements #1 and #8 that Amy and Eric resisted Clayton and Kathryn's attempts to reconnect are substantially true. As to Statement #1, Amy admits

16

that they did not respond to Clayton and Kathryn's efforts to reach out. *Id.* at ¶¶100, 107. Amy admits she and Eric did not answer the door, had their curtains closed, and reported Clayton to the police as a trespasser when he attempted to visit. *Id.* at ¶100. Instead, she challenges minor details like whether the curtains were closed prior to or during Clayton's visit. *Id.* She also argues that Clayton and Kathryn's attempts were not efforts to "reconnect" because they were interested in getting financial support or venting their frustrations. *Id.* However, individuals reconnect for many reasons, including seeking financial support or airing grievances. And Eric and Amy's rationale for resisting any attempts to reconnect—whether they were trying to escape the children's "reign of terror" (*id.* at ¶107) or to protect themselves from an "out-of-control, entitled son" (*id.* at ¶100) does not change the fact that the family members never reconnected.

Similarly, Statement #8 is substantially true. Amy admits that in 2018, she and Eric moved to Arizona. *Id.* at ¶74. Ohio was Eric's "lifelong home state" and Arizona was the state where Amy resided before her relationship with Eric and where she currently resides. *Id.* at ¶¶9, 74, 105. Exhibit A at pg. 6. Given Eric's sudden decision to leave his home state of Ohio for Amy's home state of Arizona, Clayton and Kathryn could only conclude that Eric moved to Arizona because of Amy.

Since Amy does not challenge that Clayton and Kathryn attempted to reconnect, and only challenges their reasons for reconnecting and Eric's (and her) reasons for not doing so, these statements are substantially true.

> **2.** *It is substantially true that there were deep, emotional divides within the Carmen family, and the children's recounting of the role Amy played in that divide is substantially true—based on her own pled facts.*

Amy may have pled that she "always treated Clayton and Kathryn appropriately, kindly, and with respect, and certainly in no way that could be construed as 'evil'" (*id.* at ¶104), but her Complaint paints a different picture of Amy's feelings towards her stepchildren. Amy has admitted that she views Eric's family as "bad apples rotten to their core" with "an insatiable hunger for Eric's money" and who saw Eric as "a 'golden ticket' and nothing more." Compl. at ¶¶44, 34. The main gist of Statements #3, #7, #10, and #11 is that Amy widened the rift between Eric and his family.

While Statement #3 cannot be defamatory because it is simply a rhetorical question, the facts underlying the question are indeed substantially true. The Carmens did have a family schism. There are and have been multiple lawsuits between these family members. Finally, Amy's attempt to distinguish between accusing her stepchildren of something and them actually doing it is mere hair-splitting—especially given that she has already used this against the children in another lawsuit. *See Carmen v. Carmen*, 1:24-cv-01331 ECF Doc #16 ¶38 ("Kathryn made a clear death threat against her father in 2016").

Statement #7's main gist is that Amy used Kathryn's diary to further the divide within the Carmen family. Amy has publicly asserted that that Clayton and Kathryn "*did* plot Eric's murder" and included portions of Kathryn's diary in her complaint to support her claim. *Id.* at ¶¶102, 64. Amy fervently believes that Eric's children planned

18

his murder and, she published portions of Kathryn's diary to support this claim. As a result, Kathryn could reasonably conclude that Amy was the one who originally unearthed the diary. Amy claims that Eric or a housekeeper discovered the diary. *Id.* at ¶106. Since Amy has used the diary in a divisive lawsuit with Eric's children to further her claim that Eric's children planned to murder him, the claim that she took the photos in the first place is only a minor inaccuracy that does not undermine the statement's substantial truth. The gist is that photographs were taken, and Amy, far from decrying this as an invasion of privacy, has instead publicized them in other litigation. *See Carmen v. Carmen*, 1:24-cv-01331 Doc #16-1.

Statement #10 is also substantially true. Although Amy disputes that the party was a "turning point," she does point to the party as being the "final time" the children were breaking and entering Eric's home, indicative of the fact that something changed after that party. Compl. ¶106.

As to Statement #11, Amy disputes minor details about what was said to whom about Fred's deck, but she conspicuously does not deny making a statement to Eric which insinuated that Fred had misappropriated his money to finance his deck and, indeed in her complaint, alleges that "Fred *did* commit malfeasance with respect to Eric's money" (*id.* at ¶110 (emphasis in original)), rendering the gist of the statement true. Amy alleges that Fred's malfeasance separated Eric and Fred so by bringing Eric's attention to Fred's alleged malfeasance, she contributed to the rift between the two brothers. *Id.* at ¶101.

