IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| Amy Carmen,<br><br>    *Plaintiff*,<br><br>v.<br><br>Penske Media Corporation *et. al.*,<br><br>    *Defendants*. | Case No 1:25-cv-01671<br><br>Judge Charles Esque Fleming<br><br>**DEFENDANTS CLAYTON CARMEN & KATHRYN CARMEN'S REPLY IN SUPPORT OF THEIR MOTION FOR EXPEDITED RELIEF UNDER O.R.C. 2747.01 *ET SEQ*, OR, IN THE ALTERNATIVE, FED. R. CIV. P. 12(B)(6) MOTION TO DISMISS** |

      Defendants Clayton Carmen and Kathryn Carmen respectfully submit this Reply in Support of their *Motion for Expedited Relief Under O.R.C. 2747.01 et seq., or, in the alternative, Fed. R. Civ. P. 12(B)(6) Motion to Dismiss*.

      Plaintiff Amy Carmen's defamation and false light claims boil down to veiled attempts to litigate statements which are not only highly subjective characterizations of a politically-charged celebrity family dispute, but whose truth are currently under consideration in a separate judicial proceeding. Amy's arguments in her Opposition demonstrate that this case fits squarely into the category of SLAPP suits that the Ohio General Assembly intended to immunize defendants from having to defend against by enacting Chapter 2747 of the Ohio Revised Code. As relevant to this case, the Ohio General Assembly granted substantive immunity from suit—and thereby substantively reformed the torts of defamation and false light—to those who engage in speech regarding matters under consideration in judicial proceedings as well as to those who

1

engage in speech about matters of public interest. *See* R.C. 2747.01(B)(2) and (3). The high-profile media coverage of the life, death, and resulting trust litigation that has engulfed the family of pop star Eric Carmen—and exploring themes of mental health, substance abuse, and our current hyper-partisan political moment—which resulted in the *Rolling Stone* interview, demonstrates that Clayton and Kathryn's statements in the interview both concerned an ongoing judicial proceeding and a matter of public interest, and this action seeks to silence them. This Court should apply Ohio's substantive law and dismiss Amy's case.

Regardless of whether this Court applies the substantive immunity under Ohio law, or longstanding Ohio defamation law, Amy's claims should be dismissed because her own Complaint and Opposition demonstrate that she seeks to improperly litigate subjective, value-laden opinions and competing perspectives about a public figure's life, career, and related family litigation—none of which constitute actionable statements of fact. Clayton and Kathryn's statements are either constitutionally protected opinions or are substantially true statements, and therefore Amy has failed to state a claim.

I. **Ohio Revised Code 2747 *et seq.* changed Ohio law on defamation, false light, and other speech torts, and this Court must apply Ohio law.**

The Ohio General Assembly enacted O.R.C. § 2747 in response to the rising tide of SLAPP suits in Ohio and did so "to confer substantive immunity from suit, and not merely immunity from liability, for any cause of action described in division (B) of this section" and thus to protect the right to free speech enshrined in both the U.S. Constitution and the Ohio Constitution. O.R.C. § 2747.01 (E). O.R.C. § 2747 grants

substantive immunity from suit against a person because of that "person's communication on an issue under consideration or review in a legislative, executive, judicial, administrative, or other governmental proceeding." O.R.C. § 2747.01 (B)(2). The *Rolling Stone* Article discussed the ongoing litigation about the Carmen family trust, and Clayton and Kathryn's statements concerned the underlying issues at the heart of that litigation, and thus it is a communication protected under O.R.C. § 2747. Additionally, O.R.C. § 2747 grants immunity from suit for claims based upon a "person's exercise of the right of freedom of speech … guaranteed by the United States Constitution or the Ohio Constitution, on a matter of public concern." O.R.C. § 2747.01 (B)(3).

