**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| Amy Carmen, | ) Case No. 1:25-cv-01671 |
| | ) |
| Plaintiff, | ) Judge Charles Esque Fleming |
| | ) |
| v. | ) |
| | ) **Defendant Fred Carmen's** |
| Penske Media Corporation, *et. al.*, | ) **Motion For Expedited Relief** |
| | ) **Under Ohio Rev. Code** |
| Defendants. | ) **§2747.01, *Et Seq*,, Or, In The** |
| | ) **Alternative, Fed. R. Civ. P. 12(B)(6)** |
| | ) **Motion To Dismiss** |

Defendant Fred Carmen hereby moves for the dismissal with prejudice of Plaintiff Amy Carmen's Complaint pursuant to Ohio Revised Code §2747.01, *et. seq.* (Ohio's Anti-SLAPP law) or, alternatively, under Federal Rule of Civil Procedure 12(b)(6). Fred's statements are not actionable because they are immune from suit under Ohio law, are protected by the free speech guarantees of the First Amendment and the Ohio Constitution, and have been admitted by Plaintiff's Complaint, to be true.

To avoid redundancy and promote judicial economy, Fred Carmen hereby incorporates by reference, the Rolling Stone Defendants' statements of law and arguments as to the non-actionability of the statements in their Motion To Dismiss (ECF Doc #12) and Defendant Clayton and Kathryn Carmen's statements of law and arguments as to the applicability of Ohio's Anti-SLAPP law in their Motion For Expedited Relief Or, In The Alternative, Motion To Dismiss (ECF Doc #16.) Defendant Fred Carmen argues separately the non-actionability of the specific statements attributed to him.

Respectfully submitted,

*/s/ Fred N. Carmen*
Fred N. Carmen (0014774)
Fred Carmen Law, LLC
27800 Cedar Road
Beachwood, Ohio 44122
(216) 831-1400
fred@fcarmenlaw.com

# CERTIFICATE OF SERVICE

A copy of the foregoing Motion was served this 6th day of March 2026, via email, upon the following:

Edward A. Paltzik
Edward@taylordykema.com

Meredith Lloyd
meredith@tavlordvkema.com

Amy E. Mildebrath
amildebrath@fbtlaw.com

Andrew C. Geronimo
Andrew.geronimo@case.edu

Joseph N. Cindric
jcjndric@dworkenlaw.com

Richard N. Selby, II
rselby@dworkenlaw.com

Kevin T. Shook
kshook@fbtlaw.com

Kristen M. Kraus
kmkraus@dworkenlaw.com

Sara E. Coulter
Sara.coulter@case.edu

*/s/ Fred N. Carmen*______
Fred Carmen

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 1

II. LAW AND ARGUMENT ..... 3

A. The 12(B)(6) Standard ..... 3

B. Ohio's Anti-SLAPP Law ..... 3

C. Fred's Statements Are Not Defamatory or Actionable ..... 4

1. Statements 2, 3 and 7 Are Not Identified By Amy As Actionable ..... 4

2. Statement 6 Is Not Actionable Because It Expresses An Opinion And is True ..... 5

3. Statements 1, 4 and 5 Express Fred's Opinion Regarding Amy's Actions and Intentions ..... 7

D. The General and Broader Context of the Article Would Put a Reasonable Reader On Notice That the Statements Contained Therein Were Opinions and Not Statements of Fact ..... 8

E. Amy's Revisionist History Is Evident In Her Recitation of the "Facts" Related to What Has Been Identified As Actionable Statement #14 ..... 9

F. None of Fred's Statements Constitute Defamation Per Se ..... 11

G. Amy's Claims of Defamation By Omission Fail As A Matter of Law ..... 13

H. Amy's False Light Claim Should Also Be Dismissed ..... 13

III. CONCLUSION ..... 15

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Balletta v. Spadoni,*
47 A.3d 183 (Pa. Commw. Ct. 2012)........................................................6

*Bentkowski v. Scene Mag.,*
637 F.3d 689 (6th Cir. 2011) ........................................................ 6

*Boulger v. Woods,*
917 F.3d 471 (6th Cir. 2019) ........................................................ 6

*Croce v. Sanders,*
843 F. App'x 710 (6th Cir. 2021) ........................................................ 6

*Dudee v. Philpot,*
133 N.E.3d 590 (Ohio Ct. App 2019) ........................................................14

*Green v. Mason,*
504 F.Supp.3d 813 (S.D. Ohio 2020) ........................................................ 11

*Haynes v. Alfred Knopf, Inc.,*
8 F.3d 1222 (7th Cir. 1993) ........................................................7,8

*Lambert v. Garlo,*
484 N.E.2d 260 (Ohio Ct. App. (985) ........................................................1

*Masson v. New Yorker Mag., Inc.,*
501 U.S. 496, 517 (1991) ........................................................5

*Morrow v. Reminger & Reminger Co. L.P.A.,*
183 Ohio App.3d 40, 2009-Ohio-2665, 915 N.E.2d 696, ¶ 7 (10th Dist.) ....................3

*New York Times Co. v. Sullivan,*
376 U.S. 254, 267 (1964) ........................................................1

*Olthaus v. Niesen, et al.,*
224-Ohio-1953 (1st Dist.) ........................................................16

*Patrick v. Cleveland Scene Pub., LLC,*
582 F.Supp.2d 939, 953 (N.D. Ohio 2008), *aff'd.* 360 F.App'x 592 (6th Cir. 2009) ......14