Amy goes to great lengths to describe her "cooperative and loving relationship" with Eric, so Amy almost certainly expressed her views to Eric—now codified in this Complaint—which had the potential to shape how Eric viewed his family. *Id.* at ¶105. Regardless of whether Amy's influence was ultimately positive or negative, it is clearly true that a deep and longstanding divide existed within the family. And Clayton and Kathryn's feelings as to the role played by Amy in that divide are constitutionally protected opinions.

### 3. *It is substantially true that Amy and Eric fought with Clayton over his education.*

The main gist of Statements #12 and #13 are that Amy and Eric fought with Clayton over his grades and education costs. Amy admits that Eric did not pay for Clayton to attend NYU, which resulted in Clayton suing Eric, and that Eric's decisions about paying for Clayton's tuition and expenses at Ohio State were contentious. *Id* at ¶111. But it's true that Eric sent Clayton an email imploring him to get "good grades" and graduate in eight semesters. *Id.* at ¶112. Insofar as Eric made Clayton "jump through hoops" as they required Clayton meet their requirement of getting "good grades," and contemporaneous communications show the uncertainty about his housing situation, and the tension it created. *Id.* Therefore, Statements #12 and #13 are substantially true.

### 4. *It is substantially true that Clayton and Kathryn encountered difficulties at Eric's memorial ceremonies.*

The gist of Statements #14 and #15 are also substantially true. Statement #14 is substantially true because Clayton and Kathryn were prevented from attending the

memorial service Amy planned for Eric, and there was security in place to keep unwanted visitors away. Amy admits to sending Clayton and Kathryn an email notifying them they were not invited to Eric's private memorial service. *Id*. at ¶113. She also admits to hiring a venue that provided security guards for the event. *Id*. Therefore, it is substantially true that the security for the venue Amy hired prevented unwanted guests, like Clayton and Kathryn, from attending the service. Statement #15 is also substantially true because Clayton and Kathryn were not able to speak at the Eric Carmen Day ceremony. Clayton and Kathryn's statement that Amy delayed the ceremony with a "tantrum" to prevent them from speaking is their protected opinion about why they were prevented from speaking. *See* Sub. Sect. a above. The main gist of the statement is substantially true because Amy admits that Clayton and Kathryn were "never slated to speak at the event." *Id*. at ¶114.

>  d. **Amy failed to state a claim of defamation *per se*, as her claims rely on interpretation or innuendo—each purportedly defamatory statement requires extensive explanation to convey its allegedly defamatory meaning.**

Amy Carmen has not stated a claim for defamation per se, as the statements elicited do not qualify under defamation per se as asserted in her complaint (see Count II, Defamation Per Se Under Ohio Law, ¶¶174-183). Defamation per se occurs only when the statement is "defamatory on its face." *Becker v. Toulmin*, 165 Ohio St. 549, 553, 138 N.E.2d 391 (1956).  Defamation per se is limited to four kinds of statements, they must involve 1.) a serious crime; 2.) an "offensive" or "contagious" disease; 3.) injury to an individual's trade or occupation; or, 4.) if written, subject another to "hatred, ridicule

or contempt." *Green v. Mason*, 504 F.Supp.3d 813, 833 (S.D. Ohio 2020).  "Hatred,

ridicule or contempt" requires a "relatively high standard" to be met. *Id*. That standard

is certainly not met in this case. *See Green*, 504 F.Supp.3d at 834-35 (holding that taking

offense to being characterized as, among other things, "disrespectful," "disregarding,"

being uninformed, and making misrepresentations, does not rise to the level of public

hatred, ridicule or contempt: "[n]ot even close."); *See Becker v. Toulmin*, 165 Ohio St. 549

(1956) (holding there was not defamation per se when the statement asserted had a

mutual affect and was no more than an announcement).

　　As Defendants Penske Media Corporation and Andy Greene argued, the

challenged statements do not carry a defamatory meaning. (Penske Mot. to Dismiss,

PageID#159-161).  Words such as: "bad news" (Compl. ¶100); "accusing" (Compl.

¶102); "manipulated" (Compl. ¶103); "evil stepmom/girlfriend" (Compl. ¶104);

"sycophant" (Compl. ¶105); "antics" (¶106); "turning point" (Compl. ¶109); "hiring

armed guards" (Compl. ¶113); or "tantrum" (Compl. ¶114) are not defamatory on their

face.  Any defamatory meaning that could be elicited from the statements would

require extrinsic evidence to do so, which is not permissible in a defamation *per se*

claim.

　　That Amy feels compelled to explain exactly why the "actionable" statements are

false and defamatory shows why the statements are not actionable as defamation per se.