These are substantive provisions that redefined the scope of Ohio defamation (and false light) law and must be applied in this Court under *Erie R.R. Co. v. Tompkins*, 304 US 64 (1938). Amy's claims against Clayton and Kathryn are based on Ohio law, and "when state law creates a cause of action, the State is free to define the defenses to that claim, including the defense of immunity." *Ferri v. Ackerman*, 444 U.S. 193, 198 (1979); see also *Jones v. Lake County Sheriff's Office*, 154 F.4th 538 (7th Cir. 2025) (affirming District Court's dismissal of defamation claim based on state immunity statute). As of April 2025, Ohio law substantively immunizes Kathryn and Clayton's speech at issue as a matter of law, and thus the Court should grant their Motion—as the federal courts routinely do with statutory immunities.[1]

---

[1] See, e.g., *Miller v. AutoZone, Inc.*, No. 3:11-CV-237, 2012 WL 1537645, at *3 (S.D. Ohio May 1, 2012), report and recommendation adopted, No. 3:11-CV-237, 2012 WL 1856535 (S.D. Ohio May 21, 2012) (granting 12(b)(6) motion to dismiss because employer was immune for workplace injury claims under O.R.C. § 4123.74); see also *K.W. v. Canton*

3

Amy's Opposition oversimplifies the *Erie* analysis to argue that Anti-SLAPP laws do not apply in the federal courts. Opp. at 6-10 (PageID 317-21). While many states have implemented anti-SLAPP laws which address a similar concern, each state has done this through separate statutes which achieve their goals in different ways and must be analyzed according to their text and not within the false dichotomy of if the statute is applicable or not, but rather looking at the distinct pieces of the statute and how they interact with the Federal Rules. *See, e.g.*, *Paucek v. Shaulis*, 349 F.R.D. 498, 511 (D.N.J. 2025) (Collecting cases analyzing state Anti-SLAPP laws under *Erie* and reasoning that "[i]nstead of adopting a categorical rule that anti-SLAPP statutes do or do not apply in federal court, the courts of appeal have examined the text and structure of each state anti-SLAPP statute in question to determine whether they conflict with the Federal Rules."). The split decisions of other federal courts emphasize the importance of analyzing the specific text of O.R.C. § 2747 and giving effect to the substantive provisions laid out by the Ohio legislature—including the substantive immunity provision.

---

*City Sch. Dist.*, No. 5:21-CV-02423, 2022 WL 3681790, at *3-4 (N.D. Ohio Aug. 25, 2022) (granting 12(b)(6) motion to dismiss on state tort law claims against school board members because those claims were barred by O.R.C. § 2744.02, Ohio's political subdivision tort immunity statute); see also *McCabe v. Mahoning Cnty. Child. Servs. Bd.*, No. 4:09-CV-1931, 2010 WL 3326909, at *7 (N.D. Ohio Aug. 20, 2010) (granting motion for summary judgment on state tort law claims filed against Children Services Board members because they were entitled to the statutory immunity Ohio law gives to mandatory reporters under R.C. 2151.421(G).

4

## II. O.R.C. § 2747 applies to a "civil action filed" after the effective date, and its application in this case is prospective, not retroactive.

The plain language of O.R.C. § 2747.06 demonstrates that the statute is *not* retroactive and applies prospectively to this case. O.R.C. § 2747 applies to a "civil action filed or any claim asserted in a civil action on or after the effective date of this section." R.C. 2747.06. By the statute's plain language, then, any civil action filed after April 9, 2025 is subject to the statute. O.R.C. § 1.48 (Statutes in the Ohio Revised Code are "presumed to be prospective in its operation unless expressly made retrospective."); see also *Bielat v. Bielat*, 87 Ohio St.3d 350, 353 (2000).