*Scott v. News-Herald,*
496 N.E.2d 699 (Ohio 1986)........................................................ 6

*Shiffer v. Thomson Newspapers (Ohio), Inc.*,
431 N.E.2d 1014 (Ohio 1982) .......... 5

*SPK Corp. v. Doe*,
253 F. Supp.2d 974, (N.D. Ohio 2003) .......... 6

*Stohlmann v. WJW TV, Inc.*,
2006 WL 3518121 (8th Dist. 2006) .......... 6

*Welling v. Weinfeld*,
113 Ohio St.3d 464, 2007-Ohio-2451, 886 N.E.2d 1051 (Ohio 2007) .......... 13,14

*Woods v. Sharkin*,
192 N.E.3d 1174 (Ohio Ct. App. 1997) .......... 3

*Worldnet Software Co. v. Gannett Satellite Info Network, Inc.*,
70 N.E.2d 149 (Ohio Ct. App. 1997) .......... 1

**Statutes**

Ohio Revised Code §2747.01 .......... 3

**Other Authorities**

"*Eric Carmen Was a Power Pop Legend. Then He Vanished*" ("Article")
in *Rolling Stone*, a Penske Media publication .......... *passim.*

Fed R. Civ. P. §12(B)(6) .......... 3

Restatement of the Law 2d .......... 13

Ohio Constitution, Article I, Section 11 .......... 14

**BRIEF IN SUPPORT**

## I. INTRODUCTION

Plaintiff Amy Carmen's ("Amy") Complaint stems from an article that appeared in Rolling Stone magazine in January 2025, entitled "Eric Carmen Was A Power-Pop Legend. Then He Vanished" (the "Article.") The Article largely dealt with Eric Carmen's ("Eric") early music success, his troublesome relationship with his children, Clayton and Kathryn, his estrangement from the music community as a result of his far-right views and his struggles with drugs and alcohol. The author of the article, Andy Greene ("Greene") called Eric's brother, Fred Carmen ("Fred") for comment and Fred provided some insight into his late brother's life. In addition to Fred, Greene also spoke to Eric's children, Clayton and Kathryn, his ex-wife, Susan and Eric's third-wife, Amy. As a result of the Article, Amy filed the instant action claiming that some of the statements made by Eric's family to Greene were defamatory.

While Amy attempts to cluster the comments of all the defendants together to suggest that her defamation claim applies equally to all, to properly analyze the claim, it is necessary to evaluate the individual statements of the defendants separately. In all, the article contained 19 statements and quotes attributed to Fred. 12 of the statements/quotes were about or involved Eric. 7 of the statements/quotes were about or involved Amy. As stated in both the Rolling Stone Defendants' and Clayton and Kathryn's motions to dismiss, there is no defamation with respect to a deceased person. *Lambert v. Garlo,* 484 N.E.2d 260, 263 (Ohio Ct. App. 1985.) Further, an essential element of defamation is that an allegedly defamatory statement must be "of and concerning" or "about" the plaintiff. *Worldnet Software Co. v. Gannett Satellite Info Network, Inc.,* 70 N.E.2d 149, 152 (Ohio Ct. App. 1997) citing *New York Times Co. v. Sullivan,* 376 U.S. 254, 267 (1964.) Consequently, Fred's comments about Eric, while largely positive, are not actionable.

Fred's 7 statements/quotes concerning Amy are:

| Statement No. | Identified in Complaint as "Actionable Statement" | Statement |
|---|---|---|
| 1 | #2 | Fred blames Amy for inspiring a series of lawsuits that separated Eric from his brother, his son, and 24-year-old Kathryn Carmen, Eric's only other child. |
| 2 | Not identified as an actionable statement. | "I said, "Was he sick? Were there issues?" Fred says. "She said, "No. We went out to dinner the night before and he seemed fine, We watched TV before going to bed. The next morning, I ran some errands while he slept in, like he always did. When I came home, he was gone." |
| 3 | Not identified as an actionable statement. | In search of more details about his brother's passing, Fred says he phoned the coroner's office in Maricopa County – Carmen had lived in Paradise Valley, Arizona-to ask for a copy of the autopsy report. He was told it wasn't available, and later learned that Amy had filed a lawsuit against the police, fire department, medical examiner, and the county's public-health office to prevent the report's release, even to Carmen's children. |
| 4 | #4 | His brother, children, and ex-wife, Susan, describe a bitter, paranoid conspiracy theorist haunted by the past, lost in the face of shifting musical tastes, hopelessly addicted to alcohol, and manipulated by Amy to turn on his family. |
| 5 | #9 | Not long afterward, Carmen met Amy, and as they dated and eventually married, he slowly became estranged from his ex-wife, and both of his kids. Fred Carmen says that was by Amy's design. "The plan was to first pull me away from Eric and then pull the children away from Eric so that she was the sole source of everything, and that she would control him," he says. "To her credit, she was very effective. Again, Eric is a conspiracy theorist. She made him believe his entire family was engaged in a conspiracy against him." |
| 6 | #11 | Fred says he first got wind that this might be coming when Camen and Amy were at his house for a party. "My nephew came to me,: says Fred. "He said, 'You need to watch out for Amy. I just heard her say to my dad there was no way you could have paid for your new deck on your own.' That was the kind of thing Amy was saying to make him conclude I was stealing from him." |

| | | |
|---|---|---|
| 7 | Not identified as an actionable statement. | Fred and Clayton say they heard similar stories from Amy about him taking too many vitamins in the final weeks of his life, and essentially overdosing on them. "Amy said Eric was taking 200 supplements in the morning and 200 vitamin supplements at night," says Fred. "And he had lost 11 pounds because he was taking Ozempic." |