If the statements were truly defamatory on their face, such explanation would be

unnecessary. Take, for example, Clayton's statements about his college tuition and

expenses (Statements #12 and #13). There is nothing inherently defamatory about a

22

father being unwilling or unable to pay for a child's college expenses, nor is it defamatory on its face to say that parents instituted grade minimums or mandated a cost-conscious lifestyle while in college; indeed, most parents would want or expect those things for a child. Instead, Amy relies on outside knowledge (i.e., that she and Eric had to be married in their own living room because of financial struggles, see Compl. ¶111) to argue that Clayton's statements are defamatory. This pleading deficiency exists in every single statement Amy claims is defamatory *per se*—for each one, she believes the reader lacks context for the statements' defamatory meaning. Thus, these statements—if they were actionable—cannot support a finding of liability under defamation per se.

### e. Amy's defamation claims also fail to state a claim because she failed to plead actual malice.

Amy Carmen's defamation per se claim is also deficient—in addition to the reasons mentioned above and discussed in the Rolling Stone Defendants' Motion to Dismiss—because her Complaint fails to plead actual malice as to Clayton and Kathryn.

Actual malice inquiries focus on the defendant's attitude toward the truth of their statement, rather than their attitude toward the plaintiff. *Scott v. News-Herald*, 25 Ohio St.3d 243, 248 (1986) (citations omitted). Actual malice requires a showing that a speaker made false statements with a "high degree of awareness of their probable falsity." *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964); *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (actual malice is measured by whether "the defendant in fact entertained serious doubts as to the truth of its publication."). A plaintiff cannot sue for defamation

unless the defendant makes factual statements about the plaintiff that are "provable or false." *Parks v. LaFace Records*, 329 F.3d 437, 462 (6th Cir. 2003). Courts cannot infer actual malice from evidence of personal spite, ill-will or intention to injure on part of a writer or speaker. *Scott*, 25 Ohio St.3d at 248. Moreover, Amy cannot rely on conclusory allegations about actual malice: she must plead operative facts that, if true, would constitute evidence that Kathryn or Clayton made any statements with knowledge of falsity or with reckless disregard of the truth. When evaluating a plaintiff's allegations of actual malice, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Doe v. Univ. of Dayton*, 766 F. App'x 275, 290 (6th Cir. 2019), quoting *Twombly*, 550 U.S. at 555.

Amy's allegation that Clayton and Kathryn's feelings towards Eric are insufficient to allege actual malice in their statements about her. Even if Amy could establish that comments about Eric affect her, personal animus towards a person are not the standard for actual malice; actual malice focuses not on the speaker's attitude toward the plaintiff, but the speaker's attitude toward the truth. Actual malice means the publication of a factual assertion "with knowledge that it was false or with reckless disregard of whether it was false or not." *Murray v. Chagrin Valley Publ'g Co.*, 8th Dist. Cuyahoga No. 101394, 2014-Ohio-5442, ¶ 9 (citing *Sullivan*, 376 U.S. at 280). Nothing in Amy's complaint, even if true, is sufficient to establish that Clayton or Kathryn made a statement with a disregard for the truth. Amy alleges that Clayton and Kathryn acted with actual malice through their "all consuming animus towards Eric" and their

"breach of a non-disparagement provision." However, neither allegation sufficiently

pleads actual malice for a defamation claim, which requires knowledge of falsity.

> **f.  Amy has failed to state a claim for false light because, in addition to the defenses that overlap with her defamation claims, none of the statements are "highly offensive to a reasonable person.".**

To establish a claim for false light invasion of privacy, a plaintiff must show:

1) The defendant gave publicity to a private matter concerning the plaintiff;
2) The publicity placed the plaintiff in a false light;
3) The false light would be highly offensive to a reasonable person; and
4) The defendant had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed.

*Woods v. Sharkin*, 2022-Ohio-1949, ¶ 84 (8th Dist.) (citing *Welling v. Weinfeld*, 2007-Ohio-

2451 ¶ 58). Critically, to be actionable, the statement must be false. *Id*; *see also Murray v.*

*Chagrin Valley Publishing Co.*, 2014-Ohio-5442, ¶ 38 (8th Dist.) (to be actionable as false

light, there must be untruthful statements commenting on private matters).

While the Court in *Welling* demonstrated a concern that recognizing a false light

claim in Ohio would "result in a parade of persons with hurt feelings clogging our

courthouses," *Welling*, 2007-Ohio-2451 at ¶51, the Court ultimately answered that in the

negative because false light requirements make it "difficult to prove." *Id*. One such

requirement, in addition to defendants giving publicity to a private matter and the

statement being untrue, is that it must be highly offensive to a reasonable person. "It is

only when there is such a major misrepresentation of his character, history, activities or

beliefs that serious offense may reasonably be expected to be taken by a reasonable man

in his position, that there is a cause of action for invasion of privacy." *Id*. (citing

Restatement of the Law 2d, Torts, Section 652E, Comment c.). In addition, the plaintiff must show actual malice in cases of both private and public figures. *Id*. at ¶58.