Amy attempts to draw a distinction between the date the civil action was filed and the date the cause of action accrued. *See* Opp. at 7-9 (PageID 318-320). But Ohio courts have consistently declined to interpret statutes with comparable language as retroactive, instead finding that the operative event is the filing of the lawsuit and not the underlying cause of action. *See, e.g., Estate of Johnson v. Randall Smith, Inc.*, 2013-Ohio-1507, 135 Ohio St.3d 440 (finding that a statute preventing sympathetic statements made by a healthcare provider from being used as evidence in a civil action applied when the case was filed after the effective date but the cause of action accrued prior to the enactment of the statute, stating that "[b]y its express terms, [the statute] applies to 'any civil action brought' by persons described in the statute. This means that the statute applies to a civil lawsuit filed after the effective date of the statute."); *see also Chaganti v. Cincinnati Insurance Company*, 2025-Ohio-1982 (10th Dist.).

5

Equity also compels the application of O.R.C. § 2747 to this case: Amy actively participated in the reporting in the *Rolling Stone* Article in 2024; Ohio's Anti-SLAPP law was signed into law on January 8, 2025 with an effective date of April 9, 2025; *Rolling Stone* published the article on January 19, 2025—but Amy does not explain why she waited until August 2025 to file this lawsuit. Cf. *Weidman v. Hildebrant*, 2024-Ohio-2931, 187 Ohio St. 3d 3 (2024) ("equity aids the vigilant, not those who sleep on their rights.").

### III. O.R.C. § 2747 immunizes Clayton and Kathryn's speech.

Though Amy insists that she is not a public figure for the purposes of Ohio defamation law, unlike the typical public-private analysis—which focuses on whether the plaintiff has injected herself into a public controversy—O.R.C. § 2747 focuses instead on the defendant's expression. Specifically, it asks whether the defendant, when making the statements at issue, (1) "communicat[ed] on an issue under consideration or review in a . . . judicial . . . proceeding" or (2) "exercise[d] . . . the right of freedom of speech . . . on a matter of public concern." Because Clayton and Kathryn's speech satisfies both criteria, Ohio's anti-SLAPP law protects their expression twice over, regardless of Amy's public figure status.

> **a. Kathryn and Clayton's speech was "on an issue under consideration in a ... judicial proceeding," and thus "immune from suit" under O.R.C. § 2747.01(E).**

Amy's Complaint makes clear that the Article at issue in this case relates very closely to the issues under consideration in separate, pending litigation between Amy, Clayton, and Kathryn. *See* Compl. at ¶¶ 22, 88 (PageID 6, 22), referencing *Kathryn Carmen, et al. v. Amy Carmen*, U.S. District Court for the Northern District of Ohio,

6

Eastern Division, Case No. 1:24-CV-01331 (the "Trust Litigation"). The Trust Litigation deals with the same issues explored in the *Rolling Stone* Article and now at issue in this case. For example, in her Answer, Amy asserted (1) the defendants had a poor relationship with their father (bearing on Statement #1); (2) the defendants were estranged from Eric (bearing on Statements #2, #4, #6, #8, #9, and #11); (3) the defendants plotted Eric's murder (bearing on Statements #3 #7); (4) the defendants hated Amy (bearing on Statement #5); (5) the defendants broke into Eric's home (bearing on Statement #10); Clayton cheated in school (bearing on Statements #12 & 13); and (6) defendants' behavior after Eric's death merited their exclusion from memorial services (bearing on Statements #14 and #15). *See* Amy Carmen's Answer at ¶¶ 38, 39, Trust Litigation Docket at ECF 16 (Dec. 17, 2024).

By bringing claims for communications the Defendants made about the essential allegations at issue in the Trust Litigation, Amy is attempting to pre-litigate the truth of factual matters that are already pending in a different case in this District. The *Rolling Stone* Article grapples with the issue of how a famous pop star came to be isolated from his children--the same issue currently before the Court in the Trust Litigation. O.R.C. 2747 allows Clayton and Kathryn to give their side of lawsuits they're involved in—just like Amy did—and protects them from having to defend against actions like Amy's.

### b. Kathryn and Clayton's speech was "an exercise of the right of freedom of speech and of the press … on a matter of public concern."