Amy only considered 4 of the 7 statements/quotes attributable to Fred as actionable. Each will be discussed, *infra.*

## II. LAW AND ARGUMENT

### A. The 12(b)(6) Standard

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a lawsuit will be dismissed if a complaint fails "to state a claim upon which relief can be granted." Fed. Civ. P. 12(b)(6). Fred adopts and incorporates by reference the correct statements of law with respect to Fed. Civ. P. 12(b)(6) contained in the Rolling Stone Defendants' Motion To Dismiss. In addition to the arguments contained therein, "the court need not accept as true any unsupported and conclusory legal propositions advanced in the complaint." *Woods v. Sharkin*, 2022-Ohio-1949, ¶ 30 (8th Dist.) citing *Morrow v. Reminger & Reminger Co. L.P.A.*, 183 Ohio App.3d 40, 2009-Ohio-2665, 915 N.E.2d 696, ¶ 7 (10th Dist.)

### B. Ohio's Anti-SLAPP Law

On January 8, 2025, Ohio Governor Mike DeWine signed into law Ohio's anti- SLAPP law creating a process to quickly dismiss meritless lawsuits designed to silence free speech. The law, codified as Ohio Revised Code Chapter 2747 (the "SLAPP Law") went into effect on April 9, 2025. The purpose of the legislation is to prevent Strategic Lawsuits Against Public Participation ("SLAPP") which attempt to disguise themselves as defamation but are really nothing more than efforts to silence criticism. The SLAPP Law confers substantive immunity for

constitutionally protected speech including but not limited to matters of public concern, in this case, the life and death of well-known pop star Eric Carmen. While Amy attempts to characterize herself as a "private person" who was not a public figure, every action she has taken after Eric's death has been designed to thrust herself into the limelight *e.g.* appearing and speaking at a Rock and Roll Hall Of Fame event honoring Eric, flying 2000 miles to appear at an event in Lakewood, Ohio celebrating Eric's life and legacy. Indeed, Amy's participation in the article evidences her intent to remain in the public eye and dispense her skewed version of Eric's family and last years. Clearly Amy's purpose in filing the instant lawsuit is to silence anyone who would dare say anything critical about her and her late-husband. As will be demonstrated, *infra,* Amy's lawsuit is nothing more than an attempt to re-write history and silence any criticism of her or Eric. The lawsuit is exactly the type of action the SLAPP Law was created to prevent and dispose of quickly.

**C. Fred's Statements Are Not Defamatory or Actionable.**

**1. Statements 2, 3 and 7 Are Not Identified By Amy As Actionable.**

Three of Fred's seven statements, in which he mentions Amy, Statements 2, 3 and 7, are not identified by her as actionable. The first statement deals with a conversation Fred had with Amy on the day she called to tell him his brother had died. Amy does not dispute that she called or that their conversation was about Eric's death. Further, although Amy disputes the exact content of the conversation, she does not claim Fred's recounting of the conversation is defamatory. The second statement deals with Fred's attempt to obtain a copy of Eric's autopsy report and finding that Amy had filed lawsuits against Maricopa County, Arizona officials to prevent release of the report. The lawsuits are public record and Amy does not dispute that she filed them to prevent release of the autopsy report. Consequently, the statements are true and, as Amy concedes by not including them in the list of statements she claims are defamatory, they are not actionable. Like Statement 1, Statement 7 references part of the conversation between Amy and Fred on the day

she called Fred to report Eric had died. Amy told Fred that at the time of his death, Eric was taking 200 vitamin supplements in the morning and an equal number at night. Although Fred never spoke to Eric's son Clayton about Amy's statement to him, according to the *Rolling Stone* article, Amy apparently told Clayton the same thing. In the article, Amy concedes that Eric was taking vitamin supplements but disputes that she said the number of supplements was 400 a day. A statement is "substantially true" when the "gist" of the statement is true, even if it contains minor factual errors. *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 517 (1991.) Although disagreeing about how many supplements per day Eric was taking at the time of his death, Amy's acknowledgement that he was taking supplements demonstrates the substantive truth of Statement 7. In any event, Statement 7 was not identified by Amy as defamatory or actionable.

**2. Statement 6 Is Not Actionable Because It Expresses An Opinion and Is True.**

Statement 6 contains the basis for Fred's opinion that it was Amy's plan to separate him from his brother Eric by planting seeds of doubt in his mind about whether Fred was stealing from him. The statement recounts a conversation between Fred and his nephew during a party at Fred's house at which Eric and Amy were present. When Fred told Greene about the conversation, he mentioned it was between him and his nephew. Greene assumed that the nephew to whom Fred was referring was Eric's son, Clayton. That assumption was incorrect. In fact, the conversation was between Fred and his brother-in-law's son, Michael DiFranco ("Michael"), whom he refers to as his nephew. Fred's statement regarding his conversation with Michael is true. Fred and Michael were the only two parties to the conversation and both can attest to its accuracy. Truth, of course, is an absolute defense to a claim for defamation. *Shiffer v. Thomson Newspapers (Ohio), Inc.*, 431 N.E.2d 1014, 1017 (Ohio 1982.)