Any argument that Clayton and Kathryn's statements gave publicity to a private matter is undermined by the already-public trust litigation that was ongoing at the time of the article's publication (Clayton and Kathryn filed their original Complaint in Cuyahoga County Probate Court on or about June 28, 2024 (Case No. 2024ADV290042) and the Article was published January 19, 2025). Further, the statements at issue here—as more fully described in the defamation *per se* section—are substantially true, and therefore cannot support a claim of false light. And there cannot have been a "major misrepresentation" of Amy's "character, history, activities or beliefs," *id.* at ¶55 when she is quoted in the same article and used the opportunity to present her side of the story. Instead, as she does in her defamation *per se* counts, Amy Carmen nitpicks omissions and misrepresentations. But "[t]he plaintiff's privacy is not invaded when the unimportant false statements are made, even when they are made deliberately." *Id.* (citing Restatement of the Law 2d, Torts, Section 652E, Comment c.).

Finally, Amy has not pled actual malice; her theory of actual malice rests on a theory of malice towards Eric and herself, and not towards the truth. Nothing in Clayton or Kathryn's statements demonstrate serious doubts as to the truth; indeed, their protected opinions cannot be proven true or false. For these reasons and for the reasons set forth in Rolling Stone's Motion to Dismiss, Amy's false light claim should also be dismissed.

### III.    Conclusion

Amy invokes this Court's jurisdiction to attempt to get judicial recognition of her subjective views of an intensely emotional family dispute—a dispute already set for resolution in another matter concerning the trust where their resolution would make a meaningful difference.

Clayton and Kathryn's statements in the article, when viewed in context, make clear that they are giving their subjective views of a messy situation—views the author explicitly says vary wildly depending on the speaker. And to the extent that Amy tries to identify minor inaccuracies in particular facts or sequences, none of them change the gist that these parties did not get along and blamed each other for the fractured relationship between Eric and his children. These benign statements about their subjective experiences cannot lead to tort liability, because they're immune under Ohio law, and protected speech under both the United States and Ohio Constitutions.

For these reasons, Defendants Clayton and Kathryn Carmen respectfully request that this Court dismiss Amy's Complaint under either Ohio's newly enacted Anti-SLAPP law, R.C. 2747.01 et seq. (and the substantive remedies it provides), or, alternatively, under Federal Rule of Civil Procedure 12(b)(6).

27

Respectfully submitted,*

*/s/ Alaina Alessio*
Alaina Alessio
Certified Legal Intern

*/s/ Anthony Falbo*
Anthony Falbo
Certified Legal Intern
afalbo-lawclinic@case.edu

*/s/ Atticus G. Williams*
Atticus G. Williams
Certified Legal Intern
awilliams-lawclinic@case.edu

*/s/ Hannah Taylor*
Hannah Taylor
Certified Legal Intern
htaylor-lawclinic@case.edu

*/s/ Joshua Marshall*
Joshua Marshall
Certified Legal Intern
jmarshall-lawclinic@case.edu

*/s/ Vincent Romero*
Vincent Romero
Certified Legal Intern
vromero-lawclinic@case.edu

*/s/ Sara Coulter*
Sara Coulter (#0096793)
*First Amendment Fellow*
sara.coulter@case.edu

*/s/ Andrew Geronimo*
Andrew Geronimo (#0086630)
*Director & Supervising Attorney*
andrew.geronimo@case.edu

DR. FRANK STANTON FIRST AMENDMENT CLINIC
MILTON AND CHARLOTTE KRAMER LAW CLINIC
CASE WESTERN RESERVE UNIVERSITY SCHOOL OF LAW
11075 East Blvd.
Cleveland, Ohio 44106
P: (216)-368-6855 F: (216)-368-2086
*Attorneys for Defendants Clayton Carmen and Kathryn Carmen*

---

* The contents of this filing were prepared by counsel in the course of their representation of a client and are not the official position(s) (if any) of Case Western Reserve University or CWRU School of Law.

28

## Certificate of Service

The undersigned certifies that on October 17, 2025, I submitted this ***Motion For Expedited Relief Under Ohio Rev. Code 2747.01 et seq, or, In the Alternative, Fed. R. Civ. P. 12(b)(6) Motion To Dismiss*** to the Court via the Court's ECF filing system, and it will be served on all counsel via ECF.


*/s/ Andrew Geronimo*
Andrew Geronimo (#0086630)