Amy's Opposition urges an overly narrow reading of the "public concern" language in O.R.C.. 2747.01(B)(3), even though 2747.06(B) states that the statute's

7

protections should be "broadly construe[d] and appl[ied] … to protect the exercise the right of freedom of speech and the press." Although this appears to be an issue of first impression under Ohio's brand new Anti-SLAPP law, O.R.C. § 2747.06 instructs Courts that "in construing and applying section[] 2747. . ., a court shall consider the need to promote uniformity of the law with respect to its subject matter among states that enact a substantially similar law." Other courts have examined similar statutory language in other state Anti-SLAPP laws and broadly construed "public concern" to protect speech as intended by the respective legislatures.[2]

    The cases Amy cites in attempting to narrow Anti-SLAPP laws generally to "citizen participation and petition on genuine matters of public concern" (Opp. at 11 PageID 322) are all distinguishable, either because of difference in statutory text, or on the particular parties and facts in those cases. The cases from Nevada, Florida, and California involved governmental defendants who could not invoke the Anti-SLAPP law against citizen suits. Amy also cites to a Maine case, *Gaudette v. Mainely Media, LLC*, 2017 ME 87 at *12 (2017), which addressed a-materially different (and narrower) statute

---

[2] For example, courts applying both New York and California's Anti-SLAPP laws construe "public interest" and "public concern" very broadly. *Carey v. Carey*, 2022 NY Slip Op 50124(U), 5, 74 Misc. 3d 1214(A), 160 N.Y.S.3d 854 (Sup. Ct.) ("The scope of the subject matter which may be considered of 'public interest' or 'newsworthy' has been defined in most liberal and far-reaching terms"); *Hoang v. Tran*, 60 Cal. App. 5th 513, 524, 274 Cal. Rptr. 3d 567, 577 (2021) (author of an article about a business owner's affair was entitled to anti-SLAPP dismissal because the article concerned a matter of public interest insofar as the business owner had gained notoriety by having an affair with an actress); *Jackson v. Mayweather*, 10 Cal. App. 5th 1240, 1254, 217 Cal. Rptr. 3d 234, 247 (2017), as modified (Apr. 19, 2017) (Statements that the plaintiff had cosmetic surgery and an abortion were issues of public interest and, therefore, protected under California's anti-SLAPP law where the plaintiff was "in the public eye.").

than O.R.C. § 2747's text; Maine recently enacted its own version of UPEPA to address what the legislature saw as an undesirable narrowing of speech protections under *Guadette*.³ Limiting the application of O.R.C. § 2747 based on these easily distinguishable cases would run counter to the statutory text and construction.

Amy cannot reasonably contest that this is a matter of public concern when, by her own admission, she "worked tirelessly to protect [pop star Eric Carmen's] legacy" (Compl. ¶ 30, PageID 8) while also alleging that politics played a role in the publication of the Article. Compl. at ¶¶ 6, 12 (PageID 3-4) (alleging *Rolling Stone* had a "far-left editorial agenda" writing a "hit piece" because of "Eric and Amy's early and open support of President Donald J. Trump."). Amy's acknowledges the public interest in her and Eric's life together and her active role in this controversy, sharing that Eric "brought happiness to strangers around the world," and she knew her comments to *Rolling Stone* would garner substantial attention since it is "a massive national and international platform." Compl. ¶ 3 (PageID 2). Amy also acknowledges that even before this article, Eric's life "was the topic du jour across local news, social media, independent music forums, fan groups, and discussion boards alike." Compl. ¶ 143 (PageID 43-44). Clayton and Kathryn's speech was of obvious interest to *Rolling Stone*

---

³ See Sigmund D. Schutz and Alexandra A. Harriman, *Maine's new anti-SLAPP law, the Uniform Public Expression Protection Act (UPEPA)*, Maine Bar Journal at 10-12 (January 2025) (explaining that Maine enacted a version of UPEPA to broaden speech protections following judicial decisions interpreting Maine's former Anti-SLAPP law to protect only petitioning activity: "UPEPA … is not limited to the right to petition"). Available at: https://cdn.ymaws.com/www.mainebar.org/resource/resmgr/barjournals/2025_MBJ_V40_N1_Winter.pdf

9

and its readers, and it falls well within the ambit of Ohio's anti-SLAPP law, and thus immunity applies.