Moreover, Fred's quote regarding the conversation sets forth the basis for his opinion that it was Amy's intent to drive a wedge between him and Eric. In Ohio, when a statement

communicates an opinion, as opposed to a fact, the statement is entitled to absolute protection and cannot be defamatory. *Croce v. Sanders,* 843 F. App'x 710, 713 (6th Cir. 2021.) In determining whether a statement is a protected opinion or an actionable fact, courts employ a totality of the circumstances test. In that regard, courts consider the specific language used, whether the statement is verifiable, the general context of the statement, and the broader context of the statement. *Boulger v. Woods,* 917 F.3d 471, 478 (6th Cir. 2019.) The Ohio Supreme Court has stated that if a "statement lacks a plausible method of verification, a reasonable reader will not believe that the statement has specific factual content." *Bentkowski v. Scene Mag.,* 637 F.3d 689, 694 (6th Cir. 2011) (quoting *Scott v. News-Herald,* 496 N.E.2d 699, 707 (Ohio 1986.) Fred's personal feelings about Amy's motivation, are his opinions, do not give rise to factual implications and are not verifiable. "Subjective emotions are not verifiable." *Boulger,* 917 F.3d at 481. ("[A] non-verifiable statement would be one that refers to an individual's 'internal motivation[.]'"). Fred's Statement 6 expressly referred to what he believed was Amy's internal motivation to make the statement about the affordability of his new deck. A statement is verifiable only if the author represents the he has knowledge or evidence that substantiates the statement and there is a plausible method to verify it. *Boulger,* 917 F.3d at 481 (citing *SPK Corp. v. Doe,* 253 F. Supp2d 974, 980-81 (N.D. Ohio 2003)). Here, there is no plausible way to determine whether or not Fred's opinion regarding Amy's motivation was correct and, as such, the statement is not verifiable and, consequently, neither defamatory nor actionable. Individual's subjective opinions and emotions are not verifiable. *See, e.g. Stohlmann v. WJW TV, Inc.*, 2006 WL 3518121, at *8 (8th Dist. 2006.) "Everyone is free to speculate about someone's motivations based on disclosed facts about that person's behavior." (citing *Balletta v. Spadoni,* 47 A.3d 183, 199 (Pa. Commw. Ct. 2012.) "[I]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is

not actionable." *Haymes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993). Fred's Statement 6 expresses his subjective opinion regarding Amy's internal motivation. As such, it is an opinion and not defamatory.

### 3. Statements 1, 4 and 5 Express Fred's Opinion Regarding Amy's Actions and Intentions.

Statement 4 groups together several statements apparently made to Greene by Clayton, Kathryn, Susan and Fred, but fails to attribute specific comments to specific individuals. Generally, the statement is an amalgamation of Green's impressions of what Eric's family told him about how they perceived him in his later years. In analyzing Statement 4, it is necessary to separate what was said about Eric and what was said about Amy. Fred never told Greene that Eric was bitter, paranoid, haunted by his past, lost in the face of shifting musical tastes or hopelessly addicted to alcohol. What Fred told Greene about the later portion of Eric's career is accurately reflected in two quotes contained in the article. One quote stated that the music business had changed into something Eric wasn't familiar with and didn't love and the other quote stated that Eric didn't know where his style of music fit in with what was transpiring in the music business and it frustrated him. Both are true statements about a deceased person and are not actionable. Fred told Greene that Eric was a conspiracy theorist, a fact that was well known by everyone around him.[1] Again, that statement pertains to a dead person and is not actionable. The only part of Statement 4 that pertains to Amy is a reiteration of the quote contained in Statement 5.

In Statements 1 and 5, Fred expressed his subjective opinion that his and Eric's children's estrangement from Eric was by Amy's design. While there is ample evidence in Amy's Complaint to support this view (what other purpose could there be for a supposedly caring step-mother to

---

[1] Lest there be any doubt that Eric was a conspiracy theorist, attached as Exhibit "A" is one of many emails Eric sent to Fred espousing numerous conspiracy theories. In an effort to protect Eric's reputation, Fred has never published any of Eric's emails and only does so now to demonstrate the truth of the allegation that Eric was a conspiracy theorist.

surreptitiously and without permission read her adolescent step-daughter's diary and then share what was obviously juvenile rambling with her husband and claim his daughter was plotting his murder?), as previously noted, the statement goes to Amy's internal motivation and cannot be verified. Accordingly, by definition, the statement is not defamatory. *Boulger v. Woods,* 917 F.3d 471, 478 (6th Cir. 2019), *Haynes v. Alfred A. Knopf, Inc.,* 8 F.3d 1222, 1227 (7th Cir. 1993).

### D. The General and Broader Context of the Article Would Put a Reasonable Reader On Notice That the Statements Contained Therein Were Opinions and Not Statements of Fact.