## IV. Beyond the immunity in O.R.C. § 2747, Amy's Opposition confirms that her claims should be dismissed because the statements are not actionable as defamation for multiple independent reasons.

Amy's claims fail as a matter of law because the challenged statements are outside the narrow scope of defamation *per se* (which is the only theory she pleaded), and are protected opinions and/or substantially true. Each of the statements are subjective characterizations protected by the First Amendment as opinions and substantial truths. Whether a statement constitutes fact, opinion, or a substantial truth [is] a question of law, properly within [the Court's] purview." *Scott v. News-Herald*, 25 Ohio St. 3d 243, 246 (1986).

Amy's Opposition seemingly concedes the non-actionability of several of the statements she initially challenged in her Complaint. Opp. at 3, PageID 314. ("Amy's Complaint identifies a total of fifteen false and defamatory statements in the Article, the following ten (10) of which are attributable to Clayton, Kathryn, or both, and concern Amy…"). Thus, Statements #2, 9, 10, 11, and 12 are no longer at issue as to Kathryn or Clayton. And to the extent that the factual details as alleged in Amy's Complaint didn't already show that the statements were at worst misleading, her overwrought explanations show why the statements aren't actionable as defamation per se, which requires statements to be defamatory on their face and not through "interpretation" or "innuendo." See *Carr v. Educational Theatre Assoc.*, 2023-Ohio-1681, ¶¶ 12-17, 215 N.E.3d 584, 589 (1st Dist) (distinguishing defamation *per se*, in which the defamatory meaning

10

is evident from the face of the statement and defamation *per quod*, which requires "interpretation, innuendo, or consideration of extrinsic evidence" to be defamatory).

Even as to the remaining statements, however, Amy's Opposition confirms that many of the statements at issue are substantially true because it has "some truth in it," such that the "gist" or "sting" of the statement is substantially true—even if, according to Amy, it is "misleading and fails to disclose all relevant facts." See *Serv. Emp. Int'l Union Dist. 1199 v. Ohio Elections Comm'n*, 158 Ohio App.3d 769, 772 (10th Dist. 2004). For example, for Statement #1, Amy admits that she and Eric did not respond to Clayton efforts to reach out and called the police on him, and ultimately Amy quarrels with the word "overture" to describe these attempts at reconciliation. Compl. at ¶100 (PageID 26-27). As to Statements #4 and #7, Amy admits that Eric amended the Trust that is the subject of the Trust Litigation to make Amy the Trustee. Compl at ¶42 (PageID 10). As to Statement #8, Amy admits that she and Eric moved from Ohio to Arizona, Amy's home state. Opp. at 4 (PageID 315), Compl. at ¶74 (PageID 19), ¶107 (PageID 31). As to Statement #13, Amy admits that she and Eric made Clayton "do his own work, refrain from cheating, and attend class," (Compl. at ¶112 (PageID 34)—but disputes that those requirements amounts to making him "jump through hoops." But the First Amendment protects such characterizations, ensuring that people and courts don't have to go searching in our dictionaries to weigh the connotations of the words we use—and Anti-SLAPP laws ensure that minimal court resources are directed to adjudicating such minor differences in interpretation.