A significant portion of the Article was devoted to the issues that existed between Eric and his family members. The Article quotes all of Eric's family members including his children, ex-wife, brother and surviving spouse, and makes clear there were differing opinions regarding how events transpired and who was to blame. Understandably and expectedly, the quotes attributed to Eric's children, ex-wife and brother reflected their deeply-held beliefs that Amy was a central cause of the rift between them and Eric. In Fred's case, his belief stemmed from the fact that prior to Amy's arrival, he had been Eric's sole caretaker for the past quarter century of his life, during which time the brothers were very close. In Fred's view, not coincidentally, within 18 months of Amy's arrival on the scene, everything changed and Eric had filed a lawsuit against him. During that same 18-month period, Eric distanced himself from his children. Given these facts, any reasonable reader of the Article would have anticipated and expected that Fred had negative feelings about Amy's role in his estrangement from his brother and his statements about Amy would reflect his belief that she was a central player in the drama that unfolded.

As pointed out in the Rolling Stones' Defendant's Motion To Dismiss,[2] many of the statements Amy identifies as defamatory, are introduced in the context of words that place the reader on notice of an opinion. Statement 1 begins with the phrase, "Fred blames" establishing

[2] At page 23

that the context in which Fred's words should be viewed is his opinion of what transpired. This context signals to the reader that what they are about to read is opinion and not fact. Further, the Article makes no attempt to pass itself off as a factually sourced, definitive explanation of what occurred and who was at fault. Rather, it makes clear it is investigating what happened to Eric in the later years of his life by exploring the diverse and often conflicting opinions of his family members. The general and broader context of the Article leaves no doubt that the statements contained therein are the opinions of the speakers and not facts.

### E. Amy's Revisionist History Is Evident In Her Recitation of the "Facts" Related to What Has Been Identified As Actionable Statement #14.

While Actionable Statement No. 14 does not contain any quote from Fred or any information supplied by Fred, it does mention him in relation to Eric's funeral arrangements. Clayton is quoted questioning the type of person who would attempt to keep her deceased husband's children away from his funeral service. In her Complaint, Amy offers a completely fabricated narrative of what happened. She claims that Kathryn had informed her that Eric's blood relatives had already gathered for their own tribute to Eric (not true) and that while doing nothing to prevent any of Eric's family from attending (not true), she did not invite Fred, Clayton or Kathryn because they had harmed Eric during his life. In fact, Amy and Fred exchanged several texts regarding Eric's funeral arrangements.

On March 12, 2024, the day after Eric died, Fred texted Amy asking if she could give him "some idea of what type of funeral arrangements there will be?" Fred asked if Eric wanted to be buried or cremated and whether Amy planned to have the funeral service in Arizona or Ohio, where the majority of Eric's family lived. Amy responded on the same day that she was "working all this out" and would let Fred know as soon as she could. Fred then asked Amy if she could answer the most basic question about whether Eric was going to be buried or cremated. Amy did

not respond and failed to provide any additional information for the next 17 days. During that period Fred began to hear reports from some of Eric's friends that Amy had already planned a memorial celebration for Eric.

On March 29, 2024, Fred sent Amy a text asking if there had been any word on the autopsy report and again asked for her thoughts about a memorial service. Amy responded the cause of death was still pending and that toxicology reports could take 6+ weeks. With respect to a memorial service, Amy wrote: "When I get details ironed out of Eric's celebration of life, I will let you know. I am planning a larger, more inclusive service in CLE. But as I have told other, it needs to be well done and I'm going to take my time and do it right. Meantime, I'm deep in the grieving process. I'm sure you understand, Thank you." Copies of the text exchange between Amy and Fred are attached as Exhibit "B."

At the time Amy wrote her text to Fred stating she was still considering what type of celebration to hold, she had already sent out invitations to Eric's Celebration of Life to be held on April 20, 2024 in Arizona. Fred was sent a copy of the invitation on March 27, 2024, two days before his conversation with Amy regarding her plans for a memorial service. The invitation, a copy of which is attached as Exhibit "C", began: "Please do not forward or share details of the celebration with anyone." At the bottom of the invitation it states: "Who's coming" followed by the notation, "Your host [Amy] has hidden the guest list for this event." In other words, Amy was blatantly lying to Fred about her plans for a memorial celebration which she had already planned and from which she intended to exclude Fred and Eric's children. Amy's conduct is typical of the lying and manipulation she practiced from literally the moment she set her sights on marrying Eric and ostracizing his family so she would inherit his money. It further demonstrates that Amy's claims regarding the "facts" contained in her Complaint are as false as her texts to Fred about Eric's funeral services.

**F. None of Fred's Statements Constitute Defamation Per Se.**

Count II of the Complaint alleges that Fred is liable for defamation *per se*. For a defamation *per se* claim, the statements must be defamatory on their face. To be considered defamation *per se,* the statements must either (1) accuse an individual of the commission of a serious crime; (2) impute an individual has an offensive or contagious disease; (3) tend to injure a person in his trade or occupation; or (4) subject a person to public hatred, ridicule or contempt. *Green v. Mason,* 504 F.Supp.3d 813 (S.D. Ohio 2020.) As with the rest of Amy's Complaint, Count II attempts to lump Fred's statements together with those of the other defendants. However, as previously noted, Fred's statements regarding Amy were entirely benign. Certainly nothing Fred said in the Article accused Amy of committing a crime or of having an offensive disease. Fred does not believe, and Amy does not assert in her Complaint, that she was employed or seeking employment at the time the Article was published. Upon information and belief, Amy had been unemployed and living off Eric for many years before his death. Accordingly, Amy could not have been injured in a trade or occupation because she had no trade or occupation. Finally, "[h]atred, ridicule or contempt" requires a "relatively high standard" to be met." *Id.* at 834-35. Fred's only statement, that he thought Amy was responsible for the schism between himself and his brother, certainly does not rise to the level that it would subject her to public hatred, ridicule or contempt. The fact that Fred's statements did not cause Amy to suffer public hatred, ridicule or contempt is reinforced by her Complaint which quotes from fans and commentators who reacted to the Article. The quotes Amy includes as "proof" that she was subjected to public hatred and ridicule are exclusively about how her actions affected Eric's relationship *with his children*. (Fans accused Amy of being the "evil stepmother" – Complaint at paragraph 144; "Even commentators who tried to give Amy the benefit of the doubt accused her of "undermin[ing] and eventually destroy[ing] his relationship with his children." – Complaint at paragraph 144; "Less discerning members of the public called her 'the