11

Clayton and Kathryn's statements are protected opinions because under the totality of the circumstances, (1) the specific language used, (2) whether the statement is verifiable, (3) the general context of the statement, and (4) the broader context in which the statement appeared all indicate that they are not objective facts. *Bentkowski v. Scene Magazine*, 637 F.3d 689 (6th Cir. 2011). Under this framework, statements lacking precise meaning or plausible methods of verification are more likely to be understood as opinion rather than fact, and courts also assess whether the context signals to a reasonable reader that the remarks are expressions of opinion rather than assertions of fact. *Scott v. News-Herald*, 25 Ohio St. 3d 243 (1986). Amy's Opposition also confirms that her claims are based on value-laden language, that in context, are clearly opinions under Ohio law. Opp. at 3-4, (PageID 314-15). Statements which, for example, opine that Amy "manipulated" Eric, who is described as "bitter," "paranoid," "conspiracy theorist," "haunted," and "lost," in Statement #4, or describe Amy as "the evil stepmom" from "*The Parent Trap*" and "really, really, really bad news," or a "sycophant" in Statements #5 and #6, or which describe Amy's behavior as "antics" or a "tantrum" in Statements #7 and #15 by their specific language and context suggest to readers that they are highly subjective reflections of judgment rather than concrete facts.

Even if the Court were to conclude that any of the challenged statements were actionable, Amy's claims would still fail as a matter of law because she cannot establish the requisite state of mind for her claims. Amy describes herself as a "clearly a private person," (Opp. at 2, (PageID 313)) and claims that "[t]he subject matter at issue here relates entirely to private, intra-family strife that was heretofore unknown to the public

12

and would have remained unknown outside the Carmen Family but for Defendants' publicity-seeking efforts." Opp. at 1, (PageID 312). But Amy's active participation in the *Rolling Stone* Article—before realizing that Amy wasn't controlling the narrative as much as she thought—tells a contrary tale. Amy's Complaint shows how she injected herself into this controversy: she has "worked tirelessly to protect Eric's legacy." Compl. ¶ 30, (PageID 8) by seeking to influence who was—and was not—interviewed for the article she willingly participated in. In the course of providing comments to *Rolling Stone*, Amy said she "appreciate[d] the opportunity to talk about my husband's genius musical ability with [*Rolling Stone*]" (*Id.* at ¶121, (PageID 37)), and even offered to "compile a small list of people [*Rolling Stone*] might consider interviewing and why they were important in his life and career." *Id.* at ¶123, (PageID 38).

Though Amy's Opposition tries to escape limited purpose public figure status by citing to *Time, Inc. v. Firestone*, 424 U.S. 448 (1976), that case is distinguishable. Amy has attempted to curate and control Eric's legacy, unlike in *Firestone* where the plaintiff "had not thrust herself to the forefront a controversies to influence the resolution of the issues involved." *Id.* at 453. Unlike the press conferences in Firestone, Amy's communications with Green were very intentionally designed to "protect Eric's legacy," or, in other words, to influence the public controversy surrounding that legacy. Amy has repeatedly communicated not to inform the public about an active litigation, but rather to affect the general public's understanding of Eric's life. Amy believes, for example, that Eric was a "provider" and a "loving father." Compl. ¶116 (PageID 36). Eric's children seek to contextualize these beliefs. Amy seeks to bolster them. But Amy wants

13

to publicly sing Eric's praises while claiming she and Eric were too private for others to acknowledge their faults. As in this litigation, Amy seeks to shape the narrative regarding whose accounts should—and should not—be credited when discussing Eric Carmen. But a plaintiff may not escape public figure status if she voluntarily engages in a course of conduct that invites attention and comment. *Daubenmire v. Sommers*, 2004-Ohio-914, ¶ 88, 156 Ohio App. 3d 322, 342. The bar for injection is not high. *Ackison v. Gergley*, 2022-Ohio-3490, ¶ 64, 198 N.E.3d 139, 155 (5th Dist.) (even a social media post may constitute injecting oneself into a controversy). By repeatedly trying to influence the narrative surrounding Eric's life and her life with Eric, Amy has successfully converted herself into a limited purpose public figure. For these reasons, she is at minimum a limited purpose public figure who must prove actual malice.