cause for his isolation', characterized her as 'the problem,' a 'narcissist,' and as a 'indictive, hateful person' who was only out to take Eric's money away from his darling children...." – Complaint at paragraph 144. "The cacophony of reader comments unanimously confirm that 'the second wife [Amy] does not come off as a good person'...and that the truth would be revealed from his kids." – Complaint at paragraph 146 (citations omitted.) As the quotes from the Complaint make clear, any impression readers of the Article had about Amy came from her own words contained in the Article and from statements of people other than Fred.

One final point need be made. Amy claims that she meets the requirements to establish defamation because Fred "sat for an interview and engaged in communications with Greene with the intention and knowledge that ...[his]... statements would be published in *Rolling Stone,* and did so knowing that...[he was]...prohibited from doing so pursuant to the Non-Disparagement Provisions of the Settlement Agreement." Complaint at paragraph 179. The Settlement Agreement, to which Amy refers was entered into to settle all claims related to Eric's lawsuit against Fred in which he claimed that Fred had improperly taken money from his trust. The Mutual Non-Disparagement provision in the Settlement Agreement provided, in pertinent part, "The Parties, including Eric Carmen, Amy Carmen, the Successor Trustee of the Carmen Family Gift Trust Dated July 11, 022, and Fred Carmen agree that they shall not publish, orally or in writing, to any third party, any negative or disparaging remarks harmful to the person and professional reputation of each other ***as relates to this Lawsuit or the circumstances surrounding this Lawsuit or this Release."*** The express language of the Settlement Agreement makes clear that the Non-Disparagement Provision was limited to matters related to the lawsuit pertaining to Eric's claim that Fred had improperly taken money from him, the circumstances surrounding that claim and nothing else. The Settlement Agreement was prepared by Eric and Amy Carmen's legal counsel. As such, any ambiguity in the Settlement Agreement must be construed against them. Fred's

statements to Greene which are contained in the Article, have nothing to do with Eric's lawsuit against him. While Statement 1 contains Greene's conclusion that Fred blamed Amy for inspiring a series of lawsuits against him and his children, Fred never made that statement to Greene. What Fred told Greene, which was accurately stated later in the article, was that it was his opinion that it was Amy's intent to separate him from his brother and his brother from his children and that she successfully achieved that end. Neither of those statements had anything to do with Eric's lawsuit against Fred and neither statement violated the Non-Disparagement provision of the Settlement Agreement.

**G. Amy's Claims of Defamation By Omission Fail As A Matter of Law**

Fred adopts the Penske Defendant's argument contained on page 25 of their Motion To Dismiss, that Ohio does not recognize defamation by omission. To the extent that Amy claims statements made by Fred regarding his estrangement from Eric are defamatory because he "left unanswered" the reasons for that estrangement, such claim fails as a matter of law.

**H. Amy's False Light Claim Should Also Be Dismissed.**

In Ohio, one who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability for invasion of privacy if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed. *Welling v. Weinfeld,* 113 Ohio St.3d 464, 2007-Ohio-2451, 886 N.E.2d 1051 ¶61, citing Restatement of the Law 2d, Torts, Section 652E (1977.) False light defendants enjoy protections at least as extensive as defamation defendants. *Welling* at ¶58. For a statement to be actionable in false light, just like in defamation, "the statement must be untrue." *Id. at* ¶48, 52. Accordingly, because statements of opinion are inherently not even capable of being untrue, and because a defendant cannot have "had knowledge or acted in reckless

disregard as to the falsity" of such statements, opinion cannot support false light invasion of privacy just as they cannot establish defamation. *Id* at ¶52, 58, 61; *see* Ohio Constitution, Article I, Section 11. Stated more simply, opinion speech is constitutionally protected from false light claims.

As has been previously demonstrated, Fred's statements were substantially true and expressed his opinions which are not verifiable. Because what was express in the article are Fred's opinions, by definition they cannot be untrue and Fred cannot have acted with knowledge or acted in disregard to their falsity. As such, Fred's statements are not actionable as false light. Moreover, Fred's statements would not be construed by a reasonable person to be highly offensive. To be actionable, "the plaintiff must be justified in the eyes of the community in feeling seriously offended and aggrieved by the publicity: the statement must be such a major misrepresentation of his character, history, activities or beliefs that serious offense may be reasonably expected." *Dudee v. Philpot,* 133 N.E.3d 590 (Ohio Ct. App 2019.) Here, Fred's statements don't accuse Amy of criminal activity or of spreading a contagious disease. Fred does not call Amy any names or suggest she had anything to do with Eric's death. They simply express his opinion that Amy engaged in conduct designed to separate Eric from the rest of his family. As a matter of law. Fred's opinions would not subject Amy to public hatred or disgrace.

Finally, to prove a false light claim, a plaintiff must show that a defendant acted with actual malice as to the truth of the statement and "possessed a high degree of awareness…of [a statement's] probable falsity." *Patrick v. Cleveland Scene Pub., LLC,* 582 F.Supp.2d 939, 953 (N.D. Ohio 2008), *aff'd.* 360 F.App'x 592 (6th Cir. 2009) (internal quotations and citations omitted/) Here, because Fred's statements were his opinions, they were not capable of being untrue and he could not have possessed any awareness that they were false. Further, Amy's claim that Fred's knowledge of the non-disparagement provision in the Settlement Agreement with Eric

demonstrates malice, that is simply not the case. As previously noted, the non-disparagement provision in the Settlement Agreement pertained exclusively to Fred and Eric's dispute regarding whether any money had been improperly removed from Eric's trust. Fred's comments about Amy had nothing to do with that dispute.

For all of the foregoing reasons, Amy's false light claim should be dismissed.

## III. CONCLUSION

Plaintiff's claims for defamation and false light invasion of privacy fail as a matter of law. It is clear from the context of the Article and the specific language of the four statements attributable to Fred that Amy claims are defamatory, that they represent Fred's subjective opinion of the cause of his estrangement from his brother. None of the statements Fred made are verifiable; there will always be a "he said, she said" concerning why Eric pushed his family members away at the precise moment Amy arrived. For that reason alone, Amy's claims fail. In the final analysis, just as Amy filed lawsuits to prevent disclosure to his immediate family and dissemination to the general public, of information about the cause of Eric's death, so too she is now trying to control the narrative about what happened to Eric's family relationships and musical career in his final years. While it is understandable that Amy, like most people, don't like it when others state they have a negative opinion of her actions, most people don't file lawsuits to curtail their critics First Amendment right to speak their mind. In a case involving speech much more serious than what was said here, a Cincinnati, Ohio police officer brought suit for defamation and false light against individuals who published accusations that he was a white supremacist. The trial court dismissed the case on the basis that the statements constituted opinions and not facts. The police officer appealed and the Court of Appeals affirmed the judgment of the lower court stating: "We recognize and appreciate Officer Olthaus' point that the allegations of white supremacy were incredibly damaging to him personally and professionally. Social media has the capacity to ruin lives with

the click of a button, but courts do not exist to referee debates on those platforms, nor could we do so consistent with the First Amendment and the Ohio Constitution. Indeed, [t]he First Amendment militates the protection of unrestricted and hearty debate on issues of concern to the public, including the protection of what 'may well include vehement, caustic, and sometimes unpleasantly sharp attacks….Notwithstanding the deleterious consequences of allegations of white supremacy, the courts cannot provide a remedy unless the requirements of defamation are satisfied." *Olthaus v. Niesen, et al.,* 224-Ohio-1953 (1st Dist.) Similarly, in this case, with language far less offensive than was present in *Olthaus,* Amy cannot demonstrate that the statements made about her by Fred were anything more than his constitutionally protected opinions. As such, Amy's claims for defamation and false light of invasion of privacy should be dismissed.

Respectfully submitted,

*/s/ Fred N. Carmen*

Fred N. Carmen (0014774)
Fred Carmen Law, LLC
27800 Cedar Road
Beachwood, Ohio 44122
(216) 831-1400
fred@fcarmenlaw.com

## CERTIFICATE OF SERVICE

A copy of the foregoing Brief In Support of Motion To Dismiss was served this 6th day of March 2026, via email, upon the following:

Edward A. Paltzik
Edward@taylordykema.com

Meredith Lloyd
meredith@tavlordvkema.com

Amy E. Mildebrath
amildebrath@fbtlaw.com

Andrew C. Geronimo
Andrew.geronimo@case.edu

Joseph N. Cindric
jcjndric@dworkenlaw.com

Richard N. Selby, II
rselby@dworkenlaw.com

Kevin T. Shook
kshook@fbtlaw.com

Kristen M. Kraus
kmkraus@dworkenlaw.com

Sara E. Coulter
Sara.coulter@case.edu

*/s/ Fred N. Carmen*
Fred Carmen

Gmail

EXHIBIT
tabbies
A

Fred N. Carmen <fred@fcarmenlaw.com>

**Time to get out of the market, while you still can.**
1 message

**Eric Carmen** <ecarmen2@gmail.com> Thu, Jul 12, 2012 at 3:09 PM
To: fncarm@aol.com, nancy elisabeth <msfreckles123@yahoo.com>

Fred,

We need to contact the best investment advisor in the city ( ask Steve G.) and buy water, food, gold and silver, from what I can glean from everything I read.

The global finical markets are going to collapse, the dollar is going to collapse, and there is going to be rioting in the streets.

Our government has made itself ready for this with the bills Obama has passed giving him the sole right to declare martial law and confiscate food, water, and everything else, and to disburse troops to round up dissidents ( that would be anyone who owns a gun, bought gold, campaigned for Ron Paul, etc. )

They are all going to end up in FEMA concentration camps. We are living in Germany, just before Hitler took power. I am not kidding. EVERYTHING POINTS TO THE FACT THAT THIS IS HAPPENING.

IGNORING THE SIGNS IS JUST WHAT THE JEWS DID, BEFORE THEY WERE HERDED INTO RAILROAD CARS AND SHIPPED TO CONCENTRATION CAMPS.

I am your brother, who loves you, and I am not crazy. Most people simply do not have the time to read, and the mainstream media is owned and controlled, just like Pravda.

I urge you to take this seriously. We don't have much time left.

There are riots in Spain, layoffs in France, Australia is the next country on the verge of default and we are not far behind.

Imagine waking up tomorrow, and finding that everything you have worked your whole life for is gone, and the dollar is worthless. It happened in Brazil, it's happening all over Europe. The only way the Fed is propping up our economy is by printing more worthless paper, that devalues every dollar you and I have.

The minute they stop, there is going to be a stock market crash that will make 1929 look like a picnic. Your house will be worth nothing, your stocks will be worth nothing. And after that, comes hyperinflation. Gas will be 10 dollars a gallon, Food will be off the charts, if you can get it.

No one wants to believe this, but very credible people like Lou Dobbs, Marc Faber, Donald Trump, John Bolton and many others are telling you it's happening.

Barack Obama's social security number was issued to someone dead in Connecticut. His birth certificate is a fraud. Barack Obama is not even his real name. He had his name changed in Canada in 1982 TO Barack Obama.

This is the endgame, Fred.

You have two choices. One, pretend I'm a lunatic and I don't know what I'm talking about or :Two: Take heed, do some research, and let's make a plan to try to survive what's coming.

You'll notice I didn't even mention chemtrails, fluoride, vaccines or any of the other things they're poisoning us with.

On a personal level, do you believe it's an accident that your two children and my two children all suffer from ADD or ADHT?

Do you understand that the explosion of autism and ADD in this country happened the same year mercury and squalene were introduced into mandatory vaccines that made our children sick and/ or sterile?

Bayer is I.G Farben, the same company that supplied the poison gas to the Nazis for the concentration camps. Merck, Pfizer, Scherring-Plough, Monsanto. They are all killing us.

I'm NOT CRAZ,Y Fred. Just look up at your aluminum sky. Aluminum ( currently at 150 times allowable levels ) is aided by fluoride ( which is in our water, makes you docile and causes sterility ) in crossing the blood/ brain barrier. Aluminum stored in the pineal gland causes Altzheimers', Parkinson's and dementia..

While we are plodding along, through our daily lives, as if everything is just fine, they are planning to kill us all, and take everything you have from you.

By the time most people realize it, it will be too late.

Love,

Your brother

http://wallstreetsectorselector.com/2012/07/dow-jones-industrials-sp-500-lose-five-for-five/




EXHIBIT
tabbies
B


4:12
AC
Amy
family is here in Ohio. What are your thoughts and do you have an idea on timing?
I'm working all this out. I will let you know as soon as I can.
Can you let me know about the most basic question: burial versus cremation. What was his preference?
Mar 29, 2024 at 11:47 AM
Hi Amy: Any word on
thoughts about a

4:12

◂ Phone

1003

AC

Amy

Mar 29, 2024 at 11:47 AM

Hi Amy. Any word on autopsy results? Any thoughts about a memorial service?

Hi Fred, the cause of death is still pending. Toxicology results can take 6+ weeks. I realize people are probably asking you, but It's really no one's business. Someone told me you were telling people he overdosed .However, I'm giving you the benefit of the doubt, as I realize people tend to make up their own nar-

iMessage

4:12

◂ Phone

1003

AC

Amy

...telling people ... dosed. However, I'm giving ... the ben-
efit of the ...t, as I
realize people tend to
make up their own nar-
rative. Until we know
more, all we can be
certain of is that he
passed in his sleep. It's
been agonizing for me
too.
When I get details
ironed out of Eric's cel-
ebration of life , I will let
you know. I am plan-
ning a larger, more in-
clusive celebration in
CLE. But as I have told
others, it needs to be
well done and I'm go-
ing to take my time and
do it right. Meantime
... grieving
process. I'm sure you

iMessage


4:12
Phone
1003
AC
Amy
ing to take ime and do it right. Meantime, I'm deep in the grieving process. I'm sure you understand. Thank you.
Just FYI, I haven't told anybody, anything about Eric's cause of death. When people ask, I tell them that autopsy and toxicology results are still pending.
Delivered
👍 that's what I figured. Thank you
iMessage

Mail 10:27 PM Wed Mar 27

evite.com

100%

Invitation Messages




▷ Replay

EXHIBIT
C
tabbies

WILL YOU BE ATTENDING? Yes No

evite.com

# ERIC'S CELEBRATION OF LIFE

WHEN

Saturday, April 20, 2024
12:00 PM PT

Add to calendar

WHERE

The MIM: 4725 E. Mayo Blvd., Phoenix, AZ 85050

HOSTED BY

**Amy Carmen**

Please do not forward or share details of the celebration with anyone. * Enter MIM off Mayo Blvd. It is 20 min. from Phx Sky Harbor Airport OR 8 Min from Scottsdale Airport. We will be in the Theatre for the celebration and then in the Founders' Room at the museum for catered food, open bar and plenty of time to visit with other guests. It wouldn't be the same without you...I hope you can make it.

CONTACT HOST

(323) 841-5894

## Who's coming

Your host has hidden the guest list for this event.

Download on the App Store | GET IT ON Google Play

WILL YOU BE ATTENDING? Yes No