     Amy's Complaint and Opposition confirm that she cannot prove actual malice. Mot. at 23-25 (PageID 209-10). However, even if Amy were a private figure, her claim fails under the negligence standard for similar reasons. For Clayton and Kathryn, Amy's theory for actual malice and negligence seems to be the same: because, according to Amy, Kathryn and Clayton provided "self-serving and false information…knowing they were prohibited from doing so under the Non-Disparagement Provisions of the Settlement Agreements. Clayton and Kathryn in particular acted with ill intent, given their current posture as litigants against Amy in Lawsuit #3 and knowing that generating negative press against Amy could aid them in Lawsuit #3." Compl. ¶181 (PageID 51). For the reasons described above and in Defendants' Motion to Dismiss, Amy fails to identify any false statements of fact for which Defendants may have been

14

negligent, and any ill intent Amy perceives is not evidence of ill intent towards the truth. Cf. *Varanese v. Gall, 35 OhioSt.3d 78* (1988) ("Actual malice in the context of defamation may not be inferred from evidence of personal spite, ill will, or deliberate intention to injure, as the defendant's motives for publishing are irrelevant. A defamation plaintiff who is required to show actual malice must demonstrate, with convincing clarity, that the defendant published the defamatory statement either with actual knowledge that the statement was false, or with a high degree of awareness of its probable falsity."). Amy's theory on negligence seems to be that Kathryn and Clayton didn't abandon their own well-grounded opinions on highly subjective matters to fit Amy's view of things. This is not negligence, and underscores why defamation liability cannot be predicated on highly subjective descriptions of characterizations.

V. **Conclusion**

The drafters of Ohio's Anti-SLAPP law acknowledged the limitations raised in some of the cases cited by Amy, and specifically drafted O.R.C. 2747 to avoid those problems by granting substantive immunity rather than purely procedural protections and by explicitly referencing the expansive breadth of the law's applicability. This Court should apply the clear, substantive immunity that Kathryn and Clayton are entitled to under Ohio law. Alternatively, this Court should apply traditional Ohio defamation law principles to find that the statements are non-actionable. For these reasons, Defendants Clayton and Kathryn Carmen respectfully request that this Court dismiss Amy's Complaint and grant such further relief as the Court deems appropriate.

Respectfully submitted,

| | |
|---|---|
| */s/ Andrew Gantt* <br> Andrew Gantt <br> Certified Legal Intern <br> agantt-lawclinic@case.edu | */s/ Sara Coulter* <br> Sara Coulter (#0096793) <br> *First Amendment Fellow* <br> sara.coulter@case.edu |
| */s/ Owen Stickney* <br> Owen Stickney <br> Certified Legal Intern <br> ostickney-lawclinic@case.edu | */s/ Andrew Geronimo* <br> Andrew Geronimo (#0086630) <br> *Director & Supervising Attorney* <br> andrew.geronimo@case.edu |
| */s/ Mohammed Yakoub* <br> Mohammed Yakoub <br> Certified Legal Intern <br> myakoub-lawclinic@case.edu | DR. FRANK STANTON FIRST AMENDMENT CLINIC <br> MILTON AND CHARLOTTE KRAMER LAW CLINIC <br> CASE WESTERN RESERVE UNIVERSITY SCHOOL OF LAW <br> 11075 East Blvd. <br> Cleveland, Ohio 44106 <br> P: (216)-368-6855 F: (216)-368-2086 <br> *Attorneys for Defendants Clayton Carmen and Kathryn Carmen* |

**Certificate of Service**

The undersigned certifies that on February 4, 2025, I submitted this *Reply in Support of* **Motion For Expedited Relief Under O.R.C. 2747.01 et seq, or, In the Alternative, Fed. R. Civ. P. 12(b)(6) Motion To Dismiss** to the Court via the Court's ECF filing system, and it will be served on all counsel via ECF.

> */s/ Andrew Geronimo*
> Andrew Geronimo (#0086